**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAMELA BAILEY D/B/A MORE THAN OUR CRIMES, | |
| *Plaintiff*, | **VERIFIED COMPLAINT** |
| v. | |
| FEDERAL BUREAU OF PRISONS, | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

Plaintiff Pamela Bailey, with and on behalf of her unincorporated non-profit organization More Than Our Crimes ("MTOC"), hereby alleges the following for her Complaint against Defendant Federal Bureau of Prisons ("Defendant" or "BOP"):

## NATURE OF THE ACTION

1. This case involves a systematic campaign by Defendant to silence one of its critics, in violation of the First and Fifth Amendments.

2. Since 2020, Plaintiff Pamela Bailey and the non-profit organization she co-founded, More Than Our Crimes (MTOC), have published information of significant public interest concerning Defendant, the Federal Bureau of Prisons. In particular, MTOC publishes articles, editorials, and newsletters detailing the failures of Defendant, and the ways in which Defendant must be reformed, primarily from the perspective of those living in Defendant's institutions.

3. In order to prevent, and in retaliation for, Plaintiff publishing information critical of Defendant and its practices, Defendant is engaging in a concerted effort to cut off Plaintiff's access to that information and to punish her sources. Defendant has done so over the course of

more than two years, through several means at several different facilities, including: (1) arbitrarily restricting Plaintiff's email address from accessing BOP's electronic messaging system at a minimum of six BOP facilities; (2) coercing, threatening, and intimidating MTOC sources into ending their communications with Plaintiff; and (3) retaliating against MTOC sources, including by terminating their employment, sending one source to the Special Housing Unit ("SHU") for *six months*, and strip-searching another source without cause.

4.      In several instances, Defendant's employees admitted to MTOC sources that they had no legitimate justification for their actions.  They made these admissions in order to send a message to Plaintiff and her sources: BOP and its employees can and will retaliate with impunity if Plaintiff and her sources persist in criticizing Defendant.  Such threats can only be effective if the target understands them to be threats, which is why Defendant's employees admitted their intent.

5.      MTOC is dedicated to reforming our federal prison system, by giving a voice to incarcerated people and shining light on Defendant's mistreatment of them.  In addition to publishing on its website and in newsletters first-person accounts of the hardships and injustices of life inside Defendant's prisons, MTOC also advocates for reform of Defendant's practices and policies through publications, government outreach, and public events.

6.      MTOC's work depends on Ms. Bailey's ability to communicate with people in federal prison, including through Defendant's electronic messaging system (the Trust Fund Limited Inmate Computer System, or "TRULINCS").  Through these communications, Ms. Bailey is kept up-to-date on problems within Defendant's institutions, receives first-person accounts for publication on MTOC's website, and builds and maintains relationships with incarcerated people who are or may become sources of information for future MTOC publications and advocacy.

7.      But around the same time that MTOC co-published a 39-page report in September 2022 detailing Defendant's failures and offering proposals for reform, Defendant began blocking Ms. Bailey's email address from accessing the TRULINCS system at several of its facilities.  Ms. Bailey's requests to Defendant's officials for information about the basis for these restrictions fell on deaf ears.  Despite several attempts by Ms. Bailey and her counsel to appeal the restrictions—both to the wardens of facilities where her access was blocked and to a regional BOP official—Defendant maintained its refusal to provide any factual basis for its actions and instead offered only terse, conclusory responses that failed even to identify the purportedly offending communications.

8.      These arbitrary, unconstitutional denials of TRULINCS access were not Defendant's only efforts to silence MTOC and frustrate its reform efforts.  Employees at multiple BOP facilities have retaliated against MTOC sources, in several ways.  MTOC sources were interrogated by Defendant's empoyees without justification about their communications with Ms. Bailey, including about why one was "naming names" of specific wrongdoers within Defendant's ranks.  These employees—who are obligated to protect the safety of the incarcerated people in their care—went on to threaten violence in at least one instance if a source's communications with Ms. Bailey continued, and succeeded in their efforts to intimidate certain sources into cutting off communication with Ms. Bailey.

9.      And in recent months, Defendant has retaliated against several MTOC sources by terminating their prison employment and, in at least one instance, strip-searching a source without justification.  Defendant retaliated after (1) these sources provided Ms. Bailey with information about an assault of an incarcerated person and (2) Plaintiff informed federal prosecutors that Defendant had blocked residents at one institution from using a hotline that the prosecutors had

set up *to enable the reporting of misconduct by Defendant*.  The MTOC sources against whom Defendant retaliated were the same sources who had informed Plaintiff of their inability to use the prosecutors' hotline.

10.     As a result of these efforts to prevent Ms. Bailey from engaging in protected First Amendment advocacy and chill her sources' efforts to inform MTOC's work, Ms. Bailey has suffered—and continues to suffer—irreparable injury for which she has no adequate legal remedies.  MTOC therefore seeks this Court's assistance to restore immediately Ms. Bailey's TRULINCS access, and to enjoin further harassment, intimidation, retaliation, and other unlawful conduct by Defendant.

## PARTIES

11.     Plaintiff Pamela Bailey is the co-founder and principal of MTOC, a small, unincorporated non-profit organization that operates under the fiscal sponsorship of the Justice Policy Institute.  For all relevant purposes, MTOC *is* Ms. Bailey—she directs and carries out all of MTOC's operations, and she publishes her advocacy concerning Defendant under the MTOC name in MTOC publications and on its website.  Ms. Bailey is a resident of this District and conducts all of MTOC's operations in this District.

12.     Defendant Federal Bureau of Prisons is an agency of the federal government within the U.S. Department of Justice, and its headquarters are located in this District.

## JURISDICTION AND VENUE

13.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under federal law and the United States Constitution, and pursuant to 5 U.S.C. § 702.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1), because a substantial part of the events giving rise to this action occurred in this District and because Plaintiff is a resident of this District.

## FACTUAL BACKGROUND

### I.    The Federal Bureau of Prisons Is Badly in Need of Reform.

15.    It cannot reasonably be disputed that the Federal Bureau of Prisons is failing on many fronts.  Indeed, one of Defendant's most persistent critics sits within the Department of Justice itself: the Department's Office of the Inspector General ("OIG").

16.    OIG regularly issues reports raising serious concerns about Defendant's failures, which just in the past three years include: "deficiencies in the [Defendant's] planning, administering, and monitoring of medical contracts" (Sept. 2022); "significant delays in the resolution of multiple OIG recommendations related to revising or creating BOP policies concerning various correctional and safety issues" (Nov. 2021); and "security weaknesses that have in some cases enabled inmates to escape undetected" (June 2021).

17.    These failures identified by OIG, however, are not limited to garden-variety incompetence or mismanagement.  Instead, they reflect repeated examples of intentional, widespread misconduct, as well as efforts by Defendant to frustrate institutional oversight and accountability for those wrongdoers within its ranks.

18.    In just the past three years, OIG has raised concerns including: "staff entering BOP facilities without being searched," a practice that "increase[s] the risk that staff will bring contraband into BOP facilities, thereby jeopardizing the safety and security of the institution, inmates, and other staff"  (Aug. 2021); "repeatedly observed inadequacies in the BOP's camera system" over an eight-year period that "have negatively impacted the OIG's investigations and ability to secure prosecution of serious incidents in BOP institutions, including sexual assaults,

civil rights violations, introduction of contraband, dereliction of duty, and even inmate deaths" (October 2021); and Defendant's "reluctance to rely on evidence provided by inmates in investigations of employee misconduct," which "enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing . . . risk of serious harm to inmates" (Oct. 2022).

19.    Another office within the Department of Justice, the United States Attorney's Office for the Northern District of West Virginia, is also investigating Defendant's misconduct. In May 2023, that office secured an indictment charging two of Defendant's correctional officers with civil rights violations, involving the assault of a prisoner at U.S.P. Hazelton in Bruceton Mills, West Virginia.  And in October 2023, United States Attorney William Ihlenfeld announced the establishment of a hotline for information related to civil rights abuses at F.C.C. Hazelton (which comprises U.S.P. Hazelton, F.C.I. Hazelton, and a prison camp for women).  The U.S. Attorney's Office set up the hotline to gather information from persons who may have witnessed or were victims of physical assault while incarcerated at F.C.C. Hazelton, including information about attempts to conceal such crimes.

20.    Both Congress and the news media have also shed light on Defendant's failures, including: a finding by a Senate subcommittee that BOP employees "sexually abused female inmates in at least two-thirds of Federal prisons that have held women over the past decade" (Sen. Jon Ossoff, Dec. 2022); "continued failures" by Defendant to "adequately implement the Earned Time Credit (ETC) provisions of the First Step Act," which resulted in many incarcerated people serving more time than required (U.S. Senate Judiciary Committee, Nov. 2022); Defendant's resistance to reform efforts to "make inmates pay much more of their court-ordered restitution to crime victims, in part because the money they would use helps fund salary and benefits for

hundreds of [BOP] staff positions" (Washington Post, Aug. 2022); and "abuse, neglect and leadership missteps—including rampant sexual abuse by workers, severe staffing shortages, inmate escapes and the mishandling of the COVID-19 pandemic—leading directly to the agency's director announcing his resignation" (Associated Press, December 2022).

21.    Defendant's current Director, Colette Peters, has also acknowledged these failings. During testimony before the Senate Judiciary Committee in September 2022, Director Peters "recognize[d] the gravity of the alleged misconduct within some of [BOP's] institutions in recent years," admitting "unacceptable conditions or conduct at certain [BOP] institutions" and "instances of misconduct by [BOP] employees that must be rooted out and prevented moving forward."  Although Director Peters testified that BOP is "committed to eradicating all criminal activity and unethical behavior in the agency," Defendant's employees either did not hear or did not heed her testimony.

## II.    Plaintiff Founds MTOC to Advocate for Necessary Reforms of the Federal Prison System.

22.    Defendant's institutional failures have continued to persist for many years, demonstrating the need for even more oversight, public attention, and reform efforts.  Despite the efforts of OIG, federal prosecutors, Congress, the media, and prison reform advocates, the one constituency most knowledgeable about Defendant's failures was not being adequately heard: those incarcerated at BOP institutions.

23.    In addition, although prison reform advocates were speaking out about big-picture problems at Defendant's institutions, such as violence committed against incarcerated people, few were focusing on the many minor indignities that those people face on a daily basis, which in the aggregate can be just as degrading and dehumanizing.

24.     In 2020, Plaintiff and Robert Barton—the latter incarcerated at BOP's penitentiary in Coleman, Florida—founded MTOC to give a platform to the many people in federal prison who wished to speak out about the injustices of everyday life in Defendant's prisons.  MTOC was created in part because:

> Prison walls are erected not only to keep people in, but to prevent those on the outside from seeing the abuses of our carceral system. The inhumanity of what happens behind bars, as is reflected by these first-person accounts [on MTOC's website], is deliberately hidden from view in faraway prisons surrounded by high walls and double fences of razor wire. Few people other than those who are confined or work in prisons have a full view of how they operate.[1]

MTOC's mission is to shine a light on Defendant, its facilities, and its employees, in the interest of reforming Defendant's practices and improving the lives of the more than 150,000 Americans living in BOP facilities.

25.     In order to accomplish these reforms, Plaintiff first had to develop relationships with the BOP residents who would provide first-person accounts for publication on MTOC's website and in its newsletters.   In particular, this required Ms. Bailey to establish regular communication with scores of BOP residents, sometimes by phone, mail, or in-person visits but most often through BOP's electronic messaging system, TRULINCS.

26.     TRULINCS is the property of the United States Department of Justice, and users' access to TRULINCS is controlled by Defendant.[2]

---

[1] More Than Our Crimes, Explore Our Voices, available at https://morethanourcrimes.org/our-voices/.

[2] To give just one example of the daily indignities suffered by BOP residents, TRULINCS costs $0.05 per minute to use, while printing messages costs another $0.15 per page and sending a message can cost another $0.30.  In many BOP prisons, wages start at only $0.12 per hour.  Put differently, for a resident to spend 10 minutes composing and sending a single message over TRULINCS, it would cost the equivalent of more than seven hours of prison labor.

27.     Defendant monitors all communications sent through TRULINCS and reserves the right to deny access to users who violate its rules, including by sending messages that "jeopardize the public or the safety, security, or orderly operation of the correctional facility."  Individual BOP facilities determine who may use TRULINCS to communicate with BOP residents at their respective facilities, so a user may be blocked from TRULINCS by one BOP facility but able to use TRULINCS at other BOP facilities.  Defendant can block a non-incarcerated user's TRULINCS communications with specific residents, with all residents at a specific BOP facility, or with all residents at all BOP facilities.

28.     Notifications that a user has been blocked from TRULINCS do not identify the communication(s) that Defendant claims violated its rules.  Sometimes the block notifications are received soon after a user sent a communication using TRULINCS—such that it may be possible to infer that this last-in-time message led to the block—but sometimes block notifications are received out of the blue.

29.     According to Defendant's own Program Statement, use of TRULINCS should be restricted only when "absolutely necessary" to ensure the safety, security, or orderly operation of the correctional facility, or the protection of the public or staff.

30.     Ms. Bailey (and, by extension, MTOC) relies upon TRULINCS to send and receive messages from individuals incarcerated in BOP prisons.  Sometimes messages sent through TRULINCS are intended for publication, or to verify information intended for publication, but more often they simply involve basic human interactions that help to establish trust, a crucial first step before someone may be willing to share information.

**III.    Plaintiff First Learns of Defendant's Attempts to Frustrate MTOC's Reform Efforts, Including Through Threats of Violence.**

31.    One of Ms. Bailey's sources, Leonard Schenk, first reached out to her to discuss problems at Defendant's prison in Cumberland, Maryland after he arrived there in October 2021. Mr. Schenk had learned that MTOC was investigating Defendant's mistreatment of incarcerated people and wanted to provide information about the abusive behavior of Officer Robert Dawson, an employee of Defendant.

32.    Mr. Schenk sent Ms. Bailey this information about Officer Dawson via TRULINCS—a communication system that Defendant monitors—and not long after, Defendant's employees threatened Mr. Schenk with physical violence if he continued to speak with Ms. Bailey about Defendant's employees.

33.    Specifically, early on the morning of March 10, 2022, a member of Defendant's Special Investigative Services ("SIS") department named Officer Daniel Lindner brought Mr. Schenk to an unfinished room with cinder-block walls.  There, Officer Lindner threatened that if Mr. Schenk did not stop talking to Ms. Bailey about Defendant's employees, he would "write up" Mr. Schenk three times under false pretenses, which would allow him to send Mr. Schenk to solitary confinement in the SHU as punishment for the three falsified findings of misconduct. Similarly, Officer Lindner threatened to "mess with" Mr. Schenk's imminent release date to a halfway house.  Officer Lindner also threatened to allow Officer Dawson—the same abusive officer about whom Mr. Schenk first contacted MTOC—to beat up Mr. Schenk.

34.    Defendant's threats succeeded in stopping Mr. Schenk from communicating further with Ms. Bailey via TRULINCS.  Because Mr. Schenk was so close to being released into a halfway house, he worried that any further communication with Ms. Bailey would cause Defendant to carry through on its threats, thereby jeopardizing his release.  He removed Ms. Bailey from his

list of approved contacts on TRULINCS and did not speak to her again until after his release to a halfway house three months later.

35.    It was not until June 2022 that Ms. Bailey learned why Mr. Schenk had gone silent and removed her from his contacts: Defendant's coercion and threats, which were explicitly intended to frustrate MTOC's efforts to publicize Defendant's misconduct.

36.    Upon information and belief, Defendant did not take any disciplinary action against Officer Dawson, despite the allegations against him published in a MTOC report.  Instead, Defendant rewarded Officer Dawson by promoting him to lieutenant in mid-2023.

37.    Defendant also interrogated a different resident of F.C.I. Cumberland, Jeremy Fontanez, about why he was "naming names" of rogue BOP employees in his communications with Plaintiff.  This interrogation was intended to (a) retaliate against Mr. Fontanez for criticizing Defendant in his communications with Ms. Bailey and (b) intimidate him into ceasing any future communication with Plaintiff.

38.    Mr. Fontanez has published several articles as a contributor to MTOC.  He corresponds frequently with Plaintiff via TRULINCS about conditions at F.C.I. Cumberland, including prison wages, Defendant's Financial Responsibility Program, and abusive employees.

39.    In January 2023, Mr. Fontanez used TRULINCS to inform Plaintiff about a complaint that had been filed with DOJ.  The complaint stated that an employee of Defendant named Captain Ricky Rakowski, Jr. had assaulted a resident of F.C.I. Cumberland and broken his wrist.[3]

---

[3] Separately, a district court in Maryland recently denied a motion to dismiss a claim that Captain Rakowski attacked a prisoner in retaliation for filing grievances.  *Head v. Rakowski*, 2023 WL 6388301, at *11 (D. Md. Sept. 29, 2023).

40.    In April or May of 2023, Mr. Fontanez was stopped by SIS Lieutenant Divelbliss as he was entering the dining hall.  Lt. Divelbliss, who had never spoken to Mr. Fontanez before, brought him into a small, cinderblock room inside a lieutenants' office and closed the door behind them.  Inside the room, where residents are often brought to provide urine samples, was just a toilet and a concrete bench.

41.    Mr. Fontanez, who had been aware that his communications with Plaintiff might make him a target for retaliation by Defendant, began to feel worried when Lt. Divelbliss closed the door behind them.

42.    Lt. Divelbliss, whose SIS department is primarily responsible for monitoring TRULINCS communications, had read communications between Plaintiff and Mr. Fontanez prior to the interrogation.  Lt. Divelbliss had no legitimate justification for his interrogation of Mr. Fontanez.  Instead, the interrogation was intended to intimidate Mr. Fontanez into ceasing all communications with Plaintiff and MTOC.

43.    Indeed, on the same day that Lt. Divelbliss interrogated Mr. Fontanez, Capt. Rakowski was heard wishing violence upon Mr. Fontanez.  A resident overheard Capt. Rakowski speaking to Unit Manager Holler angrily in a common area, and when Capt. Rakowski said "I hate that motherfucker," Unit Manager Holler asked Capt. Rakowski whether he was referring to Mr. Fontanez.  Capt. Rakowski confirmed that he was talking about Mr. Fontanez and stated that he would "love to see someone punch [Mr. Fontanez] in his fucking face."

44.    That same day during the interrogation, Lt. Divelbliss expressed concern that Mr. Fontanez had spoken to Plaintiff about problems within F.C.I. Cumberland, rather than raising them internally.  He complained that the names of specific BOP employees were being published by Plaintiff, and he claimed that by "naming names" Mr. Fontanez was jeopardizing their safety.

MTOC had never published anything by Mr. Fontanez in which any BOP employees were named—Mr. Fontanez had only "nam[ed] names" in his TRULINCS correspondence with Plaintiff, which Defendant had reviewed.

45.     During the interrogation, Lt. Divelbliss also defended Capt. Rakowski as a good person and complained that Plaintiff relies on "opinions" to the contrary, without substantiating them.   He asserted that when incarcerated people file excessive force claims against BOP employees, the force was justified in 90% of those incidents—effectively admitting Defendant's unlawful conduct as to the other 10% of incidents.

46.     Lt. Divelbliss said that he was confused why someone like Mr. Fontanez, who does not cause trouble and has a good job, would want to "risk all of that" by communicating with Plaintiff.

47.     Mr. Fontanez understood this statement—and the interrogation generally—to be a veiled threat that Defendant would retaliate against him if he continued to speak with Ms. Bailey.

48.     Mr. Fontanez nevertheless reported this incident to Ms. Bailey and continued speaking with her about problems at F.C.I. Cumberland.   He did so in part because, unlike Mr. Schenk, he is serving a life sentence and does not fear jeopardizing any imminent release.   All the same, Mr. Fontanez faces the very real possibility of retaliation by Defendant due to his reporting this incident to Ms. Bailey over TRULINCS and, now, participating as a potential witness in this lawsuit.   In particular, Mr. Fontanez fears that Defendant will retaliate by terminating his employment or finding a pretextual justification in order to send him to a higher-security penitentiary.

**IV.     MTOC Co-Publishes a Report That Publicizes Defendant's Failures and Offers Proposals for Reform.**

49.     In September 2022, MTOC published on its website a report called "Voices from Within the Federal Bureau of Prisons: A System Designed to Silence and Dehumanize" ("Voices From Within"), which Ms. Bailey co-authored with the Washington Lawyers' Committee for Civil Rights and Urban Affairs.  The report was divided into two sections.  The first section provided first-person accounts of BOP residents similar to those that MTOC has been publishing on its website since inception, and the second section offered proposals for reform "that would make it possible to hold [Defendant] accountable for its impact on the lives it controls."

50.     Throughout its 76 pages, Voices From Within described in detail a "federal prison system that is in a state of crisis," due to Defendant's "abject failure" and "cultural, entrenched, and systemic" problems.  It raised concern about Defendant's lack of any "real accountability," and explained at length why "[i]ndependent and robust oversight is essential to shining a much-needed bright light on the noxious conditions behind the walls of [Defendant's] prisons."

51.     Many of these criticisms focused on Defendant's resistance to reform and accountability.  In addition to including Mr. Schenk's account of the retaliatory threats he received (*supra*), Voices From Within detailed other BOP residents' experiences with, for instance:

- Defendant's retaliation against residents who file grievances, including through threats, violence, transfers to other BOP prisons based on false pretenses, planting contraband evidence, falsified disciplinary write-ups, improper use of restraints and solitary confinement, and transferring residents between SHUs at different facilities every few days;

- Defendant's practice of "losing" grievance forms, which it maintains only in paper form rather than electronically, until "finding" those grievance forms after the complaints raised in them have become untimely;

- A BOP employee who threatened a resident if he sought medical attention—for an injury caused by the employee—and then issued a falsified disciplinary write-up after the resident did seek medical attention;

- Efforts by multiple BOP employees to prevent the same resident from submitting a letter to the court about the mistreatment he had suffered, including through threats of violence, harassment, a strip search, and falsified disciplinary write-ups that led to the resident spending 78 days in the SHU.

52.    Indeed, the reform proposals set forth in Voices From Within were based primarily on the fact that Defendant's facilities "are beyond the reach of most ordinary methods of accountability."  For example, when they litigate against Defendant, incarcerated people face significant barriers to relief created by the Prison Litigation Reform Act; DOJ's Civil Rights Division is authorized to address unconstitutional conditions only in state and local prisons, not federal; state constitutional and legal protections do not apply to federal prisons; criminal prosecutions of BOP employees are rare and ineffective at curbing systemic misconduct; Defendant's internal grievance system is dysfunctional, antiquated, and inadequate, rarely resulting in relief; and meaningful political oversight of Defendant is absent.

53.    As a result, Voices From Within recommended that (1) Congress create an independent body with oversight authority over Defendant, and (2) Defendant's grievance system be fundamentally reformed, including through repeal of the Prison Litigation Reform Act, mandating an electronic system for grievances that cannot be accessed or decided by the subjects of the grievances, establishing an independent ombudsman to resolve grievances, and enforcing mandatory discipline for BOP employees who fail to process or resolve grievances within their authority.

54.    Defendant's employees are aware of Plaintiff's work, and upon information and belief, they became aware of Voices From Within soon after its publication, which was MTOC's most comprehensive, high-profile publication to date and was featured in articles by media outlets like the Washington Post.  MTOC and its founders have similarly received national attention,

including in Politico and from a bipartisan group of senators who cited MTOC publications in a letter to Attorney General Merrick Garland and BOP Director Peters about misconduct at F.C.C. Hazelton.

55.     Defendant's awareness of MTOC and its work was confirmed to Ms. Bailey by a correctional officer at F.C.I. Hazelton—to which residents refer as "Misery Mountain."  The officer had learned about MTOC from Hazelton residents and reached out to Plaintiff via Facebook Messenger using what she believes was a pseudonym.  During their communications, the officer expressed fear that Defendant's officials had learned about his outreach to Ms. Bailey.  Shortly thereafter the officer stopped corresponding with her.

## V.     Defendant Revokes Plaintiff's Access to TRULINCS at Multiple BOP Facilities and Doubles Down on its Efforts to Threaten and Intimidate MTOC Sources.

56.     Beginning around the same time that Voices From Within was published, Defendant doubled down on its unconstitutional efforts to stop MTOC's work.

57.     First, on August 18, 2022, Ms. Bailey received a notification that Defendant had blocked her email address from accessing the TRULINCS system at F.C.I. Ray Brook in New York.  The notification included only the boilerplate assertion that Ms. Bailey's communication with certain residents was "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."  It failed to provide any specific factual information, including identifying any improper communications or how such communications purportedly harmed the prison or facilitated a crime.  The notification also failed to disclose that Ms. Bailey's email address had been blocked from communicating via TRULINCS with all F.C.I. Ray Brook residents.

58.     Ms. Bailey's TRULINCS communications with residents at F.C.I. Ray Brook complied with TRULINCS rules.  They could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility.

59.    Plaintiff sent a letter to the warden at F.C.I. Ray Brook appealing the decision and seeking the rationale for it, and the warden responded only that certain residents had added her to their approved contact lists without using her full, correct name.

60.    This pretextual rationale makes no sense.  The warden did not allege that *Ms. Bailey* had done anything wrong, and even assuming certain residents did not know or provide Ms. Bailey's full name, that would not justify a wholesale, permanent block of Ms. Bailey's email address from the TRULINCS system at F.C.I. Ray Brook.  Defendant's true rationale was to prevent Plaintiff from learning about and publicizing problems within the prison.

61.    Next, on December 19, 2022, Ms. Bailey was restricted from accessing the TRULINCS system at a second BOP institution, this time at U.S.P. Big Sandy in Kentucky.

62.    The block notification again stated that her communications with certain residents on TRULINCS were "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity," but it provided no information about either the communications at issue or how those communications purportedly harmed the penitentiary or facilitated a crime. Again, the notification did not disclose that Ms. Bailey's email address had been blocked from using TRULINCS to communicate with everyone incarcerated at U.S.P. Big Sandy.

63.    Ms. Bailey's TRULINCS communications with residents at U.S.P. Big Sandy complied with TRULINCS rules.  They could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility.

64.    Ms. Bailey, through counsel, sent a letter to the warden at U.S.P. Big Sandy appealing the decision.  She explained that the TRULINCS restriction raised serious concerns about a violation of her First Amendment rights, and, in the event that the decision was not reversed, she requested a specific factual justification for it.

65.     Over several months, the warden at U.S.P. Big Sandy failed to respond to Ms. Bailey's appeal.

66.     Ms. Bailey, again through counsel, then contacted Defendant's Regional Director of the Mid-Atlantic Region, Christopher Gomez, to request a response to her appeal.  Again she sought to have her TRULINCS access restored or, at a minimum, to receive an appropriate explanation for Defendant's restriction of it.

67.     Mr. Gomez finally responded *three months* after Plaintiff's appeal was submitted to Defendant.  Mr. Gomez asserted vaguely that the SIS department at U.S.P. Big Sandy had "discovered suspicious activity" from Ms. Bailey's email address, offering nothing more than a boilerplate assertion that the email address purportedly was "used as a median [and]/or paid service to forward messages to other email addresses and/or other messaging services."  Mr. Gomez failed to identify any communications in which Ms. Bailey allegedly acted "as a median [and]/or paid service" or how Ms. Bailey allegedly did so.

68.     As a result, Ms. Bailey followed up yet again with Mr. Gomez.  Through counsel, she denied acting as a median or paid service, and sought identification of the specific communications that purportedly violated BOP policy so that she could understand the vague allegations against her.

69.     Defendant responded by refusing to provide any additional information.  Instead, it advised Plaintiff that she was free to submit a request for such information pursuant to the Freedom of Information Act, a process that Defendant knows is notoriously lengthy and ineffective for requesting parties.  This stonewalling response is typical of Defendant's responses to residents' grievances, and it reflects Defendant's institutional resistance to transparency and accountability.

70.     The reason that Defendant refused to provide factual support for its decision is that no such factual support exists.  Defendant blocked Ms. Bailey's email address from accessing TRULINCS at U.S.P. Big Sandy, as it did at F.C.I. Ray Brook, not because she violated any rules, but because she was using her access to gather information that could embarrass and reveal misconduct by Defendant.

71.     Ten days after restricting Ms. Bailey's TRULINCS access at U.S.P. Big Sandy, Defendant began a long-running campaign of intimidation and retaliation against one of Plaintiff's sources as a result of his communications with her.

72.     Cory Perry, one of the residents at U.S.P. Big Sandy with whom Ms. Bailey had been communicating regularly, spoke by phone with Plaintiff on the evening of December 29, 2022.  He expressed concern about things that were happening at the prison and asked for Plaintiff's support if anything bad happened to him.

73.     Forty minutes later, six correctional officers came into Mr. Perry's cell and brought him to the SHU.  They did not offer Mr. Perry any explanation for doing so.

74.     The next morning, Mr. Perry was interrogated in the SHU by two senior prison officials, Captain Blackburn and Lieutenant Parr.  Captain Blackburn is one of the highest-ranking officers at U.S.P. Big Sandy, behind only the warden and assistant wardens, and Lieutenant Parr is the head of SIS, the same investigative unit that allegedly uncovered "suspicious activity" by Ms. Bailey eleven days earlier.

75.     Captain Blackburn and Lieutenant Parr admitted to Mr. Perry that he had been taken to the SHU because of his previous night's phone call with Plaintiff.  They said they had a problem with "this Pam lady," who they called a "spider sitting in the middle of a web."  Lt. Parr claimed

to have a stack of paper six inches thick on his desk about Plaintiff and her contacts with various federal prisoners, and he was trying to figure out her relationships with each of them.

76.    Mr. Perry repeatedly asked what he had done wrong to deserve being sent to the SHU.  Lt. Parr responded that Plaintiff sends money to Mr. Perry and others in prison, but as Mr. Perry pointed out to Lt. Parr, that is not improper.  Lt. Parr then shifted to claiming that Plaintiff passes information between residents at different facilities in violation of BOP rules, which is false. In addition to being inadequate, both of those purported justifications focused on Plaintiff—neither addressed what *Mr. Perry* had done wrong to warrant been sent to the SHU.

77.    Lt. Parr and Captain Blackburn also warned Mr. Perry to stop speaking with Plaintiff, who they said was only using Mr. Perry as a "pawn."  When Mr. Perry asked what a prisoner like himself could possibly offer Plaintiff, they responded that she was a former reporter, and that Defendant listens to all of her calls at different facilities, not just at U.S.P. Big Sandy.  Mr. Perry understood this to mean that they were upset that Mr. Perry was giving information about problems at the prison to a former reporter.

78.    At the end of the interrogation, Lt. Parr claimed that he was just trying to "help" Mr. Perry avoid getting into any trouble in the future.

79.    In fact, Mr. Perry was confined in the SHU for the next six months, in retaliation for his communications with Plaintiff.

80.    During that time, he was visited three or four times by Lt. Parr and Capt. Blackburn. Mr. Perry had been working with his classification officer to arrange a transfer to an F.C.I. (meaning a low- or medium-security prison—in this case, medium), and Lt. Parr and Capt. Blackburn had promised to help.  Each time they visited Mr. Perry in the SHU, he asked them

about the status of the transfer, and each time they told him that it was in progress, but that the paperwork needed to be resubmitted.

81.    Then, during the last week of April 2023, Lt. Parr and Capt. Blackburn told Mr. Perry that he had been designated for transfer. They said they couldn't tell him the new location, but that he would be happy and that it was not an "active yard" (meaning no active gang members were housed there).

82.    Mr. Perry had previously been told by his classification officer that he could transfer to an F.C.I. when he turned 55 and automatically lost two points from his record, which would not happen until later in May 2023. When Mr. Perry told Lt. Parr and Capt. Blackburn that he did not think he was eligible for an F.C.I. until a few weeks later, they shrugged and claimed that they weren't able to get him into an F.C.I. and that the prison "wanted to get rid of" him sooner.

83.    Mr. Perry was finally released from confinement in the SHU on May 5, 2023, when he was put on a bus for U.S.P. Tucson—not the F.C.I. that Lt. Parr and Capt. Blackburn had promised him.

84.    Defendant's unconstitutional conduct did not stop there. On March 29, 2023, Defendant blocked Plaintiff's email address from TRULINCS at a *third* prison, U.S.P. Beaumont, again without providing any factual rationale. This time, Ms. Bailey had been communicating with Shukri Abu Baker, who is well-known for his conviction as part of the "Holy Land Five" for making donations to a pro-Palestinian charity. In her last message to Mr. Baker, Ms. Bailey stated that she had visited U.S.P. Coleman and found conditions there exhausting and spirit-sapping, and that she had been trying to persuade a group of women with loved ones at U.S.P. Coleman to join together and advocate for change.

85.     Almost immediately after sending it, Ms. Bailey received notification that the message had been rejected by Defendant before it was delivered to Mr. Baker.  The next day, she learned that her email address was blocked on TRULINCS from communicating with everyone incarcerated at U.S.P. Beaumont, just like at F.C.I. Ray Brook and U.S.P. Big Sandy.

86.     Ms. Bailey's TRULINCS communications with residents at U.S.P. Beaumont complied with TRULINCS rules.  They could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility.

87.     The timing of Defendant's denial of access—which occurred immediately after Ms. Bailey sent a message about inadequate prison conditions and her ongoing advocacy—further demonstrates Defendant's intent to curb this advocacy in violation of the First Amendment.

88.     Not long after this incident, Mr. Baker stopped communicating with Ms. Bailey entirely.  He had been seeking a transfer to a lower-security facility, and upon learning that Ms. Bailey's TRULINCS access had been restricted, he feared that any further attempts to communicate with Ms. Bailey could cause Defendant to retaliate against him by denying the transfer.

89.     Defendant later denied Mr. Baker's transfer request.  It was only then that Mr. Baker felt comfortable resuming his communications with Ms. Bailey, because he felt that there was nothing else that Defendant could do to harm him.

## VI.    After Plaintiff Reports Misconduct by Defendant to Prosecutors, Defendant Blocks Her TRULINCS Access for a Fourth Time.

90.     West Virginia Senator Joe Manchin, another vocal critic of Defendant, has devoted significant time and attention to the problems at F.C.C. Hazelton, which sits in his district.  His office has interacted regularly with Ms. Bailey about these problems, and he cited MTOC

publications in the September 2023 letter that he co-authored with Senators Durbin, Grassley, and Capito raising serious concerns about problems at Hazelton (*supra* ¶ 54).

91.    When Senator Manchin's staffers tried to speak with Hazelton residents about mistreatment they suffered, Defendant insisted that the staffers first secure from the residents signed permission forms—many of which were sent by residents but never made it to Senator Manchin's office.  This incident showed the need for a dedicated, protected line of communication for Hazelton whistleblowers and, upon information and belief, led to the establishment of the U.S. Attorney's hotline seeking information about Defendant's misconduct at F.C.C. Hazelton (*supra* ¶ 19).

92.    Of course, the people most likely to have reportable information concerning violations of residents' civil rights are those residents themselves.  But in a Kafkaesque twist, Defendant blocked Hazelton residents from using the hotline.  Defendant does not allow residents to make outbound calls to numbers beginning in 855, including the hotline number (1-855-WVA-FEDS), and Defendant blocked residents from sending any TRULINCS communications to the designated hotline email address (wvafeds@usdoj.gov).

93.    When Ms. Bailey learned from her sources at Hazelton that Defendant was preventing residents from using the hotline, she reached out to the U.S. Attorney's Office herself.  She was interviewed by a member of that office and three investigators from OIG, to whom she reported Defendant's efforts to frustrate the U.S. Attorney's investigation.

94.    Soon after, on the morning of November 2, 2023, Ms. Bailey received *133* notifications that her email address had been blocked on TRULINCS across F.C.C. Hazelton.  As with the previous three restrictions of TRULINCS access, Defendant did not provide any rationale

or factual support—only the bald assertion that "such communication is detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."

95.     Ms. Bailey's TRULINCS communications with residents at F.C.C. Hazelton complied with TRULINCS rules.  They could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility.

96.     The timing of Defendant's *fourth* restriction of access—which impacted three different BOP facilities and occurred soon after Ms. Bailey reported Defendant's misconduct to federal prosecutors—further indicates Defendant's intent to curb Plaintiff's advocacy and retaliate against her in violation of the First Amendment.

## VII.    Defendant Retaliates Against Multiple MTOC Sources After They Communicated with Plaintiff About Defendant's Unlawful Conduct.

97.     On the same day that Defendant blocked Ms. Bailey's TRULINCS access at F.C.C. Hazelton, it retaliated against numerous MTOC sources who had been communicating with Ms. Bailey about Defendant's unlawful conduct at F.C.C. Hazelton.   This retaliation included termination of at least two sources from their prison employment and humiliating at least one source by strip-searching him without cause.

98.     Throughout October 2023, Ms. Bailey corresponded over TRULINCS with a resident of F.C.I. Hazelton named Joel Vasquez.  On October 10th, Mr. Vasquez raised concerns about a lack of accountability for wrongdoers within Defendant's ranks, and he confirmed that Defendant had blocked Hazelton residents from sending TRULINCS messages to the U.S. Attorney's hotline.  Mr. Vasquez also agreed, along with another F.C.I. Hazelton resident named Jacky Foster, to be interviewed by a reporter who was planning a story about F.C.C. Hazelton blocking residents' access to the hotline.

99.    On October 15th, Mr. Vasquez raised with Plaintiff additional concerns using TRULINCS.  Because he had been blocked from accessing the DOJ hotline, Mr. Vasquez had no other option but to relay his concerns to Ms. Bailey instead.  He described to Ms. Bailey an October 14th incident in which Lieutenant Stickley, an officer at F.C.I. Hazelton, ordered a Rastafarian resident to remove his religious head dress.  Mr. Vasquez reported that even after the resident explained that he had a religious exemption to wear the hat, Lt. Stickley shouted and cursed at the resident ordering him to remove the hat, then she grabbed his arm trying to remove him forcibly from the dining hall.  When the resident pulled his arm away from Lt. Stickley, officers swarmed and pushed him face-first into a table, then brought him to the SHU.  Defendant's officers then locked the remaining residents in the dining hall and later locked down the entire prison.

100.    Plaintiff responded to Mr. Vasquez that she planned to report the incident to the U.S. Attorney's civil rights hotline and asked for more details.  On October 25th and 31st, Mr. Vasquez provided Plaintiff with additional information, including that the Rastafarian resident remained locked in the SHU, more than two weeks after he was sent there.  He also offered to try and locate the names of other officers besides Lieutenant Stickley who were involved in this incident.

101.    On November 2nd—the same day Plaintiff received TRULINCS block notifications concerning Mr. Vasquez and 132 other Hazelton residents—Mr. Vasquez was fired from his job in the prison barber shop.  When he asked why, a Hazelton official said it was not his decision but that Mr. Vasquez should "talk to Lieutenant Stickley."  A second Hazelton official similarly confirmed to Mr. Vasquez that he was fired in retaliation for providing Plaintiff with information about Lt. Stickley and the incident in the dining hall, which the official said was none of Mr. Vasquez's business.

102.    Defendant's retaliation did not stop there.  Jacky Foster, who like Mr. Vasquez was a MTOC source, lost his job in the snow removal group.  This termination also occurred on or about November 2nd, the same time that Defendant blocked Plaintiff from using TRULINCS to communicate with Mr. Foster and other F.C.C. Hazelton residents.

103.    Defendant's unlawful retaliation even extended to the unconstitutional and unjustified strip search of Lamar Tucker, yet another MTOC source at F.C.I. Hazelton.   On November 4th, two days after Plaintiff was blocked from TRULINCS, Mr. Tucker was removed from his cell by multiple officers and strip searched.  The officers admitted to Mr. Tucker that they had no real justification for the strip search, implying that they were doing it because Mr. Tucker is a source of information for Plaintiff and MTOC.

## VIII.    Defendant Again Threatens Cory Perry Repeatedly About his Communications With Plaintiff and her Counsel.

104.    In November 2023, Cory Perry communicated with a reporter at NBC about safety problems at his new facility, U.S.P. Tucson.  In particular, he communicated with the reporter about why so many incarcerated people were getting hurt at what is supposed to be a "safe yard" (no active gang members).

105.    Not long after, Assistant Warden Zantout informed Mr. Perry that he had been monitoring the communications with the NBC reporter and had no issue with what Mr. Perry had said.  Zantout also told Mr. Perry that BOP had blocked Plaintiff from TRULINCS at F.C.C. Hazelton and might do the same at U.S.P. Tucson, but a final decision had not been made.

106.    When Mr. Perry asked why Plaintiff might be blocked, Zantout responded that Plaintiff speaks with too many people and had been passing information between inmates in violation of BOP policy.  Mr. Perry told Zantout that his communications with Plaintiff did not involve any passing of information between inmates.

26

107.    Two or three days later, Unit Manager Palmer stopped Mr. Perry in the day room to warn him to "be careful" about who he was talking to and what he was saying.  Unit Manager Palmer called Mr. Perry a "hard to place"—meaning that Mr. Perry did not fit into typical inmate categories—and he threatened that BOP could put Mr. Perry on a bus and send him back into an active yard.

108.    In order to avoid seeming like he was trying to hide his communications with the NBC reporter, in late November or early December 2023 Mr. Perry informed Assistant Warden Blackmon about those communications.  Asst. Warden Blackmon responded angrily that Mr. Perry was not allowed to speak with reporters.  Even after he told her that Asst. Warden Zantout had already approved those communications, Asst. Warden Blackmon insisted that Mr. Perry could not speak with the reporter.

109.    Asst. Warden Blackmon also brought up Mr. Perry's conversations with Plaintiff's counsel.  Mr. Perry had been speaking with Plaintiff's counsel by phone and on TRULINCS about certain events described in this complaint, and the prison had been monitoring those communications.

110.    Asst. Warden Blackmon told Mr. Perry that he was not allowed to give any information to Plaintiff's counsel or to the NBC reporter about what happens on the compound—all information must pass through BOP officials like her.  She threatened that if Mr. Perry continued to go around her, she would investigate him and get him in "big trouble."

111.    Then, in the first or second week of December 2023, Mr. Perry was pulled out of the dining hall by Lieutenant Falconer, the head of SIS at U.S.P. Tucson.  Lt. Falconer brought Mr. Perry to a holding cell and claimed that OIG had called him and ordered him to investigate Mr. Perry for receiving money from a reporter in exchange for a story.

112.    Mr. Perry explained that it costs him money to send and receive messages on TRULINCS, and that he had merely asked the NBC reporter to reimburse him for those costs. Lt. Falconer repeated that Mr. Perry was not allowed to take money from a reporter for any reason. He also told Mr. Perry that he had been listening to Mr. Perry's calls and did not have any concerns with what Mr. Perry had told the reporter.

113.    Mr. Perry then asked Lt. Falconer why it was taking so long for his TRULINCS messages to be delivered, as there were often delays of several days between his messages being sent and being received. Lt. Falconer responded that delivery was being delayed so that the BOP's central office could review Mr. Perry's messages prior to release. Lt. Falconer said that there was a lot of "smoke in the air" about U.S.P. Tucson, even though he claimed the problems here are not the prison's fault.

114.    Lt. Falconer also mentioned Plaintiff's counsel, asking whether Plaintiff's counsel represented Mr. Perry. He told Mr. Perry that he had no concerns with what Mr. Perry had told Plaintiff's counsel "so far." Mr. Perry understood this to mean that Lt. Falconer would continue to monitor Mr. Perry's communications with Plaintiff's counsel and take action against Mr. Perry if he later developed any concerns.

115.    Lt. Falconer also asked if Mr. Perry would be interested in transferring next door to F.C.I. Tucson, a medium-security facility. When Mr. Perry confirmed that he was interested, Lt. Falconer said that he could make that transfer a reality. Lt. Falconer told Mr. Perry to submit a form requesting the transfer, which Mr. Perry did.

116.    But since submitting that transfer request form, Mr. Perry has not heard from Lt. Falconer, likely because Mr. Perry continued speaking with Plaintiff and her counsel about problems at U.S.P. Tucson, in spite of prison officials' threats.

117.    In late January 2024, Unit Manager Palmer threatened Mr. Perry again, this time in his cell.  Unit Manager Palmer again warned Mr. Perry (as he had several months earlier), "You need to watch yourself and who you are talking to."

118.    Mr. Perry asked Unit Manager Palmer why the prison had been imposing so many long lockdowns, and Unit Manager Palmer replied that they're doing it to make inmates safe. When Mr. Perry said that he could not digest the peanut butter that residents were being fed every day during lockdown, Unit Manager Palmer replied, "You're getting one hot meal a day.  Bear with it."

119.    And when Mr. Perry said that he is not the kind of person who files grievances about things like this, Unit Manager Palmer interpreted Mr. Perry to be threatening exactly that. He threatened Mr. Perry, saying "If you want to flip the lever to the other side, we can go that way too."

120.    Mr. Perry asked why Unit Manager Palmer was always threatening him like that, and Unit Manager Palmer denied it was a threat.  He claimed he was just trying to help Mr. Perry "understand."

**IX.    Defendant Restricts Ms. Bailey's TRULINCS Access at a Minimum of Two Additional Institutions in Quick Succession.**

121.    On March 8, 2024, Plaintiff received notification that her email address had been blocked from communicating with two residents at U.S.P. Marion in Marion, Illinois.

122.    As with the previous four restrictions of TRULINCS access, Defendant did not provide any rationale or factual support—only the bald assertion that "such communication is detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."

123.    Nor did Defendant's notification disclose the scope of this restriction.  Because Plaintiff had used TRULINCS the previous day to send MTOC's newsletter to many more U.S.P. Marion inmates than were identified in Defendant's block notifications, she infers that this is not a facility-wide block.

124.    If so, Defendant's restriction of Ms. Bailey's TRULINCS access to communicate with only two recipients of her newsletter—and not all such recipients—is arbitrary as well as unconstitutional.  Indeed, Ms. Bailey had exchanged very few TRULINCS communications with one of the residents identified in the block notifications, which is further indication that the block was based on the newsletter she sent on March 7, 2024.

125.    Ms. Bailey's TRULINCS communications with the two residents at U.S.P. Marion complied with TRULINCS rules.  They could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility.

126.    For example, Plaintiff's March 7th newsletter consisted of a short poem written by a federal prisoner, about the author's rehabilitation, desire to be forgiven, and hope to be seen as something more than a criminal.  That this anodyne communication was the basis of a permanent restriction on Plaintiff's communications with these two individuals highlights Defendant's unconstitutional intent.

127.    Less than a week later, on March 14, 2024, Plaintiff received notification that her email address had been blocked from communicating with two residents at F.C.I. Pekin in Pekin, Illinois.

128.    As with the previous five restrictions of TRULINCS access, Defendant did not provide any rationale or factual support—only the bald assertion that "such communication is

detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."

129.    Nor did Defendant's notification disclose the scope of this restriction.  Because Plaintiff had not communicated via TRULINCS with any residents at F.C.I. Pekin other than the two identified in the block notifications, she infers that this is a facility-wide block.

130.    Ms. Bailey's TRULINCS communications with the two residents at F.C.I. Pekin complied with TRULINCS rules.  They could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility.  Plaintiff had just begun communicating with the two individuals identified in the block notifications, so she has no idea what TRULINCS communication Defendant could possibly claim violated its rules.

131.    Defendant's unexplained *sixth* restriction on Plaintiff's TRULINCS access, coming only six days after the fifth unexplained restriction, is yet another impermissible content-based abridgment of Ms. Bailey's First Amendment rights.

132.    Upon information and belief, Defendant has restricted Plaintiff's TRULINCS access at additional facilities without providing any notice to her.

133.    For instance, in March 2024, multiple residents at USP Florence-High in Florence, Colorado were unable to exchange TRULINCS messages with Plaintiff.  One of the residents determined that Defendant had removed Plaintiff from his TRULINCS contacts list, and when another resident attempted to add Plaintiff to his TRULINCS contacts list, he received an error message reading "blocked" in red letters.  Defendant has not provided notification of any such block to Plaintiff herself.

## COUNT ONE

## VIOLATION OF THE FIRST AMENDMENT - TRULINCS

134.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

135.    Plaintiff has a right under the First Amendment to communicate with people who are incarcerated in Defendant's prisons.  This right exists independently of Plaintiff's advocacy work with MTOC, instead deriving from her fundamental liberty interest in engaging in interpersonal communication.

136.    Defendant violated Plaintiff's First Amendment right by permanently blocking her email address from communicating on TRULINCS with scores of incarcerated individuals.

137.    Defendant restricted Plaintiff's TRULINCS access for an entirely improper, unconstitutional reason—to retaliate against her for publishing critical information about Defendant and to prevent her from publishing similarly critical information in the future.

138.    But even if Defendant had no improper intent, its actions were still unconstitutional, because Defendant lacked any legitimate justification for restricting her constitutionally protected speech.  Plaintiff's communications on TRULINCS complied with applicable rules and did not in any way jeopardize the order, safety, or security of Defendant's prisons.

139.    And even if Defendant could point to a legitimate basis for some restriction on certain of Plaintiff's TRULINCS communications, it had no justification for the sweeping restriction that it imposed: permanently blocking Plaintiff's email address from accessing TRULINCS to communicate with every individual incarcerated at a minimum of five different BOP institutions (and two individuals at a sixth institution) on any topic.

## COUNT TWO

## VIOLATION OF THE FIRST AMENDMENT - RETALIATION

140.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

141.    Plaintiff regularly gathers and publishes information of significant public interest about Defendant's operations, practices and policies, and rampant misconduct and mismanagement, in an effort to inform the public of the need to reform Defendant.  Plaintiff further advocates for such reform through government outreach, public events, and other news media.  All of these efforts constitute protected First Amendment activity.

142.    In order to engage effectively in these reform efforts, Plaintiff depends upon her access to sources at Defendant's facilities.  These sources provide MTOC with first-person accounts for publication on MTOC's website and in its newsletters, as well as other information about Defendant that enables MTOC to carry out its work.  Without the ability to communicate with BOP sources, Plaintiff would be unable to receive current, firsthand information about Defendant's operations and, by extension, unable to carry out MTOC's mission of providing that information to the public or advocating effectively for reform of Defendant's practices and policies.

143.    TRULINCS is the primary mode of communication by which Plaintiff receives information from these sources.  Because the sources cannot access other electronic mail systems, and given the delays and restrictions on prison phone use and sending hard-copy communications through the prison mail system, TRULINCS is the only mode of communication through which Plaintiff can exchange written information with her sources on a timely basis.

144.    By restricting Ms. Bailey's email address from TRULINCS at a minimum of six different facilities, Defendant has unconstitutionally retaliated against Ms. Bailey and MTOC for criticizing Defendant and calling publicly for its reform.

145.    The timing of those TRULINCS blocks, and Defendant's persistent refusal to provide a factual justification for them, indicates that they were intended to punish Plaintiff for engaging in protected First Amendment advocacy.  It is no mere happenstance that Defendant issued three unexplained blocks to Ms. Bailey so close in time to the publication of Voices From Within.  Nor is it happenstance that Defendant issued a fourth block soon after she reported Defendant's unlawful conduct to the U.S. Attorney's Office and OIG.  Nor is it happenstance that Defendant issued a fifth and sixth block within six days of each other.

146.    Defendant further retaliated against Plaintiff and MTOC sources through its interrogation of multiple MTOC sources at two different facilities, F.C.I. Cumberland and U.S.P. Big Sandy.  Defendant used these interrogations, which had no proper justification, to intimidate MTOC's sources into cutting off communication with Plaintiff and thereby prevent MTOC from carrying out its mission.  Indeed, the SIS officers who interrogated Mr. Schenk explicitly threatened him with violence, a "mess[ed] up" release date from prison, and falsified disciplinary write-ups if he continued speaking with Ms. Bailey.

147.    Defendant also retaliated against Plaintiff and MTOC source Cory Perry by confining Mr. Perry in the SHU at U.S.P. Big Sandy for six months without any justification, then transferring him to a high-security facility even though he was weeks away from being eligible for transfer to a medium-security facility.

148.    Defendant further retaliated against Plaintiff and MTOC sources at F.C.I. Hazelton by harming those sources through negative employment actions and a humiliating strip search, at

the same time that it blocked Plaintiff's email address from communicating with those same sources via TRULINCS.  On more than one occasion, Defendant's employees explicitly admitted their intent to punish these sources for providing information about Defendant to Plaintiff.

149.    Such unlawful conduct against sources also harmed Plaintiff, because it decreases the likelihood that those sources—and others who became aware of the unlawful retaliation—will provide information to Plaintiff and MTOC for publication.

150.    Defendant had no legitimate justification for these retaliatory acts, which, individually and in the aggregate, would deter a person of ordinary firmness in plaintiff's position from speaking again.

## COUNT THREE

## VIOLATION OF THE FIFTH AMENDMENT

151.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

152.    The Fifth Amendment protects Plaintiff's liberty interest in communicating with her sources without censorship or interference.  That liberty interest is protected from arbitrary governmental invasion.

153.    When Defendant censors or blocks Plaintiff's TRULINCS communications, it must provide Plaintiff with procedural safeguards, including notification of Defendant's decision and a reasonable opportunity to appeal it.  Such an appeal cannot be decided by the same official that made the initial decision to censor or block Plaintiff's communications in the first place.

154.    Defendant failed to provide Plaintiff the requisite procedural safeguards when it restricted her TRULINCS access at F.C.I. Ray Brook, U.S.P. Big Sandy, U.S.P. Beaumont, F.C.C. Hazelton, U.S.P. Marion, and F.C.I. Pekin.

155.    First, Defendant's notifications to Plaintiff of its decisions were inadequate.

156.    The notifications failed, among other things, to (a) identify any communications that purportedly violated Defendant's rules or endangered the safety and/or security its facilities; (b) provide any factual explanation how such communications violated Defendant's rules or endangered the safety and/or security its facilities; (c) disclose the full scope of Defendant's TRULINCS restrictions, which prevented Ms. Bailey's email address from communicating with all residents at five of those facilities rather than just those identified in the notifications; or (d) explain why any purportedly improper communications required Defendant not only to block those communications themselves, but also required a permanent, wholesale restriction preventing Plaintiff from using her email address to access TRULINCS and communicate with any resident at those facilities about any topic.

157.    Second, the "appeal" process provided to Plaintiff was inadequate.

158.    At F.C.I. Ray Brook, the warden denied Plaintiff's appeal without providing any information that might justify a permanent restriction on Plaintiff's TRULINCS access.  Instead, the warden stated that residents had failed to use Plaintiff's full name when adding her to their TRULINCS contact list, which (even if true) would not justify punishing *Plaintiff*.  Put differently, the warden's response to Plaintiff's appeal revealed that Defendant's actions were arbitrary at best, unconstitutional at worst.

159.    At U.S.P. Big Sandy, the warden—to whom Plaintiff was instructed to direct her appeal—failed to respond to the appeal at all.

160.    It was only Plaintiff's unilateral efforts to redirect the appeal to a regional BOP office that allowed her to receive *any* response.   But the Regional Director's response, which denied the appeal without providing any factual information about the purportedly improper communication, was inadequate too.  Defendant's insistence that Plaintiff pursue this basic

information by filing a FOIA request, rather than simply providing the information itself, shows that the appeal process was never a bona fide procedural safeguard.

161.    Third, and most fundamentally, these nominal "procedural safeguards" were illusory, because Defendant withheld the information necessary for Plaintiff to rely on those safeguards.  It was impossible for Plaintiff to pursue an informed appeal, or even to understand whether an appeal would be warranted, when Defendant refused to provide the basis for its initial decision and persisted in that refusal over the course of several appeals.

## **COUNT FOUR**

### **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – CONTRARY TO CONSTITUTIONAL RIGHT (5 U.S.C. § 701 *et seq.*)**

162.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

163.    Defendant's restrictions of Plaintiff's TRULINCS access at F.C.I. Ray Brook, U.S.P. Big Sandy, U.S.P. Beaumont, F.C.C. Hazelton, U.S.P. Marion, and F.C.I. Pekin constituted final agency action.

164.    These actions have caused MTOC significant, irreparable harm, for which MTOC has no other adequate remedy in a court.

165.    For the same reasons that Defendant's actions violated the First Amendment (*supra* Counts One and Two) and Fifth Amendment (*supra* Count Three), those actions violated the Administrative Procedure Act, 5 U.S.C. § 706, which prohibits agency actions that are contrary to constitutional right.

**COUNT FIVE**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS (5 U.S.C. § 701 *et seq.*)**

166.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

167.    In addition to violating Plaintiff's First and Fifth Amendment rights, Defendant's restriction of Plaintiff's TRULINCS access was arbitrary and capricious, in that Defendant provided no adequate explanation for its actions, even after several appeals and related requests seeking this explanation.

168.    Defendant had ready access to this information.  Under Defendant's Program Statement, supporting documentation concerning any blocking of email addresses from TRULINCS must be scanned into Defendant's computer system.  Defendant simply refused to provide this available information to Plaintiff, or even to summarize it for her.

169.    Defendant instead provided only legal boilerplate, without any specific factual support.  Defendant's communications failed to identify, for instance: Plaintiff's communications that purportedly violated Defendant's rules, how such communications violated Defendant's rules, and any residents involved.  Without this information, Defendant was unable even to understand the basis for termination, let alone adequately pursue an informed administrative appeal.

**COUNT SIX**

**DECLARATORY JUDGMENT ACT (28 U.S.C. § 2201)**

170.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

171.    Based on Defendant's restriction of TRULINCS access at no fewer than six BOP facilities, unlawful interrogation of multiple residents at two BOP facilities, and retaliation against

multiple residents at F.C.I. Hazelton and U.S.P. Big Sandy, there is a credible threat that Defendant will engage in similar unconstitutional conduct in the future.

172.    Plaintiff is entitled to a declaration that: (1) she has a constitutionally protected right to communicate with BOP residents, including through TRULINCS, (2) Defendant may not abridge that right without first (a) providing Plaintiff a reasoned, factual explanation for its actions and (b) identifying a compelling governmental interest that cannot be achieved through other, less restrictive means; (3) Defendant may not threaten, intimidate, coerce, or retaliate against BOP residents in order to prevent those residents from speaking with Plaintiff; (4) Defendant's standard form notifying TRULINCS users of access restrictions fails provides constitutionally required information about the scope and factual basis of such restrictions; and (5) Defendant's actions as alleged herein violated Plaintiff's First and Fifth Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    Injunctive relief that (1) requires Defendant to restore immediately Plaintiff's TRULINCS access at all BOP facilities, (2) prohibits Defendant from interfering with Plaintiff's TRULINCS communications in the future absent (a) a specific, factual determination of misconduct by Plaintiff that is timely communicated to Plaintiff in writing and (b) prior approval of this Court, and (3) prohibits Defendant from taking any other action that a reasonable observer would conclude was intended to intimidate, coerce, threaten, or retaliate anyone in order to stop Ms. Bailey's communications with sources or MTOC publications, without prior approval of this Court;

B.    Declaratory relief as set forth herein;

C.      Fees and costs, including reasonable attorney's fees pursuant to 28 U.S.C. § 2412, or as otherwise permitted by law; and

D.      Such further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a jury trial of all issues properly triable by jury.

Dated: April 8, 2024                          Respectfully submitted,


                                              By: /s/ Brian T. Gilmore

                                              Joseph M. Terry (DC Bar # 473095)
                                              Brian T. Gilmore (DC Bar # 1030601)
                                              WILLIAMS & CONNOLLY LLP
                                              680 Maine Avenue, S.W.
                                              Washington, DC 20024
                                              T: (202) 434-5000
                                              F: (202) 434-5029
                                              jterry@wc.com
                                              bgilmore@wc.com

                                              *Counsel for Plaintiff Pamela Bailey d/b/a More Than Our Crimes*

## **VERIFICATION**

I, Pamela Bailey, Plaintiff and co-founder of More Than Our Crimes, do hereby verify and affirm under penalty of perjury that the facts set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief.

Pamela Bailey

Dated: April 1, 2024