UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PAMELA BAILEY<br>d/b/a More Than Our Crimes,<br><br>       Plaintiff,<br><br>   v.<br><br>FEDERAL BUREAU OF PRISONS,<br><br>       Defendant. | Civil Action No. 24-1219 (PLF) |

**DEFENDANT'S MOTION TO DISMISS AND**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................- 1 -

BACKGROUND ..................................................................................................................- 3 -

    I.      Summary of Plaintiff's Allegations ..................................................................- 3 -

          A.     Prisons Blocked Plaintiff's Ability to Communicate through TRULINCS Using One of Multiple Email Addresses. ...............................................- 4 -

          B.     Plaintiff Alleges that the Bureau Retaliated Against Her Inmate Sources. .- 10 -

    II.     The Bureau's Policy: TRULINCS ..................................................................- 11 -

LEGAL STANDARD...........................................................................................................- 12 -

ARGUMENT.......................................................................................................................- 13 -

    I.      Plaintiff Has Failed to State a Claim Because She Has Not Alleged an Inability to Communicate with Prisoners Using an Unblocked Alternate Email Address..- 13 -

    II.     Plaintiff's Claims Against Three Prisons Are Entirely or Partially Moot ........- 14 -

    III.    Plaintiff Fails to State a First Amendment Claim Against USP Big Sandy. ....- 17 -

          A.     The Court Should Apply *Turner*............................................................- 17 -

          B.     Plaintiff's First Amendment TRULINCS Claim Against USP Big Sandy Fails under *Turner*...............................................................................- 22 -

          C.     Plaintiff's Claim against USP Big Sandy Also Fails Under *Martinez*..- 27 -

    IV.    Plaintiff Fails to State a First Amendment Retaliation Claim. .........................- 28 -

    V.     Plaintiff Has Failed to State a Due Process Claim...........................................- 35 -

    VI.    Plaintiff's APA Claims Fail. ..........................................................................- 40 -

    VII.   The Court Should Transfer Any Surviving First Amendment Claims to the District Where the Respective Prisons Are Located.........................................- 43 -

CONCLUSION....................................................................................................................- 45 -

**TABLE OF AUTHORITIES**

Cases

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ............................................................................................ 15

*Alvarez v. Smith*,
558 U.S. 87 (2009) ............................................................................................ 15

*Alvin v. Suzuki*,
227 F.3d 107 (3d Cir. 2000) ....................................................................... 36, 37

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) .................................................................. passim

*Arizona*ns *for Official English v. Arizona*
520 U.S. 43 (1997) ............................................................................................ 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................... 13, 14, 31, 41

*Bailey v. Fed. Bureau of Prisons,*
Civ. A. No. 24-1219 (PLF), 2024 WL 3219207 (D.D.C. June 28, 2024) ...................... passim

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................. passim

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......................................................................................... 17

*Benning v. Dozier*,
Civ. A. No. 18-0097, 2021 WL 1713333 (M.D. Ga. Apr. 30, 2021) .................................... 21

*Bourdon v. Dep't of Homeland Sec.*,
235 F. Supp. 3d 298 (D.D.C. 2017) ................................................................... 44

*Cannon v. District of Columbia*,
717 F.3d 200 (D.C. Cir. 2013) .......................................................................... 11

*Carter v. Fed. Bureau of Prisons*,
Civ. A. No. 22-2801 (BAH), 2024 WL 983277 (D.D.C. Mar. 7, 2024) ................... 21, 25, 42

*Chavis v. Garrett*,
419 F. Supp. 3d 24 (D.D.C. 2019) ..................................................................... 36

*Clark Cnty. Sch. Dist. v. Breeden*,
532 U.S. 268 (2001) .......................................................................................... 34

*Ctr. for Env't Sci., Accuracy & Reliability v. Nat'l Park Serv.*,
  75 F. Supp. 3d 353 (D.D.C. 2014) ...................................................................... 43

*Jones v. Hagel*,
  956 F. Supp. 2d 284 (D.D.C. 2013) .................................................................... 44

*Doe v. District of Columbia*,
  796 F.3d 96 (D.C. Cir. 2015) .............................................................................. 29

*English v. District of Columbia*,
  717 F.3d 968 (D.C. Cir. 2013) ............................................................................ 36

*FBI v. Fikre*,
  144 S. Ct. 771 (2024) .......................................................................................... 16

*Fund for Animals, Inc. v. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) .............................................................................. 41

*Hatim v. Obama*,
  760 F.3d 54 (D.C. Cir. 2014) .............................................................................. 22

*Hernandez v. Schaad*,
  Civ. A. No. 17-4055, 2017 WL 6731624 (N.D. Cal. Dec. 29, 2017) ................... 29

*Honig v. Doe*,
  484 U.S. 305 (1988) ........................................................................................... 15

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ............................................................................ 41

*Indian River Cnty. v. Rogoff*,
  254 F. Supp. 3d 15 (D.D.C. 2017) ...................................................................... 12

*Kropat v. FAA*,
  162 F.3d 129 (D.C. Cir. 1998) ............................................................................ 35

*Lewandowski v. Bureau of Prisons*,
  Civ. A. No. 19-15710, 2021 WL 5937671 (D.N.J. Dec. 16, 2021) ..................... 43

*Lewis v. Parker*,
  67 F. Supp. 3d 189 (D.D.C. 2014) ................................................................... 3, 13

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................................... 40

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ....................................................................................... 35, 40

*Mathis v. Geo Grp., Inc.*,
  535 F. Supp. 83 (D.D.C. 2008) ........................................................................... 45

*McAfee v. U.S. Citizenship & Immigr. Servs.,*
    Civ. A. No. 19-2981 (DLF), 2019 WL 6051559 (D.D.C. Nov. 15, 2019) ............................ 44

*North Carolina v. Rice*,
    404 U.S. 244 (1971) ................................................................................................. 15

*Overton v. Bazzetta*,
    539 U.S. 126 (2003) ................................................................................................. 25

*Parker v. United States*,
    Civ. A. No. 20-0430 (ABJ), 2020 WL 10486669 (D.D.C. Oct. 21, 2020) ............................ 45

*Pasem v. U.S. Citiz. & Immig. Servs.,*
    Civ. A. No. 20-0344 (CRC), 2020 WL 3447963 (D.D.C. May 15, 2020) ............................ 13

*Pell v. Procunier*,
    417 U.S. 817 ................................................................................................. 2, 17, 25

*Procunier v. Martinez*,
    416 U.S. 396 (1974) ................................................................................. 18, 27, 38, 40

*Sebolt v. Lariva,*
    Civ. A. No. 15-0353, 2017 WL 2271441 (S.D. Ind. May 23, 2017)................................ 42, 43

*Sebolt v. Samuels*,
    749 F. App'x 458 (7th Cir. 2018) ............................................................. 21, 23, 25, 26

*Sierra Club v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) .................................................................................. 41

*Slate v. Pub. Def. Serv. for D.C.,*
    31 F. Supp. 3d 277 (D.D.C. 2014) ........................................................................ 3, 13

*Slovinec v. Georgetown Univ.*,
    268 F. Supp. 3d 55 (D.D.C. 2017)............................................................................. 11

*Solan v. Zickefoose,*
    530 F. App'x 109 (3d Cir. 2013) ............................................................................... 21

*Stow v. Grimaldi*,
    993 F.3d 1002 (1st Cir. 1993) .................................................................................. 27

*Thornburgh v. Abbott*,
    490 U.S. 401 (1989) ............................................................................................ 19, 20

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) .................................................................................. 40

*Turner v. Safley*,
    482 U.S. 78 (1987) ............................................................................................ passim

iv

Statutes

5 U.S.C. § 551 .............................................................................................................. 41

5 U.S.C. § 701 .............................................................................................................. 41

5 U.S.C. § 702 ......................................................................................................... 40, 41

5 U.S.C. § 704 .............................................................................................................. 40

5 U.S.C. § 706 ......................................................................................................... 40, 43

18 U.S.C. § 4042 .......................................................................................................... 42

28 U.S.C. § 1391 .......................................................................................................... 44

28 U.S.C. § 1404 .......................................................................................................... 43

Other Sources

Trust Fund/Deposit Manual, Program Statement 4500.12 .................................................. passim

Correspondence, Program Statement 5265.14 ............................................................. 11

By and through undersigned counsel, Defendant Federal Bureau of Prisons ("the Bureau") respectfully moves to dismiss Plaintiff's Complaint (ECF No. 1) under Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of jurisdiction and Rule 12(b)(6) for failure to state a claim.

## INTRODUCTION

The Court should dismiss Plaintiff's Complaint in its entirety. At the outset, the Court should dismiss all claims because Plaintiff has not plausibly alleged that the Bureau has fully blocked her email access at any facility noted in the Complaint. This deficiency in her Complaint undercuts her entire theory of relief and casts doubt as to the plausibility of her claims. Plaintiff has merely alleged that "her email address" has been blocked at certain facilities, ECF No. 1 (Compl.) ¶¶ 57, 70, 84, 94, 121, 127, but as discussed below, Plaintiff uses at least two different email addresses to communicate with prisoners and she fails to allege that both of those email addresses have been blocked at any one facility.

Alternatively, the Court should dismiss all claims brought against two of the prisons, Federal Correctional Institution ("FCI") Pekin and FCI Marion, because those prisons either were not actively blocking Plaintiff's email access when the Complaint was filed or otherwise lifted the block before the Court's Order on Plaintiff's Motion for Preliminary Injunction. Therefore, the claims against those facilities, as to all Counts, are moot and should be dismissed under Rule 12(b)(1) for lack of jurisdiction. In addition, a third prison, United States Penitentiary ("USP") Beaumont, lifted the facility-wide block in advance of the Court's Order and retained the block only as to a single prisoner. Therefore, the claims against USP Beaumont are largely moot too.

As to Count One (First Amendment – TRULINCS) specifically, Plaintiff has failed to state a plausible First Amendment claim against USP Big Sandy because the docketed evidence shows that the Bureau's block of Plaintiff's email address was "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987), namely the Bureau's need to know

who inmates are communicating with to protect victims, prison staff, and inmates.  Plaintiff, however, was facilitating inmates' circumvention of email monitoring by operating as a message forwarding service, in violation of electronic messaging (Trust Fund Limited Inmate Computer System, or "TRULINCS") policy.  Also, Plaintiff retained "alternative means of communication" with the inmates, via the telephone, mail, and in-person visits, which Plaintiff admittedly uses to communicate with prisoners, and even an alternate email address that Plaintiff uses to communicate with prisoners, which Plaintiff fails to allege was blocked at USP Big Sandy.  *See Pell v. Procunier*, 417 U.S. 817, 823-24 (1974).

Plaintiff has also failed to state a plausible First Amendment retaliation claim in Count Two because, according to her allegations, her speech was not the but-for cause of the alleged retaliation against the inmates.  Instead, Plaintiff alleges that the facilities retaliated against the inmates because of the inmates' speech, but the inmates are not plaintiffs here.  This disconnect is a fatal flaw to the retaliation claim.  Additionally, even if Plaintiff had made the requisite connection, she has not shown in her pleadings that a person of "ordinary firmness" in her position, that of a nonincarcerated advocate, would be deterred from speaking by the Bureau's actions against some of the inmates with whom she communicates.

Plaintiff's due process claim (Count Three) fails too.  The claim should be dismissed under Rule 12(b)(6) as to all institutions except two of them because Plaintiff did not avail herself to the process that the Bureau made available to her.  As to the remaining two institutions, the Bureau's process passes constitutional muster.  The facilities notified Plaintiff of the email block (in all circumstances, one of at least two email addresses that she used to communicate with prisoners) and the general rationale for the block, and further advised her of her appeal rights (within fifteen

days to the warden). Plaintiff's dissatisfaction with the answers that she received, informing her that she was violating TRULINCS policy, does not entitle her to relief.

Lastly, Plaintiff's Administrative Procedure Act ("APA") claims (Counts Four and Five) fail because the TRULINCS blocks do not constitute "final agency action," and even if they did, the challenged action is committed to the Bureau's discretion by law, and, thus, is unreviewable.

For these reasons, pursuant to Rules 12(b)(1) and 12(b)(6), the Court should dismiss Plaintiff's Complaint in its entirety, and to the extent any First Amendment claims survive, they should be transferred to the district where the prisons are located.

## BACKGROUND

### I.   Summary of Plaintiff's Allegations

The following factual assertions are taken from Plaintiff's Complaint, or otherwise incorporated therein, and are presumed true for purposes of evaluating the Complaint's sufficiency. To the extent that Defendant refers to other matters, for example prior filings in this case, the Court may take judicial notice of such documents and consider them in adjudicating this motion to dismiss. *See, e.g.*, *Lewis v. Parker*, 67 F. Supp. 3d 189, 195 n.6 (D.D.C. 2014); *Slate v. Pub. Def. Serv. for D.C.*, 31 F. Supp. 3d 277, 288-89 (D.D.C. 2014).

Plaintiff cofounded a non-profit organization, More Than Our Crimes, which publishes information about "the failures" of the Bureau. Compl. ¶ 2. According to Plaintiff, the Bureau is trying to "cut [her] off" from accessing information from the prisoners and is "punish[ing] her sources." *Id.* ¶ 3. The conduct at issue began "around the same time" that More Than Our Crimes co-published a report in September 2022. *Id.* ¶ 7; *see also id.* ¶¶ 49-53. According to Plaintiff, unidentified Bureau employees are "aware of [her] work," and "upon information and belief," the Bureau became aware of her report "soon after its publication." *Id.* ¶ 54.

Plaintiff's work depends on her "ability to communicate with people in federal prison, including through Defendant's electronic messaging system [TRULINCS]." *Id.* ¶ 6. She communicates with prisoners, "most often" through email, which is her "primary mode of communication." *Id.* ¶¶ 25, 143. Plaintiff used at least two different email addresses to communicate with prisoners: paminprogress@gmail.com and pam@morethanourcrimes.org. *Compare* ECF No. 2 (Mot. Prel. Inj.), Ex. 5 (block of paminprogess@gmail.com at USP Big Sandy), *with* Exs. 13, 15, 16 (blocks of pam@morethanourcrimes.org at other prisons). In addition, she also communicates with prisoners "sometimes by phone, mail, or in-person visits," although she prefers to avoid the "delays and restrictions" accompanying those forms. Compl. ¶¶ 25, 143. Through these various methods, she has established "regular communication" with "scores" of Bureau prisoners. *Id.* ¶ 25.

### A. Prisons Blocked Plaintiff's Ability to Communicate through TRULINCS Using One of Multiple Email Addresses.

Plaintiff acknowledges that the Bureau "monitors all communications sent through TRULINCS and reserves the right to deny access to users who violate its rules, including by sending messages that 'jeopardize the public or the safety, security, or orderly operation of the correctional facility.'" *Id.* ¶ 27. Plaintiff further acknowledges that Defendant can "block a non-incarcerated user's TRULINCS communications with specific residents, with all residents at a specific [Bureau] facility, or with all residents at all [Bureau] facilities." *Id.* Plaintiff recognizes that, according to the Bureau's Program Statement, *see infra* at 12-14, the Bureau may restrict TRULINCS access when necessary "to ensure the safety, security, or orderly operation of the correctional facility, or the protection of the public or staff." *Id.* ¶ 29. Plaintiff alleges that at least six different institutions "arbitrarily" blocked her TRULINCS access to various degrees, and she was not satisfied with the "terse, conclusory responses" to her challenges. *Id.* ¶ 3.

FCI Ray Brook (New York).  On August 18, 2022, before the publication of Plaintiff's September 2022 report, FCI Ray Brook notified Plaintiff that it was blocking "her email address" from accessing TRULINCS because her communications with prisoners were "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."  *Id.* ¶ 57. Plaintiff fails to allege that FCI Ray Brook blocked her other email address that she used to correspond with prisoners.  *Id.*  According to Plaintiff, her communications "complied with TRULINCS rules" and "could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility."  *Id.* ¶ 58.  When Plaintiff inquired from the warden, according to Plaintiff, the warden responded that "certain residents had added her to their approved contact lists without using her full, correct name."  *Id.* ¶ 59.  Plaintiff does not dispute that this infraction occurred, but instead believes this did not warrant "a wholesale, permanent block of [her] email address," and the "true rationale was to prevent Plaintiff from learning about and publicizing problems within the prison."  *Id.* ¶ 60.

USP Big Sandy (Kentucky).  On December 19, 2022, USP Big Sandy informed Plaintiff that her "email address" was blocked because her communications were "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."  *Id.* ¶ 62. But, according to Plaintiff, her "TRULINCS communications with residents at U.S.P. Big Sandy complied with TRULINCS rules [and] could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility."  *Id.* ¶ 63.  Plaintiff inquired with the institution, and the Regional Director informed her that her email address was "used as a median [and]/or paid service to forward messages to other email addresses and/or other messaging services."  *Id.* ¶ 67.  According to Plaintiff, "no . . . factual support exists" for this decision.  *Id.* ¶ 70.  Rather, according to her, she was blocked "not because she violated any rules, but because

she was using her access to gather information that could embarrass and reveal misconduct by Defendant." *Id.*

Filings on the Court docket, *see* ECF No. 10 (Prel. Inj. Resp.), Ex. 6, of which the Court may take judicial notice, include a contemporaneous memorandum from a USP Big Sandy Special Investigative Services technician to the warden documenting that Plaintiff's email address, paminprogress@gmail.com, was one of fourteen email addresses operating as a text forwarding service and warranted being blocked. The supporting emails can be found at Exhibit 3 of the Bureau's Preliminary Injunction Response, ECF No. 10. Plaintiff has also submitted the decision of Regional Director of the Mid-Atlantic Region, Christopher Gomez, denying Plaintiff's appeal of the block because her email address, paminprogress@gmail.com, "was used as a median/or paid service to forward messages to other email addresses and/or other messaging services. As a result, to prevent the circumvention and misuse of the TRULINCS system, the email address was blocked on multiple accounts." *See* ECF No. 2 (Mot. Prel. Inj.), Ex. 5. Plaintiff does not allege that USP Big Sandy blocked her use of her alternate email address that she frequently used to communicate with prisoners, pam@morethanourcrimes.org. *See generally* Compl.

USP Beaumont (Texas). On March 29, 2023, USP Beaumont blocked "Plaintiff's email address" from TRULINCS, but she does not allege that her other email address that she used to communicate with prisoners was blocked. Compl. ¶¶ 84-85. Plaintiff was able to identify the email that she sent to Shukri Abu Baker that led to the block. *Id.* ¶ 84. Plaintiff, however, believes that her "TRULINCS communications with residents at U.S.P. Beaumont complied with TRULINCS rules [and] [t]hey could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility." *Id.* ¶ 86. Notably, Plaintiff does not allege that

she sought more information from the warden at this institution or otherwise appealed the block. *See id.* ¶¶ 84-89, Count Three (Violation of the Fifth Amendment).

According to the declaration of the USP Beaumont Special Investigative Services technician who implemented the block, which the Court may consider in assessing jurisdiction under Rule 12(b)(1), the technician intended to implement a block between Plaintiff's email address, paminprogress@gmail.com, and Baker only, but she inadvertently hit the wrong button and implemented a facility-wide block with respect to that email address. Ex. 1 (Decl. of Brandi McBride). USP Beaumont lifted the institution-wide block of Plaintiff's email address, paminprogress@gmail.com, before the Court's decision on Plaintiff's preliminary injunction motion; only the inmate-specific block with Baker remained. *Id.* USP Beaumont did not block the other email address that Plaintiff used to communicate with prisoners, pam@morethanourcrimes.org; the block applied only to Plaintiff's email address from which she sent the email to Baker, paminprogress@gmail.com. *Id.*

Federal Correctional Complex (FCC) Hazelton (West Virginia). On November 2, 2023, allegedly "[s]oon after" the United States Attorney's Office interviewed Plaintiff about difficulties prisoners were having using a whistleblower hotline, FCC Hazelton blocked "her email address" with prisoners at the facility. Compl. ¶¶ 93, 94. FCC Hazelton officials informed Plaintiff that she was blocked because her communications were "'detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity.'" *Id.* ¶ 95. The FCC Hazelton block notification that Plaintiff submitted informed her of a block to her email address pam@morethanourcrimes.org, ECF No. 2 (Mot. Prel. Inj.), Ex. 13, and she has not alleged that her alternate email address was blocked at FCC Hazelton, *see generally* Compl. Notably, Plaintiff

also does not allege that she sought more information from the warden at this institution or otherwise appealed the block. *See id.* ¶¶ 94-97, Count Three (Violation of the Fifth Amendment).

FCI Marion (Illinois).  On March 8, 2024, Plaintiff was notified that "her email address" was blocked from communicating with two FCI Marion prisoners because her communications were "'detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity.'"  Compl. ¶¶ 121-22.  She does not allege that FCI Marion blocked her other email address that she used to communicate with prisoners. *See generally* Compl.  According to Plaintiff, her communications "complied with TRULINCS rules" and "could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility."  *Id.* ¶ 125. Plaintiff does not allege that she sought more information from the warden or otherwise appealed the block. *See id.* ¶¶ 121-25, Count Three (Violation of the Fifth Amendment).

Pursuant to the declaration submitted by the Trust Fund Supervisor at FCI Marion, which the Court may consider in assessing jurisdiction under Rule 12(b)(1), there were no blocks associated with either of Plaintiff's email addresses since at least May 6, 2024.  Ex. 2 (Decl. of Stephanie Johnson).  In Plaintiff's preliminary injunction motion, when discussing the alleged block at FCI Marion, she references a block involving an inmate at a different institution.  ECF No. 2 (Mot. Prel. Inj.), at 18 (citing "*E.g.*, Ex. 15," which references a block because of an email with Monzer Al Kassar, a USP Florence inmate).  *See* https://www.bop.gov/mobile/find_inmate/ byname.jsp (Find an inmate).

FCI Pekin (Illinois).  On March 14, 2024, Plaintiff was notified that "her email address" was blocked from communicating with two prisoners at FCI Pekin because her communications were "'detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity.'"  Compl. ¶¶ 127-28.  Plaintiff submitted a block notification with an FCI Pekin

prisoner that informed her of a block to her email address pam@morethanourcrimes.org, ECF No. 2 (Mot. Prel. Inj.), Ex. 16; she has not alleged that FCI Pekin blocked her alternate email address, paminprogress@gmail.com, *see generally* Compl.  According to Plaintiff, her communications "complied with TRULINCS rules" and "could not possibly facilitate criminal behavior or threaten the security, good order, or discipline of the facility." *Id.* ¶ 130.  Notably, Plaintiff does not allege that she sought more information from the warden at this institution or otherwise appealed the block. *See id.* ¶¶ 127-30, Count Three (Violation of the Fifth Amendment).

Pursuant to the declaration submitted by a FCI Pekin Trust Fund Supervisor, Patrick Veal, which the Court may consider in assessing jurisdiction under Rule 12(b)(1), FCI Pekin initially blocked Plaintiff from sending messages through pam@morethanourcrimes.org, but removed that block on May 18, 2024.  Ex. 3 (Decl. of Patrick Veal).  FCI Pekin did not block the other email address, paminprogress@gmail.com, that Plaintiff also used to communicate with prisoners at FCI Pekin. *Id.*

USP Florence (Colorado).  Plaintiff alleges that, in March 2024, she was allegedly removed from a prisoner's contact list and another resident was allegedly unable to add her.  Compl. ¶ 133. This is the only mention of USP Florence in her Complaint. *See generally* Compl.  Plaintiff has not asserted any claims against USP Florence, let alone pled sufficient factual allegations that would entitle her to relief.  S*ee id.* ¶ 139 (First Amendment TRULINCS claims against five institutions where she was allegedly blocked facility-wide and one institution (FCI Pekin) where she was blocked with two individuals), ¶¶140-50 (no mention of retaliation claim against USP Florence, including ¶ 145 where she makes allegations against six other prisons), ¶154 (no due process claim against USP Florence), ¶163 (no APA claim against USP Florence).

B.      **Plaintiff Alleges that the Bureau Retaliated Against Her Inmate Sources.**

In addition to limitations on TRULINCS access, Plaintiff also alleges that the Bureau retaliated against the prisoners without "proper justification" and intended to "intimidate" her sources into "cutting off communication with [her]." *Id.* ¶ 146. Specifically, she alleges:

- On March 10, 2022, a Special Investigative Services officer at FCI Cumberland threatened to send prisoner Leonard Schenck to solitary confinement and have him beat up if he continued to talk to Plaintiff about Bureau employees. *Id.* ¶¶ 31-33. According to Plaintiff, the threats "succeeded in stopping Mr. Schenck from communicating further with Ms. Bailey via TRULINCS" for three months. *Id.* ¶ 34.

- On December 29, 2022, after USP Big Sandy inmate Cory Perry spoke with Plaintiff on the phone about "things that were happening at the prison," correctional officers brought Perry to the Special Housing Unit (SHU), without explanation, where he was "interrogated" and informed that he "had been taken to the SHU because of his previous night's phone call with Plaintiff." *Id.* ¶¶ 72-75. Officials warned Perry to stop speaking to Plaintiff. *Id.* ¶ 77. According to Plaintiff, Perry was confined in the Special Housing Unit for the next six months "in retaliation for his communications with Plaintiff." *Id.* ¶ 79.

- In January 2023, FCI Cumberland prisoner Jeremy Fontanez, informed Plaintiff about a complaint filed with the Department of Justice concerning a Bureau employee who allegedly assaulted a prisoner. *Id.* ¶ 39. Three or four months later, in April or May 2023, a Special Investigative Services lieutenant "interrogated" Fontanez about his communications with Plaintiff and made a "veiled threat" of retaliation against Fontanez if he continued to speak to Plaintiff. *Id.* ¶¶ 39-47. Fontanez continued to speak with Plaintiff about the problems at FCI Cumberland. *Id.* ¶ 48.

- Around March 2023, USP Beaumont denied Baker's transfer request. *Id.* ¶¶ 88-89.

- On November 2, 2023, FCC Hazelton allegedly retaliated against Plaintiff's sources who had been communicating with Plaintiff about "unlawful conduct" at the facility. *Id.* ¶ 97. Specifically, FCC Hazelton "fired" prisoner Joel Vasquez from his job at the prison barber shop after he informed Plaintiff about a Rastafarian prisoner who was being forced to remove his religious head dress. *Id.* ¶¶ 99-101. Likewise, on that same day, another "source," Jacky Foster, "lost his job in the snow removal group." *Id.* ¶ 102. And two days later, another "source," Lamar Tucker, was strip searched with "no real justification." *Id.* ¶ 103.

- In retaliation for inmate Perry speaking to an NBC reporter and Plaintiff, USP Tucson officials told him to "be careful" about who he was talking to, *id.* ¶ 107, "insisted" that he could not speak with the reporter, *id.* ¶ 108, threatened that if he continued to provide information, he would get in "big trouble," *id.* ¶ 110, investigated him for receiving

money from the reporter, *id.* ¶¶ 111-12, and did not approve his transfer request to FCI Tucson, *id.* ¶¶ 115-16.

## II.       The Bureau's Policy: TRULINCS

The Court may consider the Bureau's TRULINCS Manual without converting this motion to a motion for summary judgment because it is "incorporated by reference in the complaint." *Slovinec v. Georgetown Univ.*, 268 F. Supp. 3d 55, 59 (D.D.C. 2017), *aff'd*, No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018); *see* Compl. ¶¶ 29, 168. Additionally, the Court may take judicial notice of information posted on official public websites of government agencies. *E.g.*, *Cannon v. District of Columbia*, 717 F.3d 200, 205 & n.2 (D.C. Cir. 2013).

The Bureau provides inmates with several methods for communicating with people outside of prison, including telephone privileges, email through TRULINCS, and sending written mail. *See* https://www.bop.gov/inmates/communications.jsp. This case involves the alleged blocking of Plaintiff's ability to communicate with inmates through one of those methods: TRULINCS email.

Pursuant to the *Trust Fund/Deposit Manual* ("Manual"), Program Statement 4500.12, https://www.bop.gov/policy/progstat/4500.12.pdf, Bureau personnel is authorized to "reject[] individual emails sent to or from inmates" that jeopardize the safety, security, or orderly operation of the correctional facility, or the protection of the public and staff. *Id.* § 14.3(d). "Inmates may only communicate with approved persons on their contact lists." *Id.* § 14.10(c). "Inmates may only exchange emails with contacts who have accepted the inmate's request to communicate." *Id.* § 14.10(c)(3). Additionally, an inmate is permitted to correspond via TRULINCS with another inmate only in certain circumstances, namely when the inmate is immediate family or a party/witness in a legal action in which both inmates are involved and only with the Bureau's approval. *Id.* § 14.10(c)(3)(d); *see* Program Statement 5265.14, *Correspondence*, § 9, https://www.bop.gov/policy/progstat/ 5265_014.pdf.

- 11 -

To receive emails from an inmate, the contact must consent; the contact also has the option to refuse or ignore the request for email exchanges. Manual § 14.10(c)(3)(c). "By approving, the person in the community consents to have Bureau staff monitor the content of all emails and agrees to comply with program rules and procedures." *Id.* The Bureau also has the authority to reject emails that "would jeopardize the safety, security, or orderly operation of the correctional facility or the protection of the public and staff." *Id.* § 14.10(j)(5)(b). Such emails include those that are "detrimental to the security, good order, or discipline of the institution, or a threat to the public and staff, or it might facilitate criminal activity," or that "otherwise violate[] the established parameters of the TRULINCS Program." *Id.* "When an email is rejected, the sender is notified that his/her email will not be delivered and the reason(s) for the rejection." *Id.* § 14.10(j)(5)(c). "If either an inmate or a contact attempts to send emails that are rejected, forward inmate emails to an unauthorized address, or otherwise violate this policy, the Warden may remove the individual from participation in this program." *Id.* § 14.10(j)(6). The Bureau has the authority to block certain email addresses Bureau-wide, facility-wide, or inmate-specific. *Id.* § 14.10(c)(3)(c).

## LEGAL STANDARD

A party may move under Rule 12(b)(1) to dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion to dismiss as moot "is properly brought under Rule 12(b)(1) because mootness itself deprives the court of jurisdiction." *Indian River Cnty. v. Rogoff*, 254 F. Supp. 3d 15, 18 (D.D.C. 2017). When evaluating a Rule 12(b)(1) motion to dismiss, "the Court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Id.* The Court may also "consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Id.* "In deciding whether a claim has become moot, a court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has

jurisdiction in the case." *Pasem v. U.S. Citiz. & Immig. Servs.*, Civ. A. No. 20-0344 (CRC), 2020 WL 3447963, at *5 (D.D.C. May 15, 2020) (internal quotation marks omitted).

A Rule 12(b)(6) motion to dismiss tests whether a complaint accomplished what it was obligated to do under the pleading rules. A claim will fail this inspection if it asserts a legal theory that is not cognizable as a matter of law or if the factual allegations are implausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The pleading must demonstrate that the allegations "possess enough heft" to show a plausible entitlement to relief. *Id.* at 557. Although a complaint need not contain detailed factual allegations, it must allege enough to raise a plaintiff's claims beyond the level of speculation and must "nudge" the claims "across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009); *Twombly*, 550 U.S. at 557 n.5. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (alterations in original). In determining whether a complaint fails to state a claim, the court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice," *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), including docketed court filings, *Lewis*, 67 F. Supp. 3d at 195 n.6; *Slate*, 31 F. Supp. 3d at 288-89.

## ARGUMENT

### I.    Plaintiff Has Failed to State a Claim Because She Has Not Alleged an Inability to Communicate with Prisoners Using an Unblocked Alternate Email Address.

Plaintiff's Complaint should be dismissed in its entirety because Plaintiff has not plausibly alleged that the Bureau has blocked her email access at any facility. This deficiency undercuts Plaintiff's entire theory of relief and casts doubt as to the plausibility of her claims.

Throughout her Complaint, Plaintiff only alleges that "her email address" has been blocked at certain facilities. Compl. ¶¶ 57, 70, 84, 94, 121, 127. The Manual notes that "email addresses" are blocked, not that people are blocked. Manual § 14.10(c)(3)(c). As noted above, Plaintiff uses at least two email addresses to communicate with inmates across the Bureau: paminprogress@gmail.com and pam@morethanourcrimes.org. *See also* Mot. Prel. Inj., Ex. 5 (block of paminprogess@gmail.com at USP Big Sandy), *id.* Exs. 13, 15, 16 (blocks of pam@morethanourcrimes.org at other prisons). Plaintiff does not allege that both email addresses have been blocked at any facility or that she has been cut off from email communication at any facility. Lacking "further factual enhancement" by way of allegations that the prisons have blocked her email access, she has failed to state a plausible First Amendment claim or any derivative claims that she has asserted in her Complaint. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 550). "[C]onceivable" claims for relief, which is what Plaintiff has pled at most by merely alleging that "her email address" has been blocked when she uses at least two email addresses to communicate with prisoners, are inadequate to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 557 n.5.

## II.    Plaintiff's Claims Against Three Prisons Are Entirely or Partially Moot.

Alternatively, Plaintiff's claims brought against three of the institutions are entirely or partially moot because two of the prisons (FCI Marion and FCI Pekin) either never blocked Plaintiff's email access or otherwise lifted the block before the Court's Order on Plaintiff's Motion for Preliminary Injunction, and a third prison (USP Beaumont) lifted the facility-wide block in advance of the Court's Order and retained only the block as to a single prisoner. Therefore, the claims are moot in full as to FCI Marion and FCI Pekin, and moot in part as to USP Beaumont, and, thus, should be dismissed under Rule 12(b)(1) for lack of jurisdiction.

The mootness doctrine, derived from Article III, limits federal courts to deciding actual, ongoing controversies. *Honig v. Doe*, 484 U.S. 305, 317 (1988). Federal courts have "no power to issue advisory opinions" and are "without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971). An "actual controversy" must exist not only "at the time the complaint is filed," but through "all stages" of the litigation. *Alvarez v. Smith*, 558 U.S. 87, 92 (2009); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (internal quotation marks omitted). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Alvarez*, 558 U.S. at 93).

Here, pursuant to the declaration submitted by Trust Fund Supervisor at FCI Marion, which the Court may consider in assessing jurisdiction under Rule 12(b)(1), there were no blocks associated with either of Plaintiff's email addresses since at least May 6, 2024. Ex. 2 (Decl. of Stephanie Johnson). In fact, in Plaintiff's preliminary injunction motion, when discussing the alleged block at FCI Marion, she references a block involving an inmate at a different institution. Mot. Prel. Inj. Mot. at 18 (citing "*E.g.*, Ex. 15," which references a block because of an email with Monzer Al Kassar, a USP Florence inmate). *See* https://www.bop.gov/mobile/find_inmate/ byname.jsp. Therefore, the claims against FCI Marion are moot as to all Counts.

Likewise, FCI Pekin and USP Beaumont voluntarily ceased to maintain the TRULINCS blocks, in whole or in part, prior to the Court's Order on Plaintiff's preliminary injunction motion, dated June 28, 2024. *See* ECF No. 17 (Order). To show mootness when a defendant has

- 15 -

voluntarily ceased the challenged practice, defendant must show that the conduct could not "reasonably be expected to recur." *FBI v. Fikre*, 144 S. Ct. 771, 777 (2024) (internal quotation marks omitted). Supplemental evidence that the defendant offers to establish mootness should be accepted as true. *Id.*

Pursuant to the declaration submitted by the FCI Pekin Trust Funder Supervisor, FCI Pekin initially blocked Plaintiff from sending messages through pam@morethanourcrimes.org, but removed that block on May 18, 2024, more than forty days before the Court's decision on Plaintiff's preliminary injunction motion. Ex. 3 (Decl. of Patrick Veal). Likewise, the Special Investigative Services technician at USP Beaumont intended to implement a block between Plaintiff's email address, paminprogress@gmail.com, and inmate Baker only, but she inadvertently hit the wrong button and implemented a facility-wide block in March of 2023. Ex. 1 (Decl. of Brandi McBride). On June 17, 2024, before the Court's preliminary injunction Order, the institution-wide block of Plaintiff was lifted. *Id.*

As demonstrated in the declarations of Veal and McBride, the alleged practice of blocking Plaintiff's email access to stop her from gathering information from her inmate sources is not likely to recur. First, FCI Pekin never blocked Plaintiff's email access, but only temporarily blocked one of multiple email addresses that she used to communicate with prisoners and *sua sponte* lifted that limited block two months later. Similarly, at USP Beaumont, the facility-wide block was an inadvertent mistake altogether and was lifted *sua sponte*, which shows that USP Beaumont has no intent to suppress First Amendment expression. Second, even though the blocks were no longer in place, the Court Order enjoining FCI Pekin and USP Beaumont from maintaining blocks, was a poignant reminder to the prisons to comply with TRULINCS policy.

Thus, all claims against FCI Marion and FCI Pekin and all claims outside of the block with a single inmate Baker at USP Beaumont should be dismissed for lack of jurisdiction.

### III.     Plaintiff Fails to State a First Amendment Claim Against USP Big Sandy.

Outsiders' access to prisoners is not without limits, particularly here, where Plaintiff alleges interference with only a single form of communication (email).  So long as Plaintiff retains an "alternative means of communication" that afford her "an open and substantially unimpeded channel for communication" with the prisoners, she cannot state a First Amendment Violation. *Pell*, 417 U.S. at 823-24.  Plaintiff does not allege any interference with her ability to communicate with prisoners by telephone, in-person visitation, or regular mail.  While Plaintiff may have a right to communicate, she does not have a right to a specific form of communication, even if email is her preferred form.  And even as to her email, Plaintiff used two different email addresses to communicate with prisoners, and her allegations as to the USP Big Sandy block—as with all the other prisons—relate to a block of only one of those email addresses.  Plaintiff's First Amendment TRULINCS claim as to USP Big Sandy, thus, fails.

Moreover, even if Plaintiff did have a right to a preferred form of communication with a preferred email address, the challenged conduct survives constitutional scrutiny because the email blocks were reasonably related to legitimate penological interests, as explained below.

### A.     The Court Should Apply *Turner*.

The right to communicate with prisoners is not without limits. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 548 (1979).  Accordingly, prison regulations targeted at maintaining internal order and institutional security are governed under

- 17 -

the more deferential *Turner* standard, while the strict scrutiny *Martinez* standard is confined to regulations targeting conduct with minimal impact on order and security.  *Turner* applies here.

In *Procunier v. Martinez*, 416 U.S. 396 (1974), prisoners brought a class action against California's Department of Corrections' mail censorship regulation that prohibited certain defamatory and inappropriate inmate correspondence, including magnified grievances, undue complaints, and inflammatory political, racial, and religious views.  The Supreme Court decided that censorship passes constitutional muster if: (1) the legitimate governmental interest in the order and security of penal institutions justifies the regulation or practice; and (2) the regulation or practice is no greater than necessary to protect the governmental interest.  *Id.* at 413.

In *Turner*, 482 U.S. at 87-89, the Supreme Court held that the district and circuit courts erred in applying the *Martinez* "strict scrutiny standard" to a regulation that restricted correspondence between inmates.  Instead, a prison regulation that impinges on constitutional rights is valid if the regulation is "reasonably related to legitimate penological interests."  *Id.* at 89.  "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."  *Id.*  "The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand."  *Id.*  The Supreme Court, accordingly, delineated a four-part test for analyzing prison regulations that allegedly circumscribe a constitutionally protected interest: (1) whether there is a "valid, rational connection between the prison regulation and legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the

- 18 -

asserted constitutional right will have on guards and other inmates, and on the allocation of resources generally"; and (4) "the absence of ready alternatives" to the regulation. *Id* at 89-90.

In *Thornburgh v. Abbott*, 490 U.S. 401 (1989), the Supreme Court synthesized the *Martinez* strict scrutiny standard and the more deferential *Turner* standard. The regulation before the Court in *Thornburgh* involved the Bureau's discretion to reject incoming publications found to be "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Id.* at 404. The Court determined that the *Turner* standard applied, not just to prisoners as the Court held in *Turner*, but also to outsiders seeking access to prisons because those interactions also "have potentially significant implications for the order and security of the prison." *Id.* at 407; *see also id.* at 413 ("categorical distinction between incoming correspondence from prisoners (to which we applied a reasonableness standard in *Turner*) and incoming correspondence from nonprisoners would likely prove futile"). The Court explained that the *Martinez* standard "simply was not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons." *Id.* at 407. Rather, the *Martinez* standard was confined to outgoing personal mail from prisoners that "[do] not, by its very nature, pose a serious threat to prison order and security." *Id.* at 411. As applied to *Thornburgh*, the incoming publications had "potential for coordinated disruptive conduct," and "[i]n the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder," and, thus, *Turner* applied. *Id.* at 413.

*Turner* applies in this case. The regulations at issue give the Bureau authority to block certain TRULINCS communications that "would jeopardize the safety, security, or orderly operation of the correctional facility or the protection of the public and staff." Manual § 14.10(j)(5)(b). The paramount consideration underlying the regulations is prison order and

security, as it was in *Turner*, regardless of whether the emails are incoming or outgoing.  In contrast, in *Martinez*, the outgoing personal mail from prisoners did not pose a threat to prison order and security.

As the Court questioned in its Opinion, there are instances when restrictions on outgoing communications are implemented to maintain prison order and security, and in such circumstances, should the strict scrutiny *Martinez* standard apply just because the restriction targeted outgoing correspondence?  *Bailey v. Fed. Bureau of Prisons*, Civ. A. No. 24-1219, 2024 WL 3219207, at *5 (D.D.C. June 28, 2024).  *Thornburgh* suggests no.  The regulations governing the inappropriate outgoing inmate correspondence in *Martinez* was not "centrally concerned with the maintenance of order and security within prisons."  *Thornburgh*, 490 U.S. at 407.  The *Martinez* standard was confined to outgoing personal correspondence from prisoners that "[do] not, by its very nature, pose a serious threat to prison order and security," namely magnified grievances, undue complaints, and inflammatory political, racial, and religious views.  *Id.* at 411.

But in the instant case, not only are we dealing with an abundance of incoming communications from Plaintiff, even the outgoing correspondence at issue (e.g., emails from inmates to Plaintiff to be forwarded to inmates at other institutions and emails to be forwarded to outsiders who the Bureau has not approved as an authorized TRULINCS user) directly implicate prison order and security, unlike *Martinez*.  Simply put, the Bureau needs to know who their prisoners are communicating with to preserve prison order and security, and the regulations that govern those communications and oversight thereof should be given deference.  *See Turner*, 482 U.S. at 89 ("Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.").  The risks in allowing

inmates to communicate with each other and with unapproved outsiders, for example, to intimidate other inmates, coordinate escapes or riots, or further criminal activity, could be dangerous to the inmate population, staff, and the public.

The pace and breadth of email exponentially exacerbates those security concerns within the prison, which further demands application of *Turner*, regardless of whether the emails are incoming or outgoing.  As this Court recognized, *Martinez* involved outgoing postal mail, which "by its nature, does not present significant safety concerns."  *Bailey*, 2024 WL 3219207, at \*5 (citing *Thornburgh*, 490 U.S. at 411-12).  Email, in contrast, is "able to be sent at a rapid pace and to a wide audience" and "may not be as inherently unsafe."  *Id.*  The Court cited to *Benning v. Dozier*, Civ. A. No. 18-0097, 2021 WL 1713333, at \*8 (M.D. Ga. Apr. 30, 2021), *rev'd on other grounds*, 71 F.4th 1324, 1338 (11th Cir. 2023), which held that "*Turner* is the proper standard to apply when reviewing the constitutionality of restrictions of outgoing prisoner email." "[E]mail is just different."  *Id.* at \*1.  Other courts have also applied the *Turner* standard to challenges to the TRULINCS email policy.  *See, e.g.*, *Sebolt v. Samuels*, 749 F. App'x 458, 460 (7th Cir. 2018) ("Because the *Turner* factors all favor the Bureau, the restriction [on TRULINCS email] is sound."); *Solan v. Zickefoose*, 530 F. App'x 109, 110-11 (3d Cir. 2013) (citing *Turner*: "the critical question is whether the prison's decision to exclude Solan from using email 'is reasonably related to legitimate penological interests'"); *Carter v. Fed. Bureau of Prisons*, Civ. A. No. 22-2801 (BAH), 2024 WL 983277, at \*3 (D.D.C. Mar. 7, 2024) (applying *Turner* to prisoner's challenge to restriction on email use); *Benning*, 2021 WL 1713333, at \*8 ("The Court is hesitant to begin applying the more-exacting *Martinez* standard to a new set of facts that could have unanticipated and unknown implications to the administration of our prisons.").

Thus, *Turner* should apply here because the restrictions on Plaintiff's email use, which applied to both incoming and outgoing email use, implicate prison order and security.

### B.    Plaintiff's First Amendment TRULINCS Claim Against USP Big Sandy Fails under *Turner*.

Pursuant to *Turner,* restrictions on TRULINCS email are permissible so long as they are "reasonably related to legitimate penological interests," which is determined by application of a four-part test. *Turner*, 482 U.S at 89-90; *supra* at 19.

*First factor.*  The first *Turner* factor—whether there is a rational connection between the regulation and a legitimate government interest—essentially forecloses the First Amendment TRULINCS claim brought against USP Big Sandy.  The first factor "is the most important." *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014).

"[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational," but so long as it is "legitimate and neutral," i.e., "without regard to the content of the expression," the regulation should remain undisturbed. *Turner*, 482 U.S at 89-90.  Here, Bureau personnel is authorized to "reject[] individual emails sent to or from inmates" that jeopardize the safety, security, or orderly operation of the correctional facility, or the protection of the public and staff.  Manual § 14.3(d). "Inmates may only communicate with approved persons on their contact lists," *id.* § 14.10(c), and "[i]nmates may only exchange emails with contacts who have accepted the inmate's request to communicate," *id.* § 14.10(c)(3).  Further, "[i]f either an inmate or a contact attempts to . . . forward inmate emails to an unauthorized address, . . . the Warden may remove the individual from participation in" TRULINCS.  *Id.* § 14.10(j)(6).

Bureau policy to prohibit the conduct at issue, namely facilitating communications between inmates and passing messages to outsiders that are not authorized users, are reasonably

related to legitimate penological interests of maintaining prison order and security. Bureau staff must know who inmates are communicating with for numerous penological reasons. Inmates are not allowed to further criminal activity; inmates cannot contact victims; and the risks in allowing inmates to communicate with each other, for example, to coordinate escapes or riots, could be dangerous to staff and the public. Thus, allowing inmates to email one person for distribution to people on the outside or to other inmates is what the Bureau calls "circumventing monitoring," and it is not permitted. As this Court explained, "The [Bureau's] rule against third parties forwarding messages to individuals not on an inmate's approved contact list safeguards the [Bureau's] ability to adequately monitor inmate messages. This is because adequate monitoring requires knowledge not only of what a message says, but to whom the message is directed. When a third party acts as an intermediary for an inmate to message an unapproved contact, the [Bureau's] monitoring ability is compromised." *Bailey*, 2024 WL 3219207, at *7.

"[T]he Bureau's policy of keeping potential email abusers from using its email system is rationally related to its legitimate security interests." *Sebolt*, 749 F. App'x at 460. The Bureau's asserted interests of secure and orderly operations of its facilities satisfy even the more demanding first step of *Martinez* of establishing an "important" and "substantial" governmental interest "unrelated to the suppression of expression," *Bailey*, 2024 WL 3219207, at *4 (quoting *Martinez*, 416 U.S. at 413), let alone the more deferential *Turner* criteria.

Docket filings, of which the Court may take judicial notice, include a contemporaneous memorandum from a USP Big Sandy Special Investigative Services technician to the warden documenting that Plaintiff's email address was one of fourteen email addresses operating as a text forwarding service and warranted being blocked from inmates. *See* ECF No. 10 (Prel. Inj. Resp.), Ex. 6. The supporting emails show that Plaintiff was operating as a text and email forwarding

- 23 -

service to unapproved contacts, which circumvents the Bureau's ability to monitor who the prisoners are communicating with. *Id.,* Ex. 3. Accordingly, Regional Director of the Mid-Atlantic Region, Christopher Gomez, denied Plaintiff's appeal of the block because her email address "was used as a median/or paid service to forward messages to other email address and/or other messaging services. As a result, to prevent the circumvention and misuse of the TRULINCS system, the email address was blocked on multiple accounts." *See* Mot. Prel. Inj., Ex. 5.

Thus, the first *Turner* factor, as to USP Big Sandy, favors the Bureau. USP Big Sandy blocked Plaintiff in accordance with TRULINCS policy and consistent with the legitimate governmental interest of preventing TRULINCS users from "compromis[ing]" the Bureau's "monitoring ability," by facilitating messaging to and from unidentified third parties that are not authorized TRULINCS users, which inhibits USP Big Sandy's ability to maintain prison order and security. *See Bailey*, 2024 WL 3219207, at *7.

*Second factor.* As to the second factor, there are "alternative means" for Plaintiff to contact USP Big Sandy inmates. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (cleaned up). Here, the existence of alternative means for Plaintiff to exercise her asserted constitutional rights weighs in favor of upholding the Bureau's policy and email blocks. Specifically, Plaintiff states that her work depends on her "ability to communicate with people in federal prison, including through [TRULINCS]," not that her work depends on TRULINCS. Compl. ¶ 6. She communicates with prisoners "most often" through TRULINCS, which is her "primary mode of communication." *Id.* ¶¶ 25, 143. And although she prefers to avoid the "delays and restrictions" accompanying other forms, she also communicates with prisoners "sometimes by phone, mail, or

in-person visits." *Id.* ¶¶ 25, 143.  Moreover, USP Big Sandy blocked only one of at least two email addresses (pam@paminprogress.com) that Plaintiff used to communicate with prisoners.  *See* Prel. Inj. Resp., Ex. 6 (memorandum to warden to block pam@paminprogress.com); Mot. Prel. Inj., Ex. 5 (appeal denial as to email address pam@paminprogress.com).  Plaintiff does not allege that she was blocked from using her alternate email address that she frequently used to communicate with prisoners, pam@morethanourcrimes.org.

The availability of mail, in-person visits, the telephone, and a different email address as alternate means of correspondence counsels in favor of dismissal of Plaintiff's USP Big Sandy claims.  *See Pell*, 417 U.S. at 823-24 (holding that "alternative means of communication" must be considered and visitation restrictions do not violate First Amendment where "the medium of written correspondence affords inmates an open and substantially unimpeded channel for communication with persons outside the prison"); *Sebolt*, 749 F. App'x at 460-61 (affirming dismissal of challenge to TRULINCS restriction because the prisoner has "alternative means of exercising his First [Amendment] rights," namely through regular mail and telephone, and rejecting argument that regular mail and phone calls are "more restrictive" than email because "prison officials are not required to choose the least restrictive option when enacting a policy").  Plaintiff states that she does not like "the delays and restrictions" on phone use and prison mail, Compl. ¶ 143, but alternative communication methods "need not be ideal . . . they need only be available."  *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003); *see also Carter*, 2024 WL 983277, at *3 ("That plaintiff is unable to receive or answer his alleged admirers' messages by email or prefers email because it is speedy does not implicate the First Amendment.").

*Third factor.*  Continuing to the third factor, allowing Plaintiff email access with inmates at USP Big Sandy, despite her documented violations of TRULINCS policy, would require the

expenditure of staff resources to closely monitor her email account. "In the necessarily closed environment of the correctional institution, few changes will have no ramifications on . . . the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. As the Seventh Circuit held, "[M]onitoring emails to detect abuse imposes costs on the prison. And those costs increase when the users are likely to abuse the system because the prison must then scrutinize their emails more carefully. Prisons have a legitimate interest in limiting the costs of detecting unlawful communications between inmates and outsiders." *Sebolt*, 749 F. App'x at 460. Here, Plaintiff has a history of TRULINCS abuse and the additional resources that would be needed to monitor her continued use where she has shown a propensity to violate TRULINCS policy favors upholding the USP Big Sandy block.

*Fourth factor.* Finally, when looking at the fourth factor, Plaintiff has not identified any ready alternatives that would allow her to email USP Big Sandy inmates from [pam@paminprogress.com](mailto:pam@paminprogress.com), without placing an additional burden on Bureau resources. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Turner*, 482 U.S. at 90. Importantly, the fourth factor does not impose "a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91. Here, Plaintiff has not identified an "obvious, easy alternative" to the email program that would allow likely email abusers to use email addresses from which she has sent infringing emails without adding to the

prison's monitoring costs.  This factor, like the previous three, shows that the Bureau's regulation and implemented USP Big Sandy blocks satisfy *Turner*'s reasonable relationship standard.

In sum, the regulations on TRULINCS access and the USP Big Sandy block are reasonably related to valid corrections goals—maintaining prison order and security—and, therefore, Plaintiff's TRULINCS claims as to USP Big Sandy should be dismissed.

### C.      Plaintiff's Claim against USP Big Sandy Also Fails Under *Martinez*.

Even if *Martinez* applied to the outgoing communications, Plaintiff's TRULINCS claim against USP Big Sandy would nevertheless fail.  As the Court concluded, Plaintiff's infractions at USP Big Sandy threaten prison order and security and satisfy the first step of *Martinez*.  *Bailey*, 2024 WL 3219207, at *6.  "It is beyond dispute that 'security [and] order' are 'important [and] substantial governmental interest[s] unrelated to the suppression of expression.'"  *Id.* (quoting *Martinez*, 416 U.S. at 413).

The Court also rejected Plaintiff's arguments that the USP Big Sandy blocks did not satisfy the second step of *Martinez*.  *Id.* at *6-7.  The Court was unpersuaded by Plaintiff's argument that there was not a close enough fit because "none of the offending messages actually threatened order or security at Big Sandy."  *Id.*  The Court explained that "adequate monitoring requires knowledge not only of what a message says, but to whom the message is directed," and, therefore, where Plaintiff was acting as an intermediary, the Bureau's "monitoring ability is compromised," regardless of the content of the specific message.  *Id.* at *7.  The second step "does not mean . . . that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular" message.  *Martinez*, 416 U.S. at 414; *see also Stow v. Grimaldi*, 993 F.3d 1002, 1004 (1st Cir. 1993) (rejecting argument that *Martinez* required the plaintiff to prove that the communication at issue presented a security problem).

The Court was also unpersuaded by Plaintiff's argument that the institutions that implemented facility-wide blocks should have, instead, blocked individual messages. *Bailey*, 2024 WL 3219207, at *7. The Court pointed out that *Martinez* requires that the block was "generally necessary," not that it was the "least restrictive means." *Id.* (quoting *Thornburgh*, 490 U.S. at 411). As the Court explained, "Blocking only individual messages would not prevent contacts from forwarding messages in the future. Even if blocking individual messages that violated TRULINCS rules were a less restrictive means of achieving the same objective that the [Bureau] sought through blocking Ms. Bailey facility-wide, the *Martinez* analysis would still favor the government." *Id.* Indeed, given Plaintiff's repeated infractions, it would have been well within the Bureau's discretion to block Plaintiff Bureau-wide, but the Bureau did not do so. Manual § 14.10(c)(3)(c); *see also id.* § 14.10(j)(6) ("If either an inmate or a contact attempts to send emails that are rejected, forward inmate emails to an unauthorized address, or otherwise violate this policy, the Warden may remove the individual from participation in this program.").

For these reasons, even if the *Martinez* standard applied, the Court should dismiss Plaintiff's First Amendment claim challenging the blocks at USP Big Sandy.

## IV. **Plaintiff Fails to State a First Amendment Retaliation Claim.**

Plaintiff has failed to state a First Amendment retaliation claim because she does not allege that her speech was the but-for cause of the alleged retaliation against her sources, nor has she shown with supporting allegations that the facilities' alleged retaliatory conduct would deter a person of "ordinary firmness" in her position as a nonincarcerated advocate from speaking again.

A First Amendment retaliation claim requires a plaintiff to show that:

(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him.

*Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). "To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011)). "It does not suffice for the plaintiff to show that she was harmed by government action taken in response to a third party's speech." *Bailey*, 2024 WL 3219207, at *10. Where adverse actions are taken against plaintiff because of another person's protected conduct, "and not, as required for a First Amendment retaliation claim, because of *Plaintiff's* protected conduct," the claim should be dismissed. *Hernandez v. Schaad*, Civ. A. No. 17-4055, 2017 WL 6731624, at *3 (N.D. Cal. Dec. 29, 2017); *see Bailey*, 2024 WL 3219207, at *10 (referencing *Hernandez*).

Here, Plaintiff alleges that the retaliatory actions that the institutions took against the inmates to harm her were caused by the speech of those inmates, not her speech, and, therefore, the retaliation claim should be dismissed. For example, Plaintiff alleges that, on March 10, 2022, a member of Special Investigative Services at FCI Cumberland threatened to send prisoner Schenck to solitary confinement and have him beat up for sending information to Plaintiff about an allegedly abusive officer and warned him to "stop talking to [Plaintiff]." Compl. ¶¶ 31-33. Thus, according to Plaintiff's allegations, it was inmate Schenck's speech that was the but-for cause of the retaliation, not Plaintiff's speech, and inmate Schenck is not a plaintiff here.

Likewise, on December 29, 2022, after USP Big Sandy inmate Perry spoke with Plaintiff on the phone about "things that were happening at the prison," correctional officers brought Perry to the Special Housing Unit where he was "interrogated" and informed him that he "had been taken to the [Special Housing Unit] because of his previous night's phone call with Plaintiff." *Id.* ¶¶ 72-75. A Big Sandy official warned Perry to stop speaking to Plaintiff. *Id.* ¶ 77. Perry was confined

- 29 -

in the Special Housing Unit for the next six months "in retaliation for his communications with Plaintiff." *Id.* ¶ 79. Later, allegedly in retaliation for Perry speaking to a reporter and Plaintiff, USP Tucson officials told him to "be careful" about who he was talking to, *id.* ¶ 107, "insisted" that Perry could not speak with the reporter, *id.* ¶ 108, and threatened that if he continued to provide information, she would get him in "big trouble," *id.* ¶ 110. Thus, according to Plaintiff's allegations, it was inmate Perry's speech that was the but-for cause of the retaliation, not Plaintiff's speech, and Perry is not a plaintiff here.

Similarly, in January 2023, prisoner Fontanez informed Plaintiff about a complaint filed with the Department of Justice about a Bureau employee who allegedly assaulted a prisoner. *Id.* ¶ 39. Three or four months later, in April or May 2023, a Special Investigative Services Lieutenant "interrogated" Fontanez about his communications with Plaintiff and made a "veiled threat" of retaliation against Fontanez if he continued to speak to Plaintiff. *Id.* ¶¶ 39-47. Thus, according to Plaintiff's allegations, it was inmate Fontanez's speech that was the but-for cause of the retaliation, not Plaintiff's speech, and inmate Fontanez is not a plaintiff here.

The fatal flaw is that "no inmate is a plaintiff in this case." *Bailey*, 2024 WL 3219207, at *10. To establish First Amendment retaliation, Plaintiff must show that her "advocacy or expression to inmates . . . were the but-for cause of the [Bureau's] retaliatory actions." *Id.* Plaintiff, however, instead alleges that inmates' speech describing prison conditions and official abuses—rather than Plaintiff's speech—was the but-for cause of the allegedly retaliatory actions, and, therefore, she has failed to state a First Amendment retaliation claim.

For similar reasons, Plaintiff has failed to state a plausible retaliation claim regarding the actions taken against FCC Hazelton inmates Jacky Foster (loss of snow removal job) and Lamar Tucker (strip search). Compl. ¶¶ 102-03. Plaintiff must establish "a causal link between the

exercise of a constitutional right and the adverse action taken against [her]." *Aref*, 833 F.3d at 258. But here, Plaintiff fails to identify any communications that she had with either Foster or Tucker, let alone any speech that is linked to the adverse actions. The best that Plaintiff can do is state that Foster and Tucker were "source[s]" of Plaintiff, which is insufficient to raise Plaintiff's allegations beyond the level of speculation and "nudge" the claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 557 n.5. The mere fact that Foster and Tucker are "sources" does not make a plausible connection between protected First Amendment expression and a retaliatory act. Under Plaintiff's theory, any time a prison disciplines one of her "scores" of inmate "sources," the prison subjects itself to a claim for unlawful retaliation.

Even if Plaintiff could overcome this disconnect, her retaliation claim also fails because she has not alleged a "retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258. At the outset, the Court has already explicitly rejected Plaintiff's argument that she must only show a de minimis injury. *Bailey*, 2024 WL 3219207, at *11. Plaintiff, instead, "must show that a person of ordinary firmness in her position – that of a nonincarcerated advocate – would be deterred from speaking by the [Bureau's] actions against some of the inmates with whom she communicates." *Id.*

Besides the conclusory allegation that the retaliatory acts "would deter a person of ordinary firmness in plaintiff's position from speaking again," Compl. ¶ 150—"a formulaic recitation of the elements of a cause of action," which "will not do"—Plaintiff pleads no "further factual enhancement" showing that retaliation against third-party inmates would deter a nonincarcerated advocate from speaking again. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Rather, Plaintiff pleads that the inmates cut off communications with Plaintiff because of the retaliation against them, *e.g.*, Compl. ¶¶ 88, 146, not that the retaliation deterred her from

speaking.  She states that the Bureau's retaliation against her sources "succeeded in [the Bureau's] efforts to intimidate certain sources into cutting off communication with Ms. Bailey," *id.* ¶ 8, and that the retaliation against the inmates "also harmed [her]" because it decreases the likelihood that those sources—and others who became aware of the unlawful retaliation—will provide information to Plaintiff," *id.* ¶ 149.  Plaintiff, thus, gets it backward.  She must show that the acts of retaliation against her sources were "sufficient to deter a person of ordinary firmness in [her] position from speaking again," *Aref*, 833 F.3d at 258, not that the retaliatory acts were sufficient to deter the third-party prison sources from communicating with her.

For example, Plaintiff alleges that inmate Schenck's removal of Plaintiff from his list of approved contacts prevented her from communicating with him—not that the alleged retaliation deterred her from speaking with him.  Compl. ¶ 34 ("Defendant's threats succeeded in stopping Mr. Schenk from communicating further with Ms. Bailey via TRULINCS.").  Plaintiff did not even know about the alleged threats to Schenck until after the fact, *id.* ¶ 35, and, therefore, she cannot show that the threats to inmate Schenk deterred her speech.  In fact, just three months later, Plaintiff and inmate Schenk were communicating again.  *Id.* ¶ 34.  Thus, Plaintiff is unable to show that a person of ordinary firmness in her position of nonincarcerated advocate would be deterred from communicating because of the retaliation when she stopped communicating with Schenck for a different reason altogether and then, soon after, resumed communication.

Likewise, Plaintiff pleads that, despite a Special Investigative Services Lieutenant "interrogat[ing]" inmate Fontanez about his communications with Plaintiff and making a "veiled threat" of retaliation against Fontanez "if he continued to speak to Plaintiff," Fontanez reported the incident to Plaintiff, and Plaintiff continued to speak with Fontanez about the prison.  *Id.* ¶ 48.  Indeed, inmate Fontanez "corresponds frequently with Plaintiff via TRULINCS about conditions

at F.C.I. Cumberland, including prison wages, Defendant's Financial Responsibility Program, and abusive employees." *Id.* ¶ 38. Thus, Plaintiff is unable to show that a person of ordinary firmness "in her position – that of a nonincarcerated advocate" would be deterred because of the retaliation when she continued to speak with Fontanez despite the alleged retaliatory acts.

Similarly, inmate Baker "stopped communicating with Ms. Bailey entirely" because he "feared that any further attempts to communicate with [Plaintiff]" would result in retaliation against him, *id.* ¶ 88, and when Baker was "comfortable resuming his communications" with Plaintiff, Plaintiff participated. *Id.* ¶ 89. Thus, Plaintiff is unable to show that a "nonincarcerated advocate" of ordinary firmness would be deterred from communicating because of the retaliation when she stopped communicating with Baker for a different reason altogether (because he stopped talking to her) and then, soon after, resumed communication.

Likewise, inmate Perry—the prisoner who allegedly was put in a Special Housing Unit in retaliation for his communication with Plaintiff—"continued speaking with Plaintiff and her counsel about problems at U.S.P. Tucson, in spite of prison officials' threats." *Id.* ¶ 116. Plaintiff also continued to talk to inmate Vasquez despite the alleged retaliation. *Id.* ¶¶ 99-100. Thus, Plaintiff is unable to show that a person of ordinary firmness "in her position – that of a nonincarcerated advocate" would be deterred from communicating when she concedes that she continued to speak with Perry and Vasquez despite the alleged retaliation. As to the allegations involving loss of prison jobs and the like—again, not actions taken against Plaintiff but against third-party inmates—*id.* ¶¶ 101, 102, this conduct falls short of a "retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258.

To the extent that Plaintiff is arguing that the facilities retaliated against her by implementing the TRULINCS blocks, she has failed to plead the requisite causal link. She states, "It is no mere happenstance that Defendant issued three unexplained blocks to Ms. Bailey so close in time to the publication of Voices From Within," *id.* ¶ 145, in September 2022, *id.* ¶ 7. But the block at FCI Ray Brook occurred on August 18, 2022, before the publication. *Id.* ¶ 57. And Plaintiff's narrative about the USP Big Sandy block in December 2022 has already been debunked. *Bailey*, 2024 WL 3219207, at *6-7. The third facility that Plaintiff is referencing, USP Beaumont, issued a block on March 29, 2023, about six months after the publication, and thus there is no inference of retaliation given the large gap. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (holding that to establish inference of retaliation, temporal proximity must be "very close" and citing cases where three to four months has been found insufficient).

Plaintiff continues, "Nor is it happenstance that Defendant issued a fourth block soon after she reported Defendant's unlawful conduct to the U.S. Attorney's Office and OIG." Compl. ¶ 145. But Plaintiff has either deliberately or unintentionally omitted how "soon after," and therefore, she cannot plausibly plead causation based on temporal proximity. *Id.* ¶¶ 93, 94. "Nor is it happenstance," according to Plaintiff, "that Defendant issued a fifth and sixth block within six days of each other." *Id.* ¶ 145. But this does not show a causal link between the protected activity and the alleged retaliation. The proximity between two alleged retaliatory acts is of no relevance.

Additionally, it is implausible that the Bureau was blocking TRULINCS access in retaliation for protected speech because the prisons blocked only one of Plaintiff's multiple email addresses that she used to communicate with the prisoners. *Compare* Mot. Prel. Inj., Ex. 5 (block of paminprogess@gmail.com at USP Big Sandy), *with* Exs. 13, 15, 16 (blocks of pam@morethanourcrimes.org at other prisons). If the prisons were retaliating against Plaintiff for

- 34 -

her speech, they would have blocked her access altogether, but instead, the prisons confined their blocks to the email addresses from which the infringing emails were sent.

For these reasons, Plaintiff has failed to state a First Amendment retaliation claim.

## V.    Plaintiff Has Failed to State a Due Process Claim.

The Fifth Amendment provides that no person shall be "deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up). The Fifth Amendment requires only that a person receive his or her due process, not every procedural device that he or she may claim or desire. *Kropat v. FAA*, 162 F.3d 129, 132 (D.C. Cir. 1998).

Here, at the outset, Plaintiff has failed to state a claim as to all the institutions because she has not been "deprived" of anything, let alone a protected property or liberty interest. Plaintiff only alleges that "her email address" has been blocked at certain facilities, Compl. ¶¶ 57, 70, 84, 94, 121, 127, but Plaintiff uses at least two email addresses to communicate with inmates across the Bureau: paminprogress@gmail.com and pam@morethanourcrimes.org. *See* Mot. Prel. Inj., Ex. 5 (block of paminprogess@gmail.com at USP Big Sandy), *id.* Exs. 13, 15, 16 (blocks of pam@morethanourcrimes.org at other prisons). Plaintiff does not allege that both email addresses have been blocked at any facility or that she has been cut off from email communication at any facility. Lacking "further factual enhancement" by way of allegations that the prisons have blocked her email access, she has failed to adequately allege that she was "deprived" of access to her "sources." *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 550).

Additionally, the Court can dismiss the due process claim as applied to all institutions except FCI Ray Brook and USP Big Sandy because, as to the remaining facilities, she cannot plausibly state a claim for a violation of due process when she failed to avail herself to the process

available to her.  *See, e.g.*, *English v. District of Columbia*, 717 F.3d 968, 970 (D.C. Cir. 2013) (affirming dismissal where plaintiff "was not denied due process; rather, he failed to pursue the process available to him"); *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) ("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate."); *Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019) ("Because Ms. Chavis has not alleged that she availed herself of available procedures under District of Columbia law, she cannot plausibly state a claim under § 1983 for violation of her due process rights.").  "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin*, 227 F.3d at 116.

Plaintiff has alleged that she received notifications from the various facilities that her email address had been blocked.  Compl. ¶¶ 57, 62, 85, 94, 121, 127.  She has also submitted evidence that the Court may take judicial notice of showing that, when she was blocked, she was informed about her appeal rights.  Mot. Prel. Inj., Exs. 2, 13, 15, 16.  Specifically, in addition to identifying the inmate to whom the blocked message was addressed and the general rationale for the block ("the Bureau has determined that such communication is detrimental to the security, good order, and discipline of the facility, or might facilitate criminal activity"), the notification instructs Plaintiff about how to appeal the block ("You may appeal this block within 15 days of the date of this message by submitting a written request to the Warden of the prison where the prisoner is located.  You should include a copy of this notice, an explanation of your appeal request, and any additional documents or information you wish to be considered.").  *Id.*

Here, Plaintiff alleges that she pursued her appeal of the TRULINCS blocks at only two institutions: FCI Ray Brook and USP Big Sandy.  Compl. ¶¶ 59, 64, 158-60.  As to the other

institutions, she has failed to plausibly state a due process claim because she has not availed herself to the process available to her, despite the notifications advising her how to do so. Plaintiff does not allege that she challenged any of the blocks outside of USP Big Sandy and FCI Ray Brook until she filed her Complaint in April 2024. "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin*, 227 F.3d at 116. Therefore, the Court should dismiss the due process claims brought against USP Beaumont, FCC Hazelton, FCI Marion, and FCI Pekin.

As to USP Big Sandy, Plaintiff alleged that she received a block notification on December 19, 2022, which informed her that her email address was blocked because her communications with "certain residents" were "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity." Compl. ¶¶ 61-62. The notification identified the inmate with whom she was corresponding that led to the block and further informed her that she had a right to appeal the block by submitting a written request to the warden within fifteen days. Mot. Prel. Inj., Ex. 2.

Plaintiff states that "through counsel," she "sent a letter to the warden at U.S.P. Big Sandy appealing the decision," and although she did not get a response from the warden, Compl. ¶¶ 64-65, Regional Director Gomez denied her appeal because the "Special Investigative Services (SIS) Department at the USP Big Sandy discovered suspicious activity from the email address: paminprogess@gmail.com. Specifically, the SIS Department determined the listed email address 'was used as a median/or paid service to forward messages to other email address and/or other messaging services.' As a result, to prevent the circumvention and misuse of the TRULINCS system, the email address was blocked on multiple accounts." *Id.* ¶ 67; Mot. Prel. Inj., Ex. 5.

At FCI Ray Brook, Plaintiff alleges that, on August 18, 2022, she received a notification that the facility blocked her email address because her communication with certain inmates was "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity." Compl. ¶ 57. The notification informed Plaintiff the name of the inmate with whom she was corresponding and further informed her that she had a right to appeal the block by submitting a written request to the warden within fifteen days. *See* Mot. Prel. Inj., Exs. 2, 13, 15, 16. Plaintiff alleges that she sent a letter to the warden, who responded that "certain residents had added her to their approved contact lists without using her full, correct name." Compl. ¶ 59.

Regardless of Plaintiff's dissatisfaction with the Bureau's answers in certain circumstances when she pursued an appeal, the Bureau's administrative procedures for TRULINCS restrictions provide Plaintiff with the "minimum procedural safeguards" to which she is entitled. *Martinez*, 416 U.S. at 417. Those safeguards require that the sender is notified of the block, that the author be given "a reasonable opportunity to protest that decision," and that complaints are referred to someone other the "the person who originally disapproved the correspondence." *Id.* at 418-19.

The Bureau's process passes constitutional muster. Plaintiff concedes that she received notice when the various facilities blocked her access. *See* Compl. ¶¶ 57, 62, 85, 94, 121, 127; Mot. Prel. Inj., Exs. 2, 13, 15, 16. Those block notifications identified the inmate whom the blocked message was addressed; provides the general rationale for the block ("the Bureau has determined that such communication is detrimental to the security, good order, and discipline of the facility, or might facilitate criminal activity"); and instructs Plaintiff about how to appeal the block ("You may appeal this block within 15 days of the date of this message by submitting a written request to the Warden of the prison where the prisoner is located. You should include a copy of this notice, an explanation of your appeal request, and any additional documents or information you wish to

be considered."). Mot. Prel Inj., Exs. 2, 13, 15, 16. All elements of *Martinez* have, thus, been satisfied: Plaintiff was notified of the block, she was given "a reasonable opportunity to protest that decision" (a fifteen-day window to appeal to the warden), and her appeal is referred to someone other the "the person who originally disapproved the correspondence" (i.e., the warden and not the Special Investigative Services officer).

Plaintiff may argue that the Bureau should provide the email that led to the block, and while this may be good practice, it is not constitutionally required. Plaintiff is already in possession of the evidence, which makes this case distinguishable from a situation where an agency withholds exculpatory evidence. Considering that the Bureau oversees millions of messages sent through TRULINCS on a weekly basis, it is adequate for the facilities to provide Plaintiff with the name of the inmate to whom she was corresponding; the general reason for the block; and her appeal rights. Because of the timing of the block notification, in conjunction with the identity of the inmate and her presumed knowledge of the TRULINCS rules as an authorized user, Plaintiff should be able to identify the emails that violated policy—all emails that are in her possession. Indeed, according to her allegations, on at least one occasion, she did just that. Compl. ¶¶ 84-85. And if she cannot identify the email, she can timely pursue her appeal rights, which would give the facility notice that the block is being challenged and, should the facility deem appropriate, it can compile any evidence or explanation, including, but not necessarily, the email itself. The TRULINCS Manual requires only that "[s]upporting documentation for blocking email addresses are scanned into TRUFACS using the document imaging process," Manual § 14.10(c)(3)(c), and this documentation specifically includes written requests for blocking an email address, *id.* § 14.11(c). There is no requirement that the emails themselves be provided, as the inmate or contact who broke the rule has the evidence in their possession.

Importantly, the Court should consider "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. If the Bureau was required to produce the infringing email in the first instance, the scarce Bureau resources would be shifted from oversight of TRULINCS to maintain prison safety and security to building evidentiary files. Simply put, the information that the Bureau provides at the outset (recipient's name, general rationale for the block, and appeal rights), with a more detailed explanation for the block that accompanies an appeal is more than sufficient to satisfy the "minimum procedural safeguards" to which Plaintiff is entitled. *Martinez*, 416 U.S. at 417.

Thus, Plaintiff has failed to state a plausible Fifth Amendment due process claim.

## VI.    Plaintiff's APA Claims Fail.

Plaintiff has brought claims pursuant to 5 U.S.C. § 706 of the APA, but these claims fail as well. "Although the APA does not confer jurisdiction," § 706 provides "a limited cause of action for parties adversely affected by agency action." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 185 (D.C. Cir. 2006). The APA provides that a person who suffers "legal wrong because of agency action" or is "adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

Where review is sought, not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, which is the case here, *see* Compl. ¶ 163, the "agency action" in question must be "final agency action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *accord* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). A person claiming a right to sue "must identify some 'final agency action' that affects him in the specified action; it is judicial review 'thereof' to which he is entitled." *Lujan*, 497 U.S. at 883. Agency action means "the whole or a part of an agency rule, order, license, sanction, relief,

- 40 -

or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004). The D.C. Circuit has "long recognized" that the term "agency action" is "not so all-encompassing as to authorize [courts] to exercise judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006). If a plaintiff has not shown an "agency action," the APA claim must be dismissed for failure to state a claim. *Id.* at 18, n.4.

Plaintiff makes one conclusory allegation—that the Court need not accept as true, *see Iqbal*, 556 U.S. at 678-79—that the TRULINCS restrictions "constituted final agency action." Compl. ¶ 163. Plaintiff does not plausibly allege that the restrictions constitute "agency action," which, for purposes of 5 U.S.C. § 702, means "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13), let alone "final agency action," *Lujan*, 497 U.S. at 882. *See also Bailey*, 2024 WL 3219207, at *12 (pointing out that Plaintiff has been unable to "cite any case that reviews a correctional official's decision for compliance with [Bureau] policy").

Additionally, "[a] complaint seeking review of agency action 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6)[.]" *Sierra Club v. Jackson,* 648 F.3d 848, 855 (D.C. Cir. 2011). There are at least two occasions when the exclusion applies: "where statutes are drawn in such broad terms that in a given case there is no law to apply," and "when the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* (cleaned up). "Agency actions in these circumstances are unreviewable because the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion." *Id.* (cleaned up).

- 41 -

Plaintiff's challenge to the blocks of her TRULINCS access is committed to agency discretion by law, and, therefore, she has not stated an APA claim.    The Bureau's authority to operate federal prisons derives from 18 U.S.C. § 4042, which provides, in part: (a) In General. – The Bureau of Prisons, under the direction of the Attorney General, shall – (1) have charge of the management and regulation of all Federal penal and correctional institutions; (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.  *See also* Manual § 14.2 ("The Bureau's authority to operate TRULINCS is found in 18 U.S.C. 4042, which authorizes the Bureau to provide for the safekeeping, care, and subsistence of Federal prisoners.").

"The absence of specific guidelines means that the [Bureau] has broad discretion in fulfilling its responsibilities and implementing § 4042."  *Sebolt v. Lariva*, Civ. A. No. 15-0353, 2017 WL 2271441, at *6 (S.D. Ind. May 23, 2017), *aff'd sub nom. Sebolt*, 749 F. App'x 458. Noticeably absent from § 4042 is any mention of how to specifically run such correctional institutions, let alone direction on managing or maintaining an inmate email system.  There are no statutory "legal norms" or "concrete limitations" on the Bureau's discretion over the inmate email system.  Restricting access to TRULINCS falls within the Bureau's "wide discretion" under 18 U.S.C. § 4042, to secure the prison and protect the public.  Therefore, even if the blocks constituted final agency action, the claims are precluded for the independent reason that the action being challenged is committed to the Bureau's discretion and thus is unreviewable.  *See, e.g.*, *Carter*, 2024 WL 983277, at *2 n.3; *Lewandowski v. Bureau of Prisons*, Civ. A. No. 19-15710, 2021 WL 5937671, at *6 (D.N.J. Dec. 16, 2021) ("because § 4042(a) offers 'no meaningful standard against

which to judge' the [Bureau's] actions, the decision to deny Plaintiff TRULINCS access was 'committed to agency discretion by law,'" and therefore, "Plaintiff cannot challenge the decision to deny him TRULINCS access under the APA"); *Sebolt*, 2017 WL 2271441, at \*6 (decision arising from a TRULINCS Program Statement is "unreviewable" under the APA "because it falls within the BOP's broad discretionary powers to administer prisons").

**VII.    The Court Should Transfer Any Surviving First Amendment Claims to the District <u>Where the Respective Prisons Are Located.</u>**

A case may be transferred to any district where venue is proper "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Ctr. for Env't Sci., Accuracy & Reliability v. Nat'l Park Serv.*, 75 F. Supp. 3d 353, 356 (D.D.C. 2014) (internal quotation marks omitted). Because the districts where the prisons that instituted the email blocks and where the alleged retaliatory conduct occurred are the most convenient venues, this Court should transfer this case to those districts ("the prison districts"), should any First Amendment claims survive. Importantly, Plaintiff does not allege any unlawful conduct taken by any officials in Bureau headquarters, nor does she allege any Bureau-wide email blocks. Rather, the decision to block Plaintiff's email address were made at the facility level and the alleged retaliatory conduct occurred at the facility level as well. If the Court dismisses the due process and APA claims, any remaining First Amendment TRULINCS or retaliation claims should be transferred to the prison districts where the alleged unlawful conduct occurred.

"The first step in resolving a motion for transfer of venue under § 1404(a) is to determine whether the proposed transferee district is one where the action 'might have been brought.'" *Id.* Here, "a substantial part of the events or omissions giving rise to the claim," namely the email

blocks at the particular prisons and the alleged retaliatory conduct against the prisoners, occurred in the prison districts, and, therefore, venue is proper in those districts. *See* 28 U.S.C. § 1391(e)(1).

After resolving the threshold inquiry, the Court turns to whether the case is more conveniently handled in the prison districts rather than this District. This inquiry requires the Court to "weigh the public and private interests." *McAfee v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 19-2981 (DLF), 2019 WL 6051559, at *1 (D.D.C. Nov. 15, 2019). In weighing transfer, "the Court considers the following private interest factors: (1) the plaintiffs' forum choice; (2) the defendant's forum choice; (3) whether the claim arose elsewhere; (4) the parties' convenience, (5) the witnesses' convenience; and (6) the ease of access to evidence. *Bourdon v. Dep't of Homeland Sec.*, 235 F. Supp. 3d 298, 305 (D.D.C. 2017). There are three public interest factors that the Court must also consider: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the courts' calendars; and (3) the local interest in deciding local controversies at home. *Id.* at 308 (quotation marks omitted).

Under these factors, a transfer to the prison districts is appropriate. Although Plaintiff resides in this District, "venue cannot lie in the District of Columbia when a substantial part, if not all, of the [relevant acts] challenged in this action took place outside the District." *Jones v. Hagel*, 956 F. Supp. 2d 284, 289 (D.D.C. 2013). Plaintiff may have sent certain emails from this District, but the alleged unlawful conduct—the blocking of those emails and the alleged retaliation for those emails—occurred on site at the prisons. Thus, Plaintiff's claims arose in those districts, which is where most evidence, witnesses, and the greatest public interest are found. Specifically, the Special Investigative Services technicians and wardens who implemented the blocks, as well as the corrections officers who allegedly engaged in retaliation, all reside in the prison districts. "Courts have consistently transferred actions when the majority of witnesses live near the

transferee forum." *Mathis v. Geo Grp., Inc.*, 535 F. Supp. 83, 87 (D.D.C. 2008). Additionally, access to sources of proof favors transfer as most of the documentary materials would be in the prison districts. *See Parker v. United States*, Civ. A. No. 20-0430 (ABJ), 2020 WL 10486669, at *4 (D.D.C. Oct. 21, 2020).

The remaining factors—the congestion of the courts and the transferee court's familiarity with the law—are neutral or not germane to this dispute. There can be no dispute that each district faces congested dockets. *See* Table C-5—U.S. District Courts-Civil Statistical Tables for the Federal Judiciary (Dec. 31, 2023), available at https://www.uscourts.gov/statistics/table/c-5/statistical-tables-federal-judiciary/2023/12/31. Finally, there is no reason to suspect that any federal district court is unfamiliar with First Amendment law. Therefore, if the Court dismisses the due process and APA claims, any remaining First Amendment TRULINCS or retaliation claims should be transferred to the prison districts where the alleged unlawful conduct occurred.

## CONCLUSION

For these reasons, pursuant to Rules 12(b)(1) and 12(b)(6), the Court should dismiss Plaintiff's Complaint in its entirety. To the extent these claims fail, Plaintiff's claim under the Declaratory Judgment Act (Count VI) should also be dismissed. To the extent any First Amendment claims survive, they should be transferred to the prison districts.

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052    By: _____ */s/ M. Jared Littman* _____
United States Attorney                          M. JARED LITTMAN, PA BAR #91646
                                                Assistant United States Attorney
BRIAN P. HUDAK                                  601 D Street, NW
Chief, Civil Division                           Washington, DC 20530
                                                (202) 252-2523

                                                *Attorneys for the United States of America*

Dated: July 23, 2024

- 45 -