UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
PAMELA BAILEY D/B/A MORE THAN           )
OUR CRIMES,                             )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        Civil Action No. 24-1219 (PLF)
                                        )
FEDERAL BUREAU OF PRISONS,              )
                                        )
            Defendant.                  )
_____)


OPINION

        Pamela Bailey is an advocate for federal prison reform who uses the Bureau of

Prisons (the "BOP") electronic messaging system to communicate with numerous federal

inmates.  She uses the information she receives from inmates to inform her advocacy, often by

simply disseminating inmates' stories in their own words.  According to Ms. Bailey, the BOP has

engaged in a campaign to silence her by blocking her from exchanging electronic messages with

inmates at seven BOP facilities.  On June 28, 2024, following oral argument, the Court partially

granted Ms. Bailey's motion for a preliminary injunction as it related to six of the seven BOP

facilities at issue in this case.  See Order [Dkt. No. 17]; Bailey v. Fed. Bureau of Prisons, Civil

Action No. 24-1219 (PLF), 2024 WL 3219207 (D.D.C. June 28, 2024).  Before the Court is the

government's motion to dismiss.  See Defendant's Motion to Dismiss and Memorandum of

Points and Authorities in Support Thereof [Dkt. No. 21].  Upon careful consideration of the

parties' written submissions and the relevant authorities, the Court grants defendant's motion in part and denies it in part.[1]

## I.  BACKGROUND

The instant case arises out of plaintiff Pamela Bailey's advocacy work focusing on federal prison reform and her communications with inmates at seven BOP facilities that is part of this work.  In its opinion partially granting Ms. Bailey's motion for a preliminary injunction, the Court summarized Ms. Bailey's advocacy work and the electronic messaging system Ms. Bailey uses to communicate with inmates called the Trust Fund Limited Inmate Computer System ("TRULINCS").  In relevant part:

> Ms. Bailey is the co-founder of More Than Our Crimes, an unincorporated nonprofit organization whose mission is to reform the federal prison system.  Compl. ¶¶ 2, 5.  Through this organization, Ms. Bailey circulates first-person accounts of life in prison and advocates for reform via publications, outreach, and events.  Id. ¶ 5.  To do this work, Ms. Bailey relies on personal relationships with inmates, which she develops through regular communication with them.  Id. ¶ 25.  While Ms. Bailey sometimes speaks to inmates on the phone or visits them in person, she more often uses the prison electronic messaging system.  Id.

> This electronic messaging system is a part of the Trust Fund Limited Inmate Computer System, or "TRULINCS."  Compl. ¶ 6.  TRULINCS provides the only electronic messaging system that inmates are allowed to access and, according to Ms. Bailey, the only timely way to communicate with them.  Id. ¶ 143.  The BOP's Trust Fund/Deposit Fund Manual contains its rules governing TRULINCS use.  See FED. BUREAU OF PRISONS, PROGRAM STATEMENT – TRUST FUND/DEPOSIT FUND MANUAL (Mar. 14, 2018), www.bop.gov/policy/progstat/4500.12.pdf [hereinafter BOP TRUST FUND MANUAL].  When messaging the public, inmates

---

[1]    The papers reviewed by the Court in connection with this matter include: Verified Complaint ("Compl.") [Dkt. No. 1]; Defendant's Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof ("Mem.") [Dkt. No. 21]; Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opp.") [Dkt. No. 22]; and Defendant's Reply in Further Support of its Motion to Dismiss ("Reply") [Dkt. No. 23].

> must create a contact in the TRULINCS system and request to
> exchange messages with the contact before they can do so. <u>Id</u>.
> § 14.10(c)(3), at 134. Inmates are allowed no more than 30 active
> messaging contacts. <u>Id</u>. The BOP monitors TRULINCS messages
> and has the ability to block inmates' or non-inmates' access to
> TRULINCS. The BOP can block a non-inmate from
> communicating with specific inmates, from communicating with all
> inmates at a BOP facility, or from communicating with all inmates
> at all BOP facilities. <u>Id</u>. § 14.10(c)(3)(c), at 135. The Trust
> Fund/Deposit Fund Manual states that "[s]upporting documentation
> for blocking email addresses are scanned into" the BOP's internal
> electronic system. <u>Id</u>.

<u>Bailey v. Fed. Bureau of Prisons</u>, 2024 WL 3219207, at *1 (footnote omitted).

Beginning in March 2022 and continuing until March 2024, Ms. Bailey alleges that BOP officials at seven facilities took various unlawful actions, including blocking her ability to exchange TRULINCS messages with inmates in the facilities and threatening the inmates with whom she had been communicating. For purposes of this motion, the Court accepts the factual allegations in the complaint as true.

### A. March 2022: F.C.I. Cumberland

Ms. Bailey began communicating via TRULINCS with an inmate named Leonard Schenk sometime after his incarceration at F.C.I. Cumberland. Compl. ¶¶ 31-32. Mr. Schenk provided Ms. Bailey with information on conditions at the facility, including the alleged "abusive behavior" of Officer Robert Dawson. <u>Id</u>.

During the morning of March 10, 2022, Mr. Schenk was brought to "an unfinished room with cinder-block walls" by Officer Daniel Linder, a member of BOP's Special Investigation Services department, which is responsible for monitoring the TRULINCS system. Compl. ¶ 33; <u>see id</u>. ¶ 42. Officer Linder told Mr. Schenk to stop communicating with Ms. Bailey and "threatened" that if the communications continued, Officer Linder would "'write up'

Mr. Schenk three times under false pretense" and place him in solitary confinement as punishment.  Id. ¶ 33.  Officer Linder also threatened to "mess with" Mr. Schenk's release date to a halfway house and said he would allow Officer Dawson – the "abusive officer" Mr. Schenk had identified to Ms. Bailey – to "beat [him] up."  Id.

Following this interaction with Officer Linder, Mr. Schenk removed Ms. Bailey from his list of approved contacts on TRULINCS and stopped communicating with her.  Compl. ¶ 34.  Mr. Schenk told Ms. Bailey about his interaction with Officer Linder approximately three months later after he was released to a halfway house.  Id. ¶¶ 34-35.

### B.  August 2022:  F.C.I. Ray Brook

Prior to August 2022, Ms. Bailey communicated with at least two individuals at F.C.I. Ray Brook in New York.  Compl. ¶ 57; see Opp. at 5.  On August 18, 2022, Ms. Bailey received a notification that her email address was blocked entirely from using TRULINCS to communicate with inmates at F.C.I. Ray Brook.  Compl. ¶ 57.  The notification "included only the boilerplate assertion that [her] communications with certain residents was 'detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity.'"  Id.  The notification "failed to provide any specific factual information."  Id.

Ms. Bailey sent a letter to the warden of F.C.I. Ray Brook appealing the decision to block her access to TRULINCS in purported compliance with the BOP's process for appealing block decisions.  Compl. ¶ 59; see Mem. at 36 (outlining appeal process).  The warden responded to Ms. Bailey's letter, stating "only that certain residents had added [Ms. Bailey] to their approved contact lists without using her full, correct name."  Compl. ¶ 59.  No other information was provided to "justify a wholesale, permanent block of Ms. Bailey's email address from the TRULINCS system at F.C.I. Ray Brook."  Id. ¶ 60.

### C.  September 2022:  Voices From Within Report

In September 2022, More Than Our Crimes, in collaboration with the Washington Lawyers' Committee for Civil Rights and Urban Affairs, published "Voices From Within the Federal Bureau of Prison:  A System Designed to Silence and Dehumanize" ("Voices From Within"), a report that included first-person accounts of inmates and proposals for prison reform. Compl. ¶ 49; see Pl.'s Preliminary Injunction Ex. 1 [Dkt. No. 2-2 at ECF 4-43].  The 76-page report "described in detail a 'federal prison system that is in a state of crisis,' due to [the BOP's] 'abject failure' and 'cultural, entrenched, and systemic' problems."  Compl. ¶ 50 (quoting Voices from Within).  The report included "first-person accounts of BOP residents" – such as "Mr. Schenk's account of the retaliatory threats" he received from Officer Linder while Mr. Schenk was incarcerated at F.C.I. Cumberland.  Id. ¶¶ 48, 51; see also supra Section I.A.

Voices From Within was More Than Our Crimes' "most comprehensive, high-profile publication" and "was featured in articles by media outlets like the Washington Post." Compl. ¶ 54; see Theresa Vargas, They're in Federal Prison, and They're Done Staying Quiet, WASH. POST. (October 1, 2022), https://wapo.st/4cwXBFU.  More Than Our Crimes and Ms. Bailey "have similarly received national attention, including in Politico and from a bipartisan group of senators who cited [More Than Our Crimes] publications in a letter to Attorney General Merrick Garland and BOP Director Peters about misconduct" at another facility, F.C.C. Hazelton.  Compl. ¶ 54.

### D.  December 2022:  U.S.P. Big Sandy

On December 19, 2022, Ms. Bailey's email address was restricted from accessing TRULINCS at U.S.P. Big Sandy in Kentucky.  Compl. ¶ 61.  The "block notification" stated "that her communications with certain residents on TRULINCS were 'detrimental to the

security, good order, or discipline of the facility, or might facilitate criminal activity.'"  Id. ¶ 62.
Similar to the notification she received related to her access to TRULINCS at F.C.I. Ray Brook,
there was no information provided "about either the communications at issue or how those
communications purportedly harmed the penitentiary or facilitated a crime."  Id.

       Ms. Bailey sent a letter to the warden at U.S.P. Big Sandy appealing the decision
to restrict her access.  Compl. ¶ 64.  After not receiving a reply for several months, Ms. Bailey
contacted the BOP's Regional Director of the Mid-Atlantic Region, Christopher Gomez, to
request a response to her appeal and have her TRULINCS access restored.  Id. ¶¶ 65-66.
Regional Director Gomez eventually responded, "assert[ing] vaguely" that the Special
Investigative Services department at U.S.P. Big Sandy – the department responsible for
monitoring communications on TRULINCS – had concluded that her email "was 'used as a
median [and]/or paid service to forward messages to other email addresses and/or other
messaging services.'"  Id. ¶ 67 (alteration in original).  Regional Director Gomez "failed to
identify" any specific communications in which she "acted as a median" or "paid service."  Id.
Ms. Bailey "followed up yet again with" Regional Director Gomez and requested that BOP
identify the particular communications that violated BOP policy.  Id. ¶ 68.  The BOP responded
by "stonewalling" her, advising Ms. Bailey to request such information through the Freedom of
Information Act, "a process that [the BOP] knows is notoriously lengthy and ineffective for
requesting parties."  Id. ¶ 69.

       Approximately ten days after restricting Ms. Bailey's access to the TRULINCS
system at U.S.P. Big Sandy, the BOP "began a long-running campaign of intimidation and
retaliation against one of Plaintiff's sources" at the facility, Cory Perry.  Compl. ¶¶ 71-72.  On
December 29, 2022, Ms. Bailey spoke with Mr. Perry over the phone, and Mr. Perry "expressed

concern" about certain events at the facility and "asked for [Ms. Bailey's] support if anything bad happened to him." Id. ¶ 72. "Forty minutes later," six correctional officers removed Mr. Perry from his cell and placed him in the Special Housing Unit ("SHU") without explanation. Id. ¶ 73.

The following morning, Mr. Perry was "interrogated" in the SHU by Capitan Blackburn – one of the highest-ranking officers at U.S.P. Big Sandy – and Lieutenant Parr – the head of the Special Investigative Services department at Big Sandy that had investigated Ms. Bailey's "suspicious activity" on TRULINCS. Compl. ¶ 74. Captain Blackburn and Lieutenant Parr explained that Mr. Perry had been taken to the SHU because of his call with Ms. Bailey the day before. Id. ¶ 75. The two officers "said they had a problem with 'this Pam lady'" – referring to Ms. Bailey – and called her "a 'spider sitting in the middle of a web.'" Id. Lieutenant Parr claimed to have "a stack of paper six inches thick on his desk about [Ms. Bailey] and her contacts with various federal prisoners, and [stated that] he was trying to figure out her relationships with each of them." Id. As to the decision to move Mr. Perry to the SHU, the officers periodically "shifted" their justification, initially stating it was because Mr. Perry had accepted money from Ms. Bailey, and then explaining it was because Ms. Bailey had "pass[ed] information between residents at different facilities in violation of BOP rules." Id. ¶ 76. The two officers "warned Mr. Perry to stop speaking" with Ms. Bailey and suggested that the BOP "listens to all of [Ms. Bailey's] calls at different [BOP] facilities." Id.

Following the "interrogation," Mr. Perry was confined in the SHU for the next six months "in retaliation for his communications with" Ms. Bailey. Compl. ¶ 79. Captain Blackburn and Lieutenant Parr visited Mr. Perry three to four times while he was in the SHU. Id. ¶ 80. During each visit, Mr. Perry asked Captain Blackburn and Lieutenant Parr about his

transfer to another BOP facility.  Id.  Sometime prior to his placement in the SHU, Mr. Perry had

been informed by his "classification officer" that he could be transferred to an F.C.I. – a low- or

medium-security prison – in May 2023 "when he turned 55 and automatically lost two points

from his record . . . ."  Id. ¶ 82.  In April 2023, Captain Blackburn and Lieutenant Parr told Mr.

Perry that he had been designated for transfer.  Id. ¶ 81.  When Mr. Perry told Captain Blackburn

and Lieutenant Parr that he did not think he could be transferred to an F.C.I. until a few weeks

later, they "shrugged" and said that the facility "'wanted to get rid of' him sooner."  Id. ¶ 82.

Mr. Perry was released from the SHU on May 5, 2023, and transferred to U.S.P. Tucson, "not the

F.C.I. that Lt. Parr and Capt. Blackburn had promised him."  Id. ¶ 83.

### E.  March 2023:  U.S.P. Beaumont

In March 2023, Ms. Bailey was in communication with an inmate at U.S.P.

Beaumont in Texas, Shukri Abu Baker.  Compl. ¶ 84.  Ms. Bailey had sent a message to Mr.

Baker describing her trip to U.S.P. Coleman.  Id.  In that message, Ms. Bailey stated that she

found the conditions at U.S.P. Coleman "exhausting and spirit-sapping" and indicated that she

tried to "persuade a group of women with loved ones at U.S.P. Coleman to join together and

advocate for change."  Id.  "Almost immediately after sending" the message, Ms. Bailey received

a notification that the message had been rejected by the BOP before reaching Mr. Baker.  Id.

¶ 85.  The following day, Ms. Bailey learned that she "was blocked on TRULINCS from

communicating with everyone incarcerated at U.S.P. Beaumont, just like at F.C.I. Ray Brook and

U.S.P. Big Sandy."  Id.

After Ms. Bailey's access was restricted, Mr. Baker "stopped communicating with

[her] entirely."  Compl. ¶ 88.  Mr. Baker only resumed communications with Ms. Bailey after the

BOP "retaliate[d] against him by denying [his] transfer" to a lower-security facility.
Id. ¶¶ 88-89.

### F.  April/May 2023:  F.C.I. Cumberland

Ms. Bailey communicated with an inmate at F.C.I. Cumberland named Jeremy
Fontanez, who had published several articles as a contributor to More Than Our Crimes.  Compl.
¶ 38.  In January 2023, Mr. Fontanez messaged Ms. Bailey via TRULINCS to inform her of a
complaint that had been filed with the United States Department of Justice related to Captain
Ricky Rakowski, Jr.  Id. ¶ 39.  According to Mr. Fontanez, the complaint stemmed from an
instance where Captain Rakowski had "assaulted a resident of F.C.I. Cumberland and broke[] his
wrist."  Id.

Several months later, in April or May 2023, Lieutenant Divelbliss of the Special
Investigative Services team brought Mr. Fontanez "into a small, cinderblock room" and
"interrogated" him.  Id. ¶¶ 40, 42.  Lieutenant Divelbliss "expressed concern" that Mr. Fontanez
had spoken to Ms. Bailey about problems at F.C.I. Cumberland.  Id. ¶ 44.  Specifically, he
explained that Ms. Bailey's publishing of BOP employees' names jeopardized those employees'
safety, and that he "was confused why someone like Mr. Fontanez, who does not cause trouble
and has a good job, would want to 'risk all of that' by communicating with" Ms. Bailey.  Id.
¶ 46.  On the same day, Captain Rakowski was overheard by another inmate "wishing violence
upon Mr. Fontanez," stating that "he would 'love to see someone punch [Mr. Fontanez] in his"
face.  Id. ¶ 43.

Mr. Fontanez contacted Ms. Bailey and informed her of the "interrogation" by
Lieutenant Divelbliss, notwithstanding the fact that he had interpreting the interaction as a

"veiled threat" that the BOP would retaliate against future communications with Ms. Bailey. Compl. ¶¶ 47-48.

### G. November 2023: F.C.C. Hazelton

On November 2, 2023, Ms. Bailey's email address was blocked from accessing TRULINCS at F.C.C. Hazelton. Compl. ¶ 94. Shortly before, in October 2023, Ms. Bailey had communicated with an F.C.I. Hazelton inmate named Joel Vasquez. Id. ¶ 98. Mr. Vasquez informed Ms. Bailey of an incident that occurred on October 14, 2023, where Lieutenant Stickley – an officer at F.C.I. Hazelton – "ordered a Rastafarian resident to remove his religious head dress." Id. ¶ 99. After the inmate refused and explained that he had a religious exemption to wear the head dress, Lieutenant Stickley "forcibly" tried to remove it and then "pushed him face-first into a table . . . ." Id. The inmate was then taken to the SHU, where he remained for more than two weeks. Id. ¶¶ 99-100. Mr. Vasquez further explained that he was unable to report the incident to the U.S. Attorney's civil rights hotline – which had been established for F.C.C. Hazelton residents following an investigation of F.C.C. Hazelton, id. ¶¶ 91-93 – because "he had been blocked from accessing the DOJ hotline" by the BOP. Id. ¶ 99.

Ms. Bailey reported the BOP's "efforts to frustrate the U.S. Attorney's investigation" to the United States Attorney's Office and was "soon after" blocked from sending messages via TRUNLICS at F.C.C. Hazelton. Compl. ¶¶ 93-94. Similar to the notifications she received at F.C.I. Ray Brook, U.S.P. Big Sandy, and U.S.P. Beaumont, the 132 notifications she received stating that she had been blocked on TRULINCS across F.C.C. Hazelton merely asserted that her communications were "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity." Id. ¶¶ 94, 101.

After Ms. Bailey's TRULINCS access was blocked, officers at F.C.C. Hazelton began "retaliating" against Ms. Bailey's sources. First, on November 2, 2023 – the same day Ms. Bailey's TRULINCS access was blocked – Mr. Vasquez was fired from his job in the prison's barber shop. Compl. ¶ 101. Mr. Vasquez asked an officer why he was fired, to which the officer told Mr. Vasquez to "talk to Lieutenant Stickley." Id. A separate F.C.C. Hazelton official "similarly confirmed to Mr. Vasquez that he was fired in retaliation for providing Plaintiff with information about Lt. Stickley and the incident in the dining hall . . . ." Id. Second, another one of Ms. Bailey's sources, Jacky Foster, was fired from the prison's snow crew without explanation "on or about November 2nd." Id. ¶ 102. Finally, on November 4, 2023, a third source, Lamar Tucker, "was removed from his cell by multiple officers and strip searched." Id. ¶ 103. The officers "admitted" to Mr. Tucker that they had "no real justification for the strip search, implying that they were doing it" because of Mr. Tucker's contributions to Ms. Bailey's advocacy work. Id.

*H.  November 2023 – January 2024:  U.S.P. Tucson*

In November 2023, following Mr. Perry's transfer to U.S.P. Tucson from U.S.P. Big Sandy, see supra Section I.B, Mr. Perry began communicating with a reporter at NBC about "safety problems" at U.S.P. Tucson. Compl. ¶ 104. "Not long after," Assistant Warden Zantout notified Mr. Perry that his communications with the NBC reporter were being monitored but were not an "issue." Id. ¶ 105. During the conversation, Assistant Warden Zantout mentioned that F.C.C. Hazelton had blocked Ms. Bailey from using TRULINCS at their facility and that U.S.P. Tucson was considering doing the same. Id. Mr. Perry inquired into the reasoning for blocking Ms. Bailey's TRULINCS access, to which Assistant Warden Zantout stated it was because Ms. Bailey "speaks with too many people and had been passing information between

inmates in violation of BOP policy." Id. ¶ 106.  Several days later, Mr. Perry was stopped by

Unit Manager Palmer who also "warn[ed] [Mr. Perry] to 'be careful' about who he was talking

to and what he was saying." Id. ¶ 107.  Unit Manager Palmer "threatened" Mr. Perry by stating

that the BOP could transfer him to an "active yard," meaning a facility where active gang

members are housed. Id.; see id. ¶ 81.

       In late November or early December 2023, Mr. Perry approached Assistant

Warden Blackmon to inform her of his conversations with the NBC reporter.  Compl. ¶ 108.

Assistant Warden Blackmon "responded angrily" and stated that Mr. Perry was not allowed to

speak with reporters, even after he informed her that Assistant Warden Zantout had approved the

communications. Id.  Assistant Warden Blackmon also referenced conversations Mr. Perry had

been having with Ms. Bailey's counsel, stating that all information "must pass through BOP

officials" and that she would investigate him and "get him in 'big trouble'" if he continued to

"give any information to" Ms. Bailey's counsel. Id. ¶ 110.

       In the first or second week of December 2023, Mr. Perry was approached by

Lieutenant Falconer, the head of Special Investigative Services – the department responsible for

monitoring TRULINCS activity – at U.S.P. Tucson.  Compl. ¶ 111.  Lieutenant Falconer brought

Mr. Perry to a holding cell and "claimed that [the BOP's Office of the Inspector General]

had . . . ordered him to investigate Mr. Perry for receiving money from a reporter in exchange for

a story." Id.  After Mr. Perry explained that he had only asked the reporter to reimburse the costs

he incurred in sending and receiving TRULINCS messages, Lieutenant Falconer emphasized that

he was not allowed to receive money from a reporter for any reason. Id. ¶ 112.  During the

interaction, Mr. Perry inquired into the delay he experienced in sending and receiving

TRULINCS messages, noting that it would often take several days between sending the message

and receiving the notification that the message had been received.  Id. ¶ 113.  Lieutenant

Falconer responded that the delay was a result of the BOP's central office needing time to review

Mr. Perry's messages prior to their release.  Id.  Lieutenant Falconer also mentioned Mr. Perry's

conversations with Ms. Bailey's counsel, noting that he had no concerns with the

communications "so far."  Id. ¶ 114.  Mr. Perry and Lieutenant Falconer discussed possibly

transferring Mr. Perry to F.C.I. Tucson – a medium-security facility.  Id. ¶ 114.  Mr. Perry later

submitted a transfer request form but had not received an update on his transfer request from

Lieutenant Falconer at the time the complaint was filed in this case.  Id. ¶¶ 114-16.

Approximately one month later, in January 2024, Unit Manager Palmer – who

had spoken with Mr. Perry sometime in late November or early December 2023 – "threatened

Mr. Perry again," warning him to "watch [himself] and who [he] [was] talking to."  Compl.

¶ 117.  After Mr. Perry mentioned he was having some digestion problems with the peanut butter

the residents were fed during lockdowns, Unit Manager Palmer "threatened" Mr. Perry again.

Id. ¶¶ 118-19.

## I.   *March 2024:  U.S.P. Marion, F.C.I. Pekin, U.S.P. Florence-High*

In March 2024, Ms. Bailey was notified of blocks at two more BOP facilities.

First, on March 8, 2024, Ms. Bailey received a notification that she was blocked from

communicating with two of the inmates at U.S.P. Marion in Illinois.  Compl. ¶ 121.  Because she

had communicated with more than two inmates at U.S.P. Marion, she inferred that the block was

not facility-wide.  Id. ¶ 123.  The day before she received the block notifications, she sent More

Than Our Crimes subscribers – including several inmates at U.S.P. Marion – a newsletter with a

"short poem written by a federal prisoner[] about the author's rehabilitation."  Id. ¶ 126.  Similar

to the other notifications she received related to her blocked access, the notifications simply

stated that her access was blocked because her communications were found to be "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."  Id. ¶ 122.

Second, on March 14, 2024, Ms. Bailey received a notification that she was blocked from communicating with two inmates at F.C.I. Pekin in Illinois.  Compl. ¶ 127. Because she had only spoken with two inmates at F.C.I. Pekin and the notification did not disclose the scope of the restriction, she inferred the block was facility wide.  Id. ¶ 129.  The notifications provided the similar rationale that her communications were found to be "detrimental to the security, good order, or discipline of the facility, or might facilitate criminal activity."  Id. ¶ 128.

In addition to the facilities that provided notice to Ms. Bailey about her blocked account, Ms. Bailey alleges that evidence suggests she was blocked at other facilities without giving her notice.  Compl. ¶ 132.  For example, in March 2024, "multiple residents at USP Florence-High in Florence, Colorado were unable to exchange TRULINCS messages with" Ms. Bailey.  Id. ¶ 133.  One of Ms. Bailey's sources informed her that Ms. Bailey had been "removed [ ] from his TRULINCS contacts list," and another inmate stated that "he received an error message reading 'blocked' in red letters" when he attempted to add Ms. Bailey to his TRULINCS contact list.  Id.

## J.   The Instant Case

On April 24, 2024, Ms. Bailey filed her complaint in this case.  See Compl.  She brings six causes of action arising under federal law and the United States Constitution:  a First Amendment restriction-of-speech claim, a First Amendment retaliation claim, a Fifth Amendment procedural due process claim, two Administrative Procedure Act ("APA") claims,

and a claim for declaratory judgment.  See id. ¶¶ 134-72.  In regard to relief, Ms. Bailey seeks an

injunction restoring her TRULINCS access at all BOP facilities, prohibiting the BOP from

limiting her TRULINCS access absent "a specific, factual determination of misconduct" and

prior court approval, and prohibiting the BOP from interfering with her communication with

inmate sources or retaliating against them.  Id. 39-40.  On the same day she filed the complaint,

Ms. Bailey also moved for a preliminary injunction.  See Plaintiff's Motion for Preliminary

Injunctive Relief [Dkt. No. 2].  The scope of the preliminary injunction was identical to the

permanent injunction requested in the complaint.  On June 13, 2024, following the parties

briefing on Ms. Bailey's motion for a preliminary injunction, the Court held oral argument on the

motion.  See Minute Entry for June 13, 2024.

        On June 28, 2024, the Court granted Ms. Bailey's motion for a preliminary

injunction in part.  See Bailey v. Fed. Bureau of Prisons, 2024 WL 3219207.  In summary, the

Court analyzed each of Ms. Bailey's claims and concluded that she had sufficiently shown her

entitlement to a preliminary injunction with respect to her First Amendment claim stemming

from the BOP's decision to restrict her access at all the facilities except U.S.P. Big Sandy.  Id.

at *13.  The Court therefore ordered the BOP to restore Ms. Bailey's TRULINCS access at those

facilities – F.C.I. Ray Brook, U.S.P. Beaumont, F.C.C. Hazelton, U.S.P. Marion, F.C.I. Pekin,

and U.S.P. Florence-High – and further prohibited the BOP from "block[ing] Ms. Bailey from

TRULINCS at [those] facilities, or from exchanging TRULINCS messages with any inmate at

[those] facilities, absent a specific, factual determination of misconduct by Ms. Bailey or the

inmate that is timely communicated to Ms. Bailey in writing."  Bailey v. Fed. Bureau of Prisons,

Civil Action No. 24-1219 (PLF), 2024 WL 3227051, at *1 (D.D.C. June 28, 2024).

        On July 23, 2024, the BOP filed its motion to dismiss now before the Court.

## II.  LEGAL STANDARD

### A.  Motion to Dismiss Under Rule 12(b)(1) of the Federal Rules of Civil Procedure

Federal courts are courts of limited jurisdiction, possessing only those powers authorized by the Constitution and an act of Congress.  See, e.g., Janko v. Gates, 741 F.3d 136, 139 (D.C. Cir. 2014); Abulhawa v. U.S. Dep't of the Treasury, 239 F. Supp. 3d 24, 30 (D.D.C. 2017).  Lack of subject matter jurisdiction is fatal to a court's authority to hear a case. See FED. R. CIV. P. 12(h)(3).  The plaintiffs bear the burden of establishing that the Court has jurisdiction.  See Khadr v. United States, 529 F.3d 1112, 1115 (D.C. Cir. 2008); Walen v. United States, 246 F. Supp. 3d 449, 452 (D.D.C. 2017).  In determining whether to grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court must construe the complaint in plaintiffs' favor and treat all well-pleaded factual allegations as true.  See Attias v. CareFirst, Inc., 865 F.3d 620, 627 (D.C. Cir. 2017). Although the Court must grant plaintiffs the benefit of all reasonable inferences, it "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint," and the Court need not accept plaintiffs' legal conclusions.  Disner v. United States, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting Speelman v. United States, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)).  In determining whether a plaintiff has established jurisdiction, the Court may consider materials beyond the pleadings where appropriate.  See Cumis Ins. Soc'y, Inc. v. Clark, 318 F. Supp. 3d 199, 207 (D.D.C. 2018).

### B.  Motion to Dismiss Under Rule 12(b)(6) of the Federal Rules of Civil Procedure

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), plaintiffs must plead facts that "give the defendant fair notice of what the claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration

in original).  Although "detailed factual allegations" are not necessary to withstand a

Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted

as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570); see Spence v. U.S. Dep't

of Veterans Affs., 109 F.4th 531, 539 (D.C. Cir. 2024).  And "[a] claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  In re Interbank Funding Corp. Sec.

Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. at 678).

        In deciding a motion to dismiss under Rule 12(b)(6), the Court "must accept the

plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor."

Sanchez v. Off. of State Superintendent of Educ., 45 F.4th 388, 395 (D.C. Cir. 2022); see

Ashcroft v. Iqbal, 556 U.S. at 678.  The Court considers the complaint in its entirety, see Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007), and construes it liberally,

granting plaintiffs "the benefit of all inferences that can [reasonably] be derived from the facts

alleged."  See Sickle v. Torres Advanced Enter. Sols., LLC., 884 F.3d 338, 345 (D.C. Cir. 2018)

(alteration in original).  The Court, however, need not accept all inferences drawn by the plaintiff

"if such inferences are unsupported by the facts set out in the complaint."  Nurriddin v.

Bolden, 818 F.3d 751, 756 (D.C. Cir. 2016).  Nor is the Court "bound to accept as true a legal

conclusion couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. at 678; see also Kaempa

v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's

factual allegations insofar as they contradict exhibits or matters subject to judicial notice.").

III.  DISCUSSION

The government seeks dismissal of Ms. Bailey's claims brought pursuant to the
First Amendment, Fifth Amendment, and the APA.  The government also requests that, in the
event "the Court dismisses the due process and APA claims," the Court "transfer any surviving
First Amendment claims to the District where the respective prisons are located."  Mem. at 43
(capitalization omitted).  The Court addresses each claim separately.

### A.  First Amendment

Ms. Bailey's First Amendment claims are premised on the restrictions to her
TRULINCS access imposed by the BOP at seven different BOP facilities.  Specifically, Ms.
Bailey alleges that she was either blocked from communicating with certain individuals at a
particular facility or received a "facility-wide block" – that is, she was prohibited from
communicating with any inmate at a particular facility.

In partially granting Ms. Bailey's motion for a preliminary injunction, the Court
concluded that Ms. Bailey was likely to succeed on the merits of her First Amendment claim as
to six of the seven facilities.  See Bailey v. Fed. Bureau of Prisons, 2024 WL 3219207, at *4-9.
The Court began its analysis by highlighting the "difficult question" of determining the
appropriate framework under which to evaluate Ms. Bailey's First Amendment claim.  See id.
at *4-5.  Specifically, the Court observed that two Supreme Court cases – Procunier v. Martinez,
416 U.S. 396 (1974), and Turner v. Safley, 482 U.S. 78 (1987) – provide competing frameworks
for reviewing Ms. Bailey's First Amendment claim.  The Court summarized the two frameworks,
stating:

> Martinez requires that the challenged BOP practice or regulation
> "further an important or substantial governmental interest unrelated
> to the suppression of expression" and that "the limitation of First

18

Amendment freedoms . . . be no greater than is necessary or essential to the protection of the particular governmental interest involved." <u>Procunier v. Martinez</u>, 416 U.S. at 413-14. <u>Turner</u>, by contrast, requires only a "legitimate governmental interest" and a "'valid, rational connection' between" the challenged BOP practice or regulation and that interest. <u>Turner v. Safley</u>, 482 U.S. at 89 (quoting <u>Block v. Rutherford</u>, 468 U.S. 576, 586 (1984)). <u>Turner</u> also requires the Court to consider "whether there are alternative means of exercising the right that remain open to prison inmates"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "[t]he existence of obvious, easy alternative[ ]" regulations or actions that could "fully accommodate[ ] the prisoner's rights at <u>de minimis</u> cost to valid penological interests." <u>Id</u>. at 90-91.

<u>Bailey v. Fed. Bureau of Prisons</u>, 2024 WL 3219207, at *4. In the context of Ms. Bailey's motion for a preliminary injunction, the government argued that the Court should apply the framework set forth <u>Turner</u>, while Ms. Bailey argued that the Court should apply <u>Martinez</u>. <u>Id</u>.

The Court determined that it was not necessary to definitively determine whether <u>Martinez</u> or <u>Turner</u> applied to Ms. Bailey's First Amendment claim. <u>See</u> <u>Bailey v. Fed. Bureau of Prisons</u>, 2024 WL 3219207, at *5. As to six of the seven facilities, the Court reasoned that "[e]ven assuming that <u>Turner</u> – the standard urged by the government – applies, Ms. Bailey has met her burden to clearly show a likelihood of success on the merits . . . ." <u>Id</u>. As to the remaining facility, U.S.P. Big Sandy, the Court reasoned that "even assuming that <u>Martinez</u> – the standard urged by Ms. Bailey – applies, she has not met her burden" of establishing a likelihood of success on the merits of the claim. <u>Id</u>.

In the context of the motion to dismiss now before the Court, the government does not directly contest the Court's earlier conclusion that Ms. Bailey has stated a claim as to six of the seven facilities under both <u>Martinez</u> and <u>Turner</u>. The Court therefore need not revisit

19

its analysis on this point, and importantly, the Court need not decide at this juncture whether Martinez or Turner supplies the appropriate standard.

Instead of contesting the Court's earlier analysis, the government makes three separate arguments in support of dismissing Ms. Bailey's First Amendment claim in whole or in part. First, the government argues that Ms. Bailey has failed to state a First Amendment claim because Ms. Bailey can communicate via TRULINCS through two separate email addresses and has not alleged that the BOP blocked both of these email addresses at each facility. See Mem. at 13-14. In other words, the government contends that Ms. Bailey was never deprived of the ability to communicate with inmates at the facilities. See id. Second, the government argues that Ms. Bailey's First Amendment claims are "entirely or partially moot" as to three of the facilities – F.C.I. Marion, F.C.I. Pekin, and U.S.P. Beaumont – because those facilities either never blocked Ms. Bailey's TRULINCS access or partially lifted the block prior to the Court's issuance of the preliminary injunction in this case. See id. at 14-17. Finally, the government argues that Ms. Bailey has failed to state a claim against U.S.P. Big Sandy. See id. at 17-28.

The Court addresses each of these arguments in turn.

### 1.  Alternative Email Address

The government's first argument pertaining to Ms. Bailey's multiple email addresses is unavailing. The government contends that Ms. Bailey has failed to state a First Amendment claim because she never alleges that both of her email addresses were blocked at each facility, and therefore she has not alleged that she was deprived of the ability to communicate with her sources. See Mem. at 13-14. In support, the government points to several exhibits submitted by Ms. Bailey in connection with her motion for a preliminary injunction showing that she had received TRULINCS notifications to two separate email addresses. See

Declaration of Brian T. Gilmore ("Gilmore Decl.") [Dkt. No. 2-2], Ex. 5
(paminprogess@gmail.com at USP Big Sandy); id. Ex. 13 (pam@morethanourcrimes.org
blocked from communicating with inmate at F.C.C. Hazelton); id. Ex. 15
(pam@morethanourcrimes.org blocked from communicating with inmate at U.S.P. Marion); id.
Ex. 16 (pam@morethanourcrimes.org blocked from communicating with inmate at F.C.I.
Pekin).[2]

       The government essentially asks the Court to draw the following inference in its
favor: because there is evidence that Ms. Bailey has received TRULINCS notifications to two
different email addresses, she therefore must be capable of communicating with inmates at each
facility with at least one of those email addresses. Such an inference is inappropriate for at least
two reasons. First, given that this case is before the Court on the government's motion to
dismiss, the Court is required to "draw all reasonable inferences in the plaintiff's favor," not the
government's favor. Sanchez v. Off. of State Superintendent of Educ., 45 F.4th 388, 395 (D.C.
Cir. 2022). Second, the government's inference is likely not a reasonable one in light of several
allegations in the complaint. For example, Ms. Bailey alleges multiple times that her "access"
was restricted, not just that she was restricted from communicating through a particular email
address. See, e.g., Compl. ¶¶ 61, 66, 71, 88, 102, 128, 131-33. Furthermore, Ms. Bailey
suggests in the complaint that mere access to TRULINCS via a particular email address may be

---

[2]     The evidence the government relies on for this argument is not found within the
complaint. In most circumstances, a court may not consider evidence outside the complaint in
resolving a motion to dismiss without converting the motion to dismiss into a motion for
summary judgment. See Hurd v. D.C., Gov't, 864 F.3d 671, 678 (D.C. Cir. 2017). The Court
need not reach the issue of whether it would need to convert the government's motion to dismiss
into one for summary judgment because even if the Court were to consider the evidence without
converting the government's motion into one for summary judgment, the evidence is not fatal
Ms. Bailey's First Amendment claim.

insufficient to communicate with an inmate if that email address is not on the inmate's

"approved contact list."  See, e.g., Compl. ¶¶ 34, 59.  In other words, even if Ms. Bailey was able

to use two different email addresses to communicate via TRULINCS, that does not mean that she

could communicate with her inmate sources through either email address because the particular

email address may not have been on the inmate's "approved contact list."  Indeed, the

government's memorandum of law submitted in connection with its motion to dismiss references

this approved contact list, citing to the TRULINCS Program Statement, which provides that

"[i]nmates may only communicate with approved persons on their contact lists."  Mot. at 11.

　　　　　While discovery and a more complete record may later provide support for the

government's argument, the Court cannot at this stage draw the inference that Ms. Bailey's use

of two separate email addresses necessarily meant that she was able to communicate with each of

her sources at each facility with both email addresses.  The argument therefore must be rejected.

　　　　2.　Mootness of Claims Against F.C.I. Marion, F.C.I. Pekin, and U.S.P. Beaumont

　　　　　The government next argues that Ms. Bailey's First Amendment claims against

three of the facilities – F.C.I. Marion, F.C.I. Pekin, and U.S.P. Beaumont – are "entirely or

partially moot" because there was either never a block at these facilities or the block was lifted in

whole or in part in advance of this Court's preliminary injunction order.  See Mem. at 14-17.  In

support, the government submits three declarations from BOP employees at each facility stating

the status of Ms. Bailey's TRULINCS restriction.  See Declaration of Brandi McBride

("McBride Decl.") [Dkt. No. 21-1] (U.S.P. Beaumont); Declaration of Stephanie Johnson

("Johnson Decl.") [Dkt. No. 21-2] (F.C.I. Marion); Declaration of Patrick Veal ("Veal Decl.")

[Dkt. No. 21-3] (F.C.I. Pekin).

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Ameziane v. Obama, 620 F.3d 1, 4 (D.C. Cir. 2010) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)) (cleaned up). The doctrine of mootness is a jurisdictional inquiry. Safari Club Int'l v. Jewell, 842 F.3d 1280, 1285, 1287 (D.C. Cir. 2016); see Mine Reclamation Corp. v. FERC, 30 F.3d 1519, 1522 (D.C. Cir. 1994) ("[M]ootness goes to the jurisdiction of this court."); Kanghawa v. U.S. Dep't of Homeland Sec., Civil Action No. 21-1386 (PLF), 2022 WL 4598627, at *3 (D.D.C. Sept. 30, 2022). Accordingly, motions to dismiss for mootness are properly brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Han v. Lynch, 223 F. Supp. 3d 95, 102 (D.D.C. 2016). In analyzing a motion to dismiss brought pursuant to Rule 12(b)(1), "the Court may consider materials beyond the pleadings where appropriate." Nelson's Cabinetry, Inc. v. Blinken, Civil Action No. 24-1335 (PLF), 2025 WL 83027, at *4 (D.D.C. Jan. 13, 2025)

"The initial heavy burden of establishing mootness lies with the party asserting a case is moot, but the opposing party bears the burden of showing an exception applies." Whale & Dolphin Conservation v. Nat'l Marine Fisheries Serv., 573 F. Supp. 3d 175, 179 (D.D.C. 2021) (quoting Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n, 628 F.3d 568, 576 (D.C. Cir. 2010)); see J.D. v. Azar, 925 F.3d 1291, 1307 (D.C. Cir. 2019). One such exception to the mootness doctrine is the doctrine of voluntary cessation. The Supreme Court has held that where voluntary cessation of a challenged practice causes a case to become moot, federal courts may still determine the legality of the practice in certain circumstances. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000); see People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv., 918 F.3d 151, 157-58 (D.C. Cir. 2019). Courts will only dismiss the claim as moot "if subsequent

events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. at 189.  And "the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  Id. (internal quotation marks omitted); see Chavis v. Garrett, 419 F. Supp. 3d 24, 32 (D.D.C. 2019).  "For the [voluntary cessation] exception to apply, the [defendants'] voluntary cessation must have arisen because of the litigation."  Mejia-Mejia v. U.S. Immigr. & Customs Enf't, Civil Action No. 18-1445 (PLF), 2019 WL 4707150, at *8 (D.D.C. Sept. 26, 2019) (emphasis in original) (citation omitted); see Citizens for Responsibility & Ethics in Wash. v. Wheeler, 352 F. Supp. 3d 1, 13 (D.D.C. 2019) ("The voluntary-cessation exception to the mootness doctrine . . . does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation.") (cleaned up).

        The arguments as to each facility are different and thus the Court considers each facility separately.  Turning first to F.C.I. Marion, the government argues that Ms. Bailey's claims are moot because "there were no blocks associated with either of [Ms. Bailey's] email addresses [at F.C.I. Marion] since at least May 6, 2024."  Mem. at 15; see Johnson Decl.[3]  The problem with the government's argument is that it does not contradict Ms. Bailey's factual allegation that she was blocked from communicating with two residents at U.S.P. Marion, see

---

[3]      The parties appear to be discussing two separate facilities in Marion, Illinois.  Ms. Bailey alleges in her Complaint that her TRULINCS access was restricted at "U.S.P. Marion," Compl. ¶ 121, while the government argues that Ms. Bailey's First Amendment claim against "F.C.I. Marion" is moot.  Mem. at 15.  The parties never address this discrepancy, and their arguments suggest that F.C.I. Marion and U.S.P. Marion are two segments of the same facility.  The Court therefore assumes that there is no meaningful difference between F.C.I. Marion and U.S.P. Marion for purposes of its analysis.  To the extent F.C.I. Marion and U.S.P. Marion are in fact two separate facilities, the government's argument that Ms. Bailey's claims against F.C.I. Marion are moot must be rejected because she does not bring claims against F.C.I. Marion.

Compl. ¶ 121, nor the inference from that allegation that the block continued until at least the filing of the complaint on April 24, 2024.  It therefore is incumbent on the government to "persuad[e] the court that the challenged conduct cannot reasonably be expected to start up again . . . ."  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. at 189.  The government makes no such showing.  The only argument in support for its contention that the challenged conduct is unlikely to recur is that because Ms. Bailey never provided evidence that her TRULINCS access was actually restricted at F.C.I. Marion, it is unreasonable to conclude that "[c]onduct that never occurred in the first place is not likely to recur . . . ."  Reply at 6.  This argument, however, ignores the fact that the Court is required to accept Ms. Bailey's "well-pleaded factual allegations" in the complaint as true at this stage.  See Ashcroft v. Iqbal, 556 U.S. at 679.  Accordingly, because Ms. Bailey alleges that she "received notification that her email address had been blocked from communicating with two residents" at the facility in Marion, Compl. ¶ 121, and because the government has otherwise failed to persuade the Court that the challenged conduct is not likely to recur, the Court concludes that Ms. Bailey's First Amendment claim against F.C.I. Marion is not moot.  See Env't Def. Fund v. Regan, Civil Action No. 20-0762 (LLA), 2024 WL 3887383, at *14 (D.D.C. Aug. 20, 2024) (concluding that plaintiff's claims were not moot because "nothing [ ] prevent[ed] the [agency] from reverting to its 'old ways').

As to F.C.I. Pekin, the government argues that Ms. Bailey's claim is moot because the "temporary block" at the facility was lifted on May 18, 2024, "more than forty days before the Court's decision on [Ms. Bailey's] preliminary injunction motion."  See Mem. at 16; Veal Decl.  As with the arguments discussed above in the context of F.C.I. Marion, the government's factual contention does not negate Ms. Bailey's allegations that her TRULINCS

access was blocked and that the block existed at the time of the filing of the complaint.  See
Compl. ¶ 127.  Indeed, the government's factual contention shows that the block Ms. Bailey
received at F.C.I. Pekin was only lifted on May 18, 2024, several weeks after the complaint was
filed on April 24, 2024.  See Veal Decl. ¶ 3.  The Court therefore must determine whether the
doctrine of voluntary cessation applies.  The government contends it does not, arguing that the
challenged conduct is unlikely to recur both because Ms. Bailey's access was "only temporarily
blocked" and later "sua sponte lifted," and because the Court's preliminary injunction order
"served as a poignant reminder to comply with TRULINCS policy."  Reply at 7.  The
government's arguments amount to nothing more than an assertion that the BOP will not initiate
further blocks at F.C.I. Pekin, which does not satisfy the government's "heavy burden of
persuading the court that the challenged conduct cannot reasonably be expected to start up
again . . . ."  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. at 189
(cleaned up).

   Finally, as to U.S.P. Beaumont, the government argues that Ms. Bailey's claims
are moot because "the facility-wide block" she received "was an inadvertent mistake," which
was corrected on June 17, 2024, approximately two weeks before the Court issued the
preliminary injunction.  Mem. at 16; see McBride Decl.  The government concedes, however,
that BOP officials at U.S.P. Beaumont intended to prevent Ms. Bailey "from communicating
with one inmate at F.C.C. Beaumont."  McBride Decl. ¶ 3.  In other words, notwithstanding the
scope of the restriction, the BOP intended to restrict Ms. Bailey's TRULINCS access – in
possible violation of Ms. Bailey's First Amendment rights – and has not provided a reason as to
why such conduct is unlikely to recur.  For the same reasons discussed above, the Court cannot
conclude that the government has carried its "heavy burden of persuading the court that the

challenged conduct cannot reasonably be expected to start up again . . . ."  <u>Friends of the Earth,</u>

<u>Inc. v. Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. at 189 (cleaned up).

   In sum, the Court concludes that none of Ms. Bailey's First Amendment claims

are moot.  <u>See</u> <u>Env't Def. Fund v. Regan</u>, 2024 WL 3887383, at *14.[4]

### 3.  U.S.P. Big Sandy

   The government's final argument is that Ms. Bailey has failed to state a claim

against U.S.P. Big Sandy.  <u>See</u> Mem. at 17-28.  The government makes three arguments in

support:  first, the Court should apply the Supreme Court's framework in <u>Turner v. Safley</u>, 482

U.S. 78 (1987), in assessing whether Ms. Bailey has stated a First Amendment claim, <u>see</u> <u>id</u>.

at 17-22; second, the Court should find that Ms. Bailey has failed to state a claim under <u>Turner</u>

because certain evidence – specifically, "a contemporaneous memorandum . . . documenting that

[Ms. Bailey's] email address was . . . operating as a text forwarding service . . ." – shows that the

BOP's restriction on Ms. Bailey's TRULINCS access was "reasonably related to legitimate

---

[4]  The government briefly argues that Ms. Bailey has failed to state a claim against U.S.P. Florence-High.  <u>See</u> Reply at 7-8.  In support, the government points to the fact that Ms. Bailey has not specifically alleged that her TRULINCS access was blocked at U.S.P. Florence-High, and the fact that Ms. Bailey only alleges for purposes of her First Amendment claim that she was permanently blocked at five facilities and was blocked from communicating with two individuals at a sixth facility.  <u>Id</u>.; <u>see</u> Compl. ¶ 139.  The Court rejects the government's argument for two reasons.  First, in her complaint, Ms. Bailey alleges that her TRULINCS access was blocked "at a minimum of five different BOP institutions," not that her TRULINCS access was blocked at only five facilities.  Compl. ¶ 139.  Second, Ms. Bailey sets forth sufficient facts from which to infer that her TRULINCS access was restricted in some way at U.S.P. Florence-High, notwithstanding the fact that she does not allege that she was notified of the block.  Specifically, Ms. Bailey asserts that in March 2024 – the same month her TRULINCS access was restricted at U.S.P. Marion and F.C.I. Pekin, <u>see</u> <u>id</u>. ¶¶ 121-130 – two inmates at U.S.P. Florence-High were unable to add Ms. Bailey to their TRULINCS contacts list or had her contact removed from their approved contact list.  <u>Id</u>. ¶ 133.  Those allegations coupled with the temporal proximity with the TRULINCS restrictions at U.S.P. Marion and F.C.I. Pekin create the inference that the BOP restricted either her TRULINCS access or her ability to communicate with inmates for purposes of her First Amendment claim.

penological interests," see id. at 22-27; and finally, that even if the Court applies the Supreme

Court's framework in Procunier v. Martinez, 416 U.S. 396 (1974), the Court should still

conclude that Ms. Bailey has failed to state a First Amendment claim.  See id. at 27-28.

       Ms. Bailey's opposition to the government's arguments is more procedural in

nature.  She makes two general arguments.  First, she argues that even if the government is

correct in its analysis of her claim, it is "impermissible" to "divide" her claim against BOP into

"separate claims" against each of the facilities.  See Opp. at 23-24.  In other words, the Court

should reject the government's motion to dismiss Ms. Bailey's First Amendment claim because

she has established a claim against BOP, notwithstanding the fact that she may not have a claim

against U.S.P. Big Sandy in particular.  See id.  Second, Ms. Bailey argues that the government

impermissibly relies on factual matter outside of the complaint in arguing that she fails to satisfy

the frameworks outlined in Turner and Martinez.  See id. at 24-26.  More specifically, Ms.

Bailey maintains that the government's reliance on "an extra-pleading memorandum" stating that

she violated TRULINCS rules may not be considered on a motion to dismiss.  See id. at 25; see

also Bailey v. Fed. Bureau of Prisons, 2024 WL 3219207, at *6.

       Setting aside Ms. Bailey's first argument – that it is improper to dismiss

"portions" of her First Amendment claim – the Court concludes that Ms. Bailey has sufficiently

stated a First Amendment claim as to U.S.P. Big Sandy.  The crux of the government's argument

is that the Court can rely on documents that the government submitted in connection with Ms.

Bailey's motion for a preliminary injunction, notwithstanding the fact that they are outside of the

complaint.  See Mem. at 23-24; Reply at 10.  Specifically, the government argues that the Court

can consider (1) evidence showing that Ms. Bailey forwarded messages from inmates at that

facility to third parties at those inmates' request, in violation of TRULINCS policy, see Gov't

Ex. 3 [Dkt. No. 10-3] at ECF 2-6, and (2) a BOP memorandum reflecting that the BOP's reason for blocking Ms. Bailey's TRULINCS access at U.S.P. Big Sandy was in fact because she had been forwarding messages.  <u>See</u> Mem. at 23-24; Gov't Ex. 6 [Dkt. No. 10-6].  The government is correct that if the Court were to consider this evidence and – importantly – accept the truth of the contentions contained therein, dismissal of Ms. Bailey's First Amendment claim as it relates to U.S.P. Big Sandy would be appropriate.  <u>See</u> <u>Bailey v. Fed. Bureau of Prisons</u>, 2024 WL 3219207, at *5 (concluding that Ms. Bailey's claim as to U.S.P. Big Sandy failed under <u>Martinez</u> and <u>Turner</u> in light of the government's evidence that Ms. Bailey operated as a text forwarding service).  The Court cannot, however, accept the truth of the matter asserted in the evidence the government seeks to rely on at this stage.  And indeed, the government acknowledges as much.  <u>See</u> Reply at 10 (stating that the government "is not asking the Court to rely on the materials "for the truth of the matter asserted").

It is axiomatic that on a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court's inquiry is generally confined to material contained within the four corners of the complaint.  <u>See</u> <u>Brown v. Gov't of D.C.</u>, 390 F. Supp. 3d 114, 122 (D.D.C. 2019).  In the event that a court is presented with and considers matters outside the pleadings, the motion to dismiss "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); <u>see</u> <u>Slate v. Pub. Def. Serv. for the D.C.</u>, 31 F. Supp. 3d 277, 287 (D.D.C. 2014).  A narrow exception to this rule requiring a motion to dismiss be converted into a motion for summary judgment exists when a court considers "'matter of which . . . judicial notice' may be taken, such as public records."  <u>Slate v. Pub. Def. Serv. for the D.C.</u>, 31 F. Supp. 3d at 288 (quoting <u>EEOC v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997)).

In <u>Hurd v. District of Columbia</u>, the D.C. Circuit concluded that the district court had erred by considering material outside the complaint – specifically, documentary evidence submitted in a separate litigation – without converting the motion to dismiss into a motion for summary judgment.  <u>See</u> <u>Hurd v. District of Columbia</u>, 864 F.3d 671, 686-87 (D.C. Cir. 2017). The D.C. Circuit stated that while the district court could take judicial notice of these documents, it could not "rely on [them] for the truth of the matter asserted."  <u>Id</u>. at 686.  The Circuit explained its reasoning as follows:

> That common-sense limitation on judicial notice is particularly apt in a case where the court purports to treat a noticed fact as preclusive.  "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." <u>United States v. Jones</u>, 29 F.3d 1549, 1553 (11th Cir. 1994).  The District argues that judicial notice was appropriate here because Hurd did not dispute the authenticity of the documents that the district court considered.  But acquiescing to the authenticity of documents introduced in an earlier case is a far cry from agreeing that those documents present a full or fair picture of a matter a party has a right to dispute in a later case.  That is especially true here, where the factual issues include the highly contextual, case-specific question of whether Hurd's post-release conduct rendered him ineligible for relief.

<u>Hurd v. D.C., Gov't</u>, 864 F.3d at 686.

In the instant case, the government argues that it is not asking the Court to consider the evidence for the truth of the matter asserted therein but instead is only requesting that the Court assess the "plausibility of [Ms. Bailey's] allegations" in light of the evidence. Reply at 11.  This is a distinction without a difference.  The government argues, for example, that the four proffered emails Ms. Bailey purportedly forwarded "<u>show</u> that Plaintiff was operating as a text and email forwarding service . . . ."  Mem. at 23 (emphasis added); <u>see</u> Gov't Ex. 3 [Dkt. No. 10-3] at ECF 2-6.  The Court cannot conclude that this extra-pleading material

"shows" that Ms. Bailey was operating as a text and email forwarding service without accepting the truth of the matter asserted in the emails.  See Hurd v. D.C., Gov't, 864 F.3d at 686. Furthermore, even if the Court accepted this evidence as definitive on the question of whether Ms. Bailey was in fact operating as a text and email forwarding service, the Court cannot conclude that this was ultimately the reason the BOP blocked Ms. Bailey's TRULINCS access. Indeed, the fact that the BOP restricted Ms. Bailey's TRULINCS access at six other facilities and did not point to Ms. Bailey's alleged forwarding of communications as the basis for those restrictions certainly gives rise to the inference that the BOP is merely providing an after-the-fact explanation for its decision.

As to the other piece of evidence the government relies on – a BOP memorandum listing Ms. Bailey's email address as one of fourteen emails believed to be a text forwarding service, see Gov't Ex. 6 [Dkt. No. 10-6] – the government again implicitly asks the Court to accept the truth of the matter asserted in the evidence.  The government argues that the memorandum "shows that [Ms. Bailey] was not being singled out," but instead was one of many email addresses identified as operating a text and email forwarding service.  Reply at 10 (emphasis added).  If the government is asking the Court to accept the memorandum as evidence of the true reason the BOP restricted Ms. Bailey's TRULINCS access, the Court cannot do so because this would require the Court to accept the truth of the matter asserted in the memorandum.  See Hurd v. D.C., Gov't, 864 F.3d at 686.  Similarly, if the government is asking the Court to assess the plausibility of Ms. Bailey's allegations in light of the evidence, such an analysis would require indirectly accepting the truth of the BOP's factual assertion provided in the memorandum.  In other words, the Court would need to find that the memorandum creates the inference that the BOP more likely restricted Ms. Bailey's TRULINCS access because she

was operating a text and email forwarding service, rather than – as Ms. Bailey's many other allegations suggest – because of her speech. Accepting the inference the government's evidence suggests over the inference Ms. Bailey suggests is not proper at the motion to dismiss stage. See Sanchez v. Off. of State Superintendent of Educ., 45 F.4th at 395 ("In assessing the sufficiency of the pleadings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor.").

The evidence presented by the government is strong and was indeed the basis on which the Court denied Ms. Bailey request for preliminary relief as to U.S.P. Big Sandy. But to conclude at this stage that this evidence is fatal to Ms. Bailey's claim before she can conduct any discovery into the validity of the evidence or the matters asserted therein is improper. The Court therefore denies the government's request to dismiss Ms. Bailey's First Amendment claim as it relates to U.S.P. Big Sandy.

## B. *First Amendment Retaliation*

The government cannot circumvent the First Amendment by retaliating against those who have spoken instead of directly restricting their speech. "If an official takes adverse action against someone based on th[e] forbidden motive [of retaliation for protected speech], . . . the injured person may generally seek relief by bringing a First Amendment claim." Nieves v. Bartlett, 587 U.S. 391, 398 (2019). In this Circuit, a First Amendment retaliation claim requires a plaintiff to show that:

> (1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him.

Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting Banks v. York, 515 F. Supp. 2d 89,

111 (D.D.C. 2007)); see Flannery v. Eckenwiler, Civil Action No. 23-2804 (ABJ), 2024

WL 4345832, at *4 (D.D.C. Sept. 30, 2024).

Ms. Bailey advances three theories by which she argues she can state a First

Amendment Retaliation claim:  "(1) retaliation against Ms. Bailey for her own protected speech;

(2) retaliation against Ms. Bailey's incarcerated sources for Ms. Bailey's protected speech; and

(3) retaliation against the sources for their own protected speech."  Opp. at 26-27.  The

government responds that Ms. Bailey has failed to allege sufficient factual matter to state a claim

for First Amendment retaliation.  See Mem. at 34-35; Reply at 15-17.  Furthermore, the

government argues that Ms. Bailey's latter two theories of a First Amendment retaliation are not

viable because they involve either retaliation against a third-party or were motivated by the

speech of a third-party.  See Mem. at 28-33.

The Court addresses each of Ms. Bailey's theories separately.

### 1.   Retaliation Against Ms. Bailey for Ms. Bailey's Speech

Ms. Bailey's first theory is that she has stated a viable First Amendment

retaliation claim because she has sufficiently alleged that the BOP retaliated against her because

of her protected speech.  See Opp. at 27-31.  More specifically, Ms. Bailey argues that:  (1) she

engaged in protected speech through her advocacy for prison reform; (2) the BOP retaliated

against her by initiating TRULINCS restrictions at seven BOP facilities; and (3) the retaliatory

actions were directly in response to her protected speech.  See id. at 27.  The government makes

two arguments in response:  first, the claim should be dismissed because it "is simply a

repackaging of her First Amendment TRULINCS claim;" and second, Ms. Bailey has not alleged

sufficient facts suggesting that there was a "causal link" between her protected speech and the retaliatory actions. See Reply at 15-17.

The Court agrees with the government that Ms. Bailey's first theory of a First Amendment retaliation premised on the government's restrictions of her TRULINCS access is duplicative of her First Amendment claim. "A court may dismiss duplicative claims in its discretion." DTCC Data Repository (U.S.) LLC v. United States Commodity Futures Trading Comm'n, 25 F. Supp. 3d 9, 18-19 (D.D.C. 2014). "Duplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." Sandler v. Blinken, Civil Action No. 21-2226 (DLF), 2022 WL 4547557, at *7 (D.D.C. Sept. 29, 2022) (quoting Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 81 (D.D.C. 2010)).

In essence, the First Amendment retaliation claim Ms. Bailey presents is a First Amendment claim within a First Amendment retaliation claim. More specifically, she argues that the BOP retaliated against her by violating her First Amendment rights. But if the Court were to find that the BOP's "retaliatory action" – that is, restricting her TRULINCS access – was itself a violation of Ms. Bailey's First Amendment rights, then it would be unnecessary to consider whether that First Amendment violation was an unlawful retaliation. Conversely, if the Court were to conclude that the BOP's restrictions were not a violation of Ms. Bailey's First Amendment rights – that is, the restrictions were based on valid, non-speech related reasons – then the restrictions are not "retaliatory" because there is no "causal link between the exercise of a constitutional right and the adverse action taken." Aref v. Lynch, 833 F.3d at 258. Indeed, it is worth highlighting that the D.C. Circuit in Aref addressed a prisoner's First Amendment retaliation claim in part by applying the test set forth in Turner v. Safley, 482

U.S. 78 (1987), one of the frameworks under which the Court may analyze Ms. Bailey's First

Amendment claim.  See Aref v. Lynch, 833 F.3d at 258-59.

    The factors courts typically consider when determining if one claim is duplicative

of another reinforce this analysis.  Turning first to whether the legal standards are identical,

although First Amendment claims and First Amendment retaliation claims have different legal

standards, both Ms. Bailey's First Amendment claim and her First Amendment retaliation claim

rise or fall on the same legal issue and associated standard:  whether the BOP's restriction of her

TRULINCS access was valid.  In the context of Ms. Bailey's First Amendment claim, as

discussed above, the Court must either consider whether the BOP's restrictions were valid under

the standards set forth in Procunier v. Martinez, 416 U.S. 396 (1974), or Turner v. Safley, 482

U.S. 78 (1987).  See Bailey v. Fed. Bureau of Prisons, 2024 WL 3219207, at *4.  Under

Martinez, the Court must consider whether "the challenged BOP practice or regulation 'further

an important or substantial governmental interest unrelated to the suppression of expression' and

that 'the limitation of First Amendment freedoms . . . be no greater than is necessary or essential

to the protection of the particular governmental interest involved.'"  Id. (quoting Procunier v.

Martinez, 416 U.S. at 413-14).  Under Turner, the Court must consider, inter alia, whether the

BOP has "a 'legitimate governmental interest' and a 'valid, rational connection between' the

challenged BOP practice or regulation and that interest."  Id. (quoting Turner v. Safley, 482 U.S.

at 89).  In the context of Ms. Bailey's First Amendment retaliation claim, the Court must

consider whether the restriction of Ms. Bailey's TRULINCS access was a retaliatory action that

was taken as a result of her protected speech.  See Aref v. Lynch, 833 F.3d at 258.

    If the Court were to determine – in the context of Ms. Bailey's First Amendment

claim – that the BOP satisfied the appropriate standard set forth in Martinez or Turner, then Ms.

Bailey's First Amendment retaliation claim <u>necessarily</u> fails because the Court would have found either that the blocks were motivated by an "important or substantial governmental interest unrelated to the suppression of expression" (<u>Martinez</u>), or were rationally connected to a "legitimate government interest" (<u>Turner</u>).  <u>Bailey v. Fed. Bureau of Prisons</u>, 2024 WL 3219207, at *4.  Put differently, if Ms. Bailey fails to prevail on her First Amendment claim, she will fail to prevail on her First Amendment retaliation claim since the Court already will have found that the restriction was based on a valid reason, not a retaliatory motive.  On the other hand, while success on her First Amendment claim does not necessarily mean that Ms. Bailey will succeed on her First Amendment retaliation claim – <u>e.g.</u>, Ms. Bailey must still show a "causal connection" between the BOP's retaliatory action and her protected speech – it would be unnecessary to consider whether she has shown a causal connection since she already would have obtained all the relief to which she is entitled by virtue of succeeding on her First Amendment claim.

Outside of the legal standards applied to each claim, the First Amendment claim and First Amendment retaliation "stem from identical allegations" related to the BOP's restrictions of Ms. Bailey's TRULINCS access and the reasoning for those restrictions.  <u>See</u> <u>Sandler v. Blinken</u>, 2022 WL 4547557, at *7.  And because a First Amendment claim and First Amendment retaliation claim are merely different ways of proving a First Amendment violation, the relief under either theory would also be "identical."  <u>See</u> <u>id</u>.

The Court is further guided by a practical consideration – namely, the First Amendment retaliation theory that Ms. Bailey posits would collapse the difference between a First Amendment claim and a First Amendment retaliation claim.  <u>See</u> <u>Nat'l Rifle Ass'n of Am.</u> <u>v. Vullo</u>, 602 U.S. 175, 203 (2024) (Jackson, J., concurring) (drawing the distinction between

claims of "censorship" under the First Amendment and "coercion claims" under First Amendment retaliation jurisprudence). The problem for Ms. Bailey's articulation of her First Amendment retaliation claim is that the purported retaliatory action – i.e., the TRULINCS restrictions – is itself a speech restriction. Accepting Ms. Bailey's argument would allow a plaintiff to bring both a First Amendment and a First Amendment retaliation claim whenever they face a speech restriction.

In sum, the Court rejects Ms. Bailey's first formulation of a First Amendment retaliation claim because it is duplicative of her First Amendment claim.

### 2. Retaliation Against an Inmate Source for Ms. Bailey's Speech

Ms. Bailey's second theory of First Amendment retaliation is that she can state a viable claim if she sufficiently alleges that the government took retaliatory action against her inmate sources as a result of her speech. See Opp. at 31-35. The theory rests on the argument that the retaliatory actions taken directly against her sources had the effect of harming her. See Opp. at 34-35 ("Although Defendant may scoff at the idea that Ms. Bailey could be negatively impacted by harm suffered by someone else, it ignores the relationships that she has developed with sources over time.").

As an initial matter, it is not clear to the Court that Ms. Bailey's theory of First Amendment retaliation premised on retaliation against a third party that indirectly or incidentally causes harm to her is a viable theory. The case law on this point is limited and Ms. Bailey does not point to a case where a court accepted such a theory. In other areas of constitutional law – such as in due process jurisprudence – the Supreme Court has recognized "[t]he simple distinction between government action that directly affects a citizen's legal rights . . . and action that is directed against a third party and affects the citizen only indirectly or incidentally . . . ."

O'Bannon v. Town Ct. Nursing Ctr., 447 U.S. 773, 788 (1980).  As the Supreme Court recently

stated in Dep't of State v. Munoz, "the Constitution does not ordinarily prevent the government

from taking actions that 'indirectly or incidentally' burden a citizen's legal rights."  602 U.S.

899, 916 (2024).  Consistent with this principle, at least two judges in this District summarily

rejected a First Amendment retaliation theory premised on retaliation against a third party.  See

Scahill v. D.C., 271 F. Supp. 3d 216, 235 (D.D.C. 2017) (dismissing plaintiff's First Amendment

retaliation claim because plaintiff failed to allege that defendant "took any retaliatory action

against" him), aff'd, 909 F.3d 1177 (D.C. Cir. 2018); Brown v. Fed. Bureau of Prisons, Civil

Action No. 19-2795, 2022 WL 2237217, *6-7 & n.3 (D.D.C. June 22, 2022) (plaintiff cannot

"stand in [the] shoes" of his incarcerated uncle to assert a claim of retaliation against the uncle).

        The Court, however, need not decide the issue because even if Ms. Bailey can

state a First Amendment retaliation claim premised on retaliatory actions taken against a third

party, she has not sufficiently alleged that a causal connection exists between her speech and the

retaliatory actions taken against her sources.  See Bailey v. Fed. Bureau of Prisons, 2024

WL 3219207, at *10 ("To succeed on her First Amendment retaliation claim, Ms. Bailey must

show that the BOP would not have taken adverse action absent her own speech.").  Ms. Bailey's

general proposition is that "it is reasonable to infer a causal link between all retaliation against

sources and Ms. Bailey's speech."  Opp. at 32 (emphasis in original).  Critically, however, Ms.

Bailey's arguments on this point are about the inmate sources' speech "with her," not her speech.

See Opp. at 32 ("Defendant threatened Leonard Schenk with violence and false disciplinary

writeups not because he was speaking about Defendant's mistreatment of inmates, but because

he was speaking about Defendant's mistreatment of inmates with Ms. Bailey . . . .") (emphasis in

original); id. ("Defendant made clear to Jeremy Fontanez that he was free to speak about

problems at F.C.I. Cumberland internally, but he was not free to speak about those same problems <u>with Ms. Bailey</u> . . . .") (emphasis in original). Ms. Bailey's argument therefore is that the inmate's speech directed at Ms. Bailey was the motivation for the retaliation, not that her speech was the "'but for' cause of the defendants' retaliatory action." <u>See</u> <u>Aref v. Holder</u>, 774 F. Supp. 2d 147, 169 (D.D.C. 2011). Such an argument is insufficient to establish the causation element for purposes of stating a First Amendment retaliation claim.

        Ms. Baley's allegations as to each instance of retaliation against her inmate sources emphasize the importance of the inmates' speech – rather than her speech – as the motivating factor for the retaliation. For example, Ms. Bailey alleges that Mr. Fontanez – an inmate at F.C.I. Cumberland – was "interrogat[ed]" as "retaliat[ion] . . . for criticizing [BOP] <u>in his communications with Ms. Bailey</u>," in an attempt to "intimidate <u>him into ceasing any future communication</u> with" Ms. Bailey. Compl. ¶ 37 (emphasis added). As to Mr. Perry at U.S.P. Big Sandy, BOP officials at the facility "admitted" that Mr. Perry was "interrogated" "because of his previous night's phone call with Plaintiff," and that he was later "confined in the SHU for the next six months, <u>in retaliation for his communications with Plaintiff</u>." <u>Id</u>. ¶¶ 73-74, 79 (emphasis added). As to Mr. Vasquez at F.C.C. Hazelton, Ms. Bailey alleges that Mr. Vasquez was fired from his job in the prison "in retaliation <u>for providing Plaintiff with information</u>" about an incident that occurred at the facility. <u>Id</u>. ¶ 101 (emphasis added). As to Mr. Schenk at F.C.I. Cumberland, Ms. Bailey alleges that BOP officials told Mr. Schenk that they would retaliate against him – such as through "messing up" his release date – "if <u>he continued speaking</u> with Ms. Bailey." <u>Id</u>. ¶ 146 (emphasis added).[5]

_____

     [5]     Ms. Bailey also argues that the BOP retaliated against U.S.P. Beaumont inmate Baker by denying his request for a transfer to a medium-security facility. <u>See</u> Opp. at 35-36. Ms. Bailey provides very little information suggesting that this action was retaliatory. The only

Each of these allegations plainly demonstrates that the retaliation was motivated by the inmates' speech, not Ms. Bailey's speech. While it is conceivable that Ms. Bailey's speech could have also motivated the retaliation, she would "need to allege more by way of factual content to 'nudg[e]' [her] claim . . . 'across the line from conceivable to plausible.'" Ashcroft v. Iqbal, 556 U.S. at 683. Because she has not sufficiently alleged that her "constitutional speech was the 'but for' cause of the defendants' retaliatory action," Aref v. Holder, 774 F. Supp. 2d at 169, and indeed has directly alleged that the retaliatory actions were taken in response to the sources' speech, Ms. Bailey has not sufficiently stated a First Amendment retaliation claim.

     3.   Retaliation Against an Inmate Source for the Inmate Source's Speech

Ms. Bailey's final theory of a First Amendment retaliation claim is not viable. She argues that she can state a First Amendment retaliation claim by alleging that she was harmed by retaliation against her sources for her source's speech. See Opp. at 35-37. As articulated, Ms. Bailey is essentially attempting to bring the First Amendment retaliation claims of her sources on their behalf. Ms. Bailey makes a novel argument to get around this: a First Amendment retaliation claim prevents the government from retaliating against an individual for exercising their First Amendment rights, and that here, the government took retaliatory actions against her sources for her exercise of her "right to listen" or "receiv[e] information and ideas."

---

allegations in the complaint are that Mr. Baker stopped communicating with Ms. Bailey because "he feared that any further attempts to communicate with Ms. Bailey could cause Defendant to retaliate against him by denying the transfer," and that his transfer request was denied. Compl. ¶¶ 88-89. These allegations themselves negate the inference that the BOP's denial of Mr. Baker's transfer request was retaliatory since they reveal that the BOP's denial of his transfer request occurred at some unknown point after he had already stopped communicating with Ms. Bailey.

See Opp. at 36.  In other words, Ms. Bailey argues that she can state a First Amendment

retaliation claim where the "conduct protected by the First Amendment" that she engaged in was

receiving information rather than, as is typically the case, speech.  See Aref v. Holder, 774 F.

Supp. 2d at 169 (stating that the first element of a First Amendment retaliation claim is that the

plaintiff "engaged in conduct protected under the First Amendment").

        The Court is skeptical of Ms. Bailey's argument, and none of the cases she cites

involved a court concluding that a plaintiff had stated a First Amendment retaliation claim based

on the plaintiff's exercise of the "right to receive information and ideas."  Ms. Bailey is certainly

correct that the First Amendment establishes such a right, as the cases she cites establish.  See

Murthy v. Missouri, 603 U.S. 43, 75 (2024) (stating that the First Amendment protects the "right

to receive information and ideas") (citation omitted); Procunier v. Martinez, 416 U.S. at 417-18;

Thomas v. Collins, 323 U.S. 516, 534 (1945); Stanley v. Georgia, 394 U.S. 557, 564 (1969);

Lamont v. Postmaster Gen. of U. S., 381 U.S. 301, 307 (1965).  But none of the cases involved a

First Amendment retaliation claim that was premised on the "right to receive information."  See

Opp. at 37 (citing California First Amend. Coal. v. Calderon, 150 F.3d 976, 980 (9th Cir. 1998)

(plaintiff journalist had standing to bring a First Amendment claim challenging a restriction on

viewing executions); and Pinson v. United States Dep't of Just., 246 F. Supp. 3d 211, 224

(D.D.C. 2017) (retaliation claim brought by inmate plaintiff premised on various actions BOP

took against her while incarcerated), on reconsideration sub nom. Pinson v. U.S. Dep't of Just.,

514 F. Supp. 3d 232 (D.D.C. 2021)).

        The Court need not decide this issue, however, because Ms. Bailey's First

Amendment retaliation claim as formulated suffers from another defect:  a failure to plausibly

allege that the exercise of her First Amendment right – that is, her right to receive

information – was the "but for cause" of the BOP's retaliatory actions toward her inmate sources.
See Aref v. Holder, 774 F. Supp. 2d at 169. As discussed above, see supra Section III.B.2, Ms.
Bailey's complaint asserts only that the BOP retaliated against her inmate sources for their
speech rather than for her speech. While it is conceivable that the BOP's retaliation against the
inmate sources was caused by Ms. Bailey exercising her First Amendment right to receive
information, the allegations themselves do not plausibly suggest this. See Banneker Ventures,
LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("A claim crosses from conceivable to
plausible when it contains factual allegations that, if proved, would allow the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged.") (citation omitted).
The Court therefore concludes that Ms. Bailey has failed to state a First Amendment retaliation
claim because she has not sufficiently alleged a causal relationship between her exercise of
protected conduct and the retaliatory actions.

*      *      *

In sum, Ms. Bailey has failed to state a First Amendment retaliation claim under
any of the three theories she forwards. Ms. Bailey's First Amendment retaliation claim therefore
must be dismissed.

### C. Fifth Amendment

The Due Process Clause of the Fifth Amendment requires that no person be
deprived of life, liberty, or property without due process of law. See Mathews v. Eldridge, 424
U.S. 319 (1976). "'The fundamental requisite of due process of law is the opportunity to be
heard' at 'a meaningful time and in a meaningful manner.'" Alaska Commc'ns Sys. Holdings,
Inc. v. Nat'l Lab. Rels. Bd., 6 F.4th 1291, 1298 (D.C. Cir. 2021) (quoting Goldberg v. Kelly, 397
U.S. 254, 267 (1970)). The Fifth Amendment requires only that a person receive his or her due

42

process, not every procedural device that he or she may claim or desire.  Kropat v. F.A.A., 162

F.3d 129, 132 (D.C. Cir. 1998).  Before assessing what process was due, the Court must "first

determine whether constitutional safeguards apply at all, i.e., whether a private party has a

property or liberty interest that triggers Fifth Amendment due process protection."  Reeve

Aleutian Airways, Inc. v. United States, 982 F.2d 594, 598 (D.C. Cir. 1993); see Nelson's

Cabinetry, Inc. v. Blinken, 2025 WL 83027, at *10 ("To state a procedural due process claim, a

plaintiff must allege that an official deprived him of a liberty or property interest without

providing appropriate procedural protections.") (citation and internal quotation marks omitted).

        The parties do not dispute, and the Court has already explained in its earlier

opinion related to Ms. Bailey's motion for a preliminary injunction, that Ms. Bailey has a

protected liberty interest in "uncensored communication via TRULINCS."  Bailey v. Fed.

Bureau of Prisons, 2024 WL 3219207, at *12 (citing Procunier v. Martinez, 416 U.S. 396

(1974)).  The government's basis for seeking dismissal of Ms. Bailey's due process claim instead

rests on three arguments:  first, Ms. Bailey was not deprived of a protected liberty interest since

she was still able to communicate with inmates at the facility via an alternate email address;

second, Ms. Bailey was afforded adequate process; and third, Ms. Bailey's failure to avail herself

of the process made available to her requires dismissal of her due process claim.  See Mem.

at 35-40.  The Court rejects each of these arguments.

        First, the government argues that Ms. Bailey has not been deprived of a protected

liberty interest because she had alternative methods to communicate with inmates at the facilities

through TRULINCS – namely, she had a separate TRULINCS email account which was not

blocked.  See Mem. at 35.  This argument is unavailing for at least two reasons.  First, and as

explained above in the context of Ms. Bailey's First Amendment claim, the Court cannot

conclude at the motion to dismiss stage that Ms. Bailey was in fact able to communicate via TRULINCS with her sources at each of the seven facilities through two separate email addresses. See supra Section III.A. Second, as Ms. Bailey points out, the existence of alternative email addresses is not relevant to the due process inquiry. See Opp. at 38. Ms. Bailey has alleged that certain messages were rejected by BOP at some of the facilities, see id. ¶¶ 57 (F.C.I. Ray Brook); 85 (U.S.P. Beaumont), and that she was prevented from sending future messages through TRULINCS at each facility. See id. ¶¶ 57, 70, 84, 94, 121, 127. Ms. Bailey therefore has adequately alleged that she was deprived of a protected liberty interest. See Procunier v. Martinez, 416 U.S. at 418.

The government next argues that Ms. Bailey was afforded sufficient process. See Mem. at 38-40. The parties' arguments related to the exact procedural safeguards Ms. Bailey was entitled to is meaningfully lacking. It appears, however, that the parties agree that the Court should be guided by the Supreme Court's decision in Procunier v. Martinez. See Mem. at 39 ("All elements of Martinez have, thus, been satisfied . . . ."); Opp. at 38 (citing Martinez). In Procunier v. Martinez, the Supreme Court held that in the context of the censoring or restricting of inmate correspondence, the government must provide the following procedural safeguards: (1) notice "of the rejection of a letter written by or addressed to [the individual]"; (2) "a reasonable opportunity to protest that decision"; and (3) "complaints be referred to a prison official other than the person who originally disapproved the correspondence." Procunier v. Martinez, 416 U.S. at 418-19; see Benning v. Comm'r, Georgia Dep't of Corr., 71 F.4th 1324, 1329 (11th Cir. 2023). The government contends that it provided each of these procedural safeguards: (1) Ms. Bailey "received notice when the various facilities blocked her access;" (2) the notices provided the "general rationale for the block" and instructions on how to appeal

the block; and (3) the notice provided that the written appeal should be sent to the warden of the facility, not the "Special Investigative Services officer" responsible for instituting the block. Mem. at 38-39.

Ms. Bailey's opposition essentially boils down to an argument that these procedural safeguards were "illusory" as they did not provide meaningful information nor a meaningful opportunity to appeal the BOP's decision. See Opp. at 38-40. Ms. Bailey focuses primarily on the inadequacy of the block notifications she received and the appeal process. As to the block notifications, Ms. Bailey alleges in the complaint that the notifications she received did "not identify the communication(s) that Defendant claim[ed] violated its rules" nor the "scope of [the] restriction." Compl. ¶¶ 28, 129; see id. ¶ 94 (alleging that she received 133 notifications informing her that she had been blocked on TRULINCS across F.C.C. Hazelton). Such information, she avers, is "needed to pursue an informed appeal, or even to determine whether an appeal would be warranted." Opp. at 38. As to the appeal process, Ms. Bailey alleges that she pursued appeals of the blocks at F.C.I. Ray Brook and U.S.P. Big Sandy. Compl. ¶¶ 59-60, 64-66. As to F.C.I. Ray Brook, she alleges that the warden's response to her appeal – which was that "certain residents had added her to their approved contact lists without using her full, correct name" – failed to explain or justify the "wholesale, permanent block" of her TRULINCS access at the facility. Id. ¶¶ 59-60. As to U.S.P. Big Sandy, she alleges that the warden failed to respond to her appeal, id. ¶ 65, and that when she went to the Regional Director of the Mid-Atlantic Region, Christopher Gomez, to request a response to the appeal, he provided a "boilerplate assertion" – without identifying a particular communication – that Ms. Bailey's email address was being used to forward messages to other individuals in violation of BOP policy. Id. ¶ 67. When Ms. Bailey requested further information including the "identification of

45

the specific communications that purportedly violated BOP policy," the BOP official refused and "advised [Ms. Bailey] that she was free to submit a request for such information pursuant to the Freedom of Information Act."  Id. ¶ 69.

   These allegations, which the Court accepts as true as it must at this stage, do not inspire confidence in the procedural safeguards afforded to Ms. Bailey by the BOP.  The fact that Ms. Bailey pursued two appeals – one of which was never responded to by the warden of the facility as the BOP's notice provided for – and concluded the appeal process without knowing the message or messages that motivated the block or the scope of the block strongly suggests that the BOP's "process" is severely limited.  Further fact finding may reveal that these procedures were more substantive than Ms. Bailey has alleged in the complaint.  See Goldberg v. Kelly, 397 U.S. at 270 ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.") (quoting Greene v. McElroy, 360 U.S. 474, 496 (1959)).  At this stage, however, the Court concludes that Ms. Bailey has adequately alleged "that 'the procedures attendant upon that deprivation were constitutionally insufficient.'"  Roberts v. United States, 741 F.3d 152, 161 (D.C. Cir. 2014) (quoting Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).

   The government's final argument is that Ms. Bailey's due process claim must be dismissed as to five of the facilities – U.S.P. Beaumont, F.C.C. Hazelton, F.C.I. Marion, F.C.I. Pekin, and U.S.P. Florence-High – because she fails to allege that she availed herself of the process made available to her at those facilities.  See Mem. at 36-37.  The government points both to the fact that the block notifications Ms. Bailey received provided that she could appeal

the BOP's decision by submitting a written request to the warden and to the fact that she only submitted this request at two of the facilities – F.C.I. Ray Brook and U.S.P. Sandy.  See id. at 37.

Most of the cases the government relies on for its argument are inapposite because they involve instances where "procedural alternatives" exist.  See Chavis v. Garrett, 419 F. Supp. 3d at 38.  For example, in Chavis v. Garrett, Judge Kollar-Kotelly dismissed a plaintiff's due process claim where the plaintiff failed to pursue "two avenues" to judicial review under D.C. law.  Id. 38-39.  In other words, the plaintiff was not deprived of due process because statutes provided an avenue for review notwithstanding a governmental actor's failure to provide a process for review itself.  In English v. D.C., the D.C. Circuit similarly concluded that notwithstanding the defendant's alleged failure to provide adequate process, an alternative procedure under D.C. law could prevent a plaintiff from stating a due process claim since the law "provided [the plaintiff] with procedural protections sufficient to satisfy the requirements of the Fifth Amendment."  English v. D.C., 717 F.3d 968, 972 (D.C. Cir. 2013).  In the instant case, the government does not argue that an alternative mechanism provided by law was available to Ms. Bailey and that she did not avail herself of this mechanism.

Moreover, Ms. Bailey did avail herself of the process afforded to her by the BOP in connection with the blocks at F.C.I. Ray Brook and U.S.P. Big Sandy, and she has sufficiently alleged that the process provided was inadequate.  As Ms. Bailey points out, the cases cited by the government "make clear that inadequate procedures need not be pursued to futile ends." Opp. at 39; see Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) ("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate."); Chavis v. Garrett, 419 F. Supp. 3d at 38 (plaintiff must pursue procedural remedies if they are

"apparently adequate").  As discussed above, the pursuit of her two appeals at F.C.I. Ray Brook

and U.S.P. Big Sandy creates the inference that pursuit of appeals at each facility would have

been just as futile.  Accordingly, the Court concludes that her failure to pursue appeals at each

facility does not bar her ability to state a procedural due process claim, and therefore denies the

government's motion to dismiss the procedural due process claim.

### D.  APA Claim

Under the APA, a reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see Battineni v. Mayorkas, Civil

Action No. 22-1332 (PLF), 2024 WL 4367522, at *7 (D.D.C. Oct. 2, 2024).  "Review under the

APA is not available, however, where 'agency action is committed to agency discretion by

law.'"  Kondapally v. U.S. Citizenship & Immigr. Servs., 557 F. Supp. 3d 10, 25 (D.D.C. 2021)

(quoting 5 U.S.C. § 701(a)(2)).  "To determine whether a matter has been committed to agency

discretion," a court must "consider both the nature of the administrative action at issue and the

language and structure of the statute that supplies the applicable legal standards for reviewing

that action."  Sierra Club v. Jackson, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting Sec'y of Lab.

v. Twentymile Coal Co., 456 F.3d 151, 156 (D.C. Cir. 2006)).

While courts typically analyze whether a statute provides legal standards for

reviewing an agency action, such standards "may [also] be found in formal and informal policy

statements and regulations . . . ."  Physicians for Soc. Resp. v. Wheeler, 956 F.3d 634, 643 (D.C.

Cir. 2020) (quoting Steenholdt v. F.A.A., 314 F.3d 633, 638 (D.C. Cir. 2003)).  "In determining

whether administrative policies or internal statements establish judicially manageable standards,

courts look to whether statements '[impose] rights or obligations on the respective parties' and

whether an agency intended to transform a pronouncement into a binding norm." Seeger v. United States Dep't of Def., 306 F. Supp. 3d 265, 283 (D.D.C. 2018) (quoting Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987)); see Steenholdt v. F.A.A., 314 F.3d 633, 638 (D.C. Cir. 2003).  An agency can be found to have created a "binding norm" "if the statement's language, context, and available extrinsic evidence indicate the agency so intended."  Wildearth Guardians v. Salazar, 783 F. Supp. 2d 61, 72 (D.D.C. 2011).  "If, after reviewing all these sources, no judicially manageable standards are discernable, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts."  Styrene Info. & Rsch. Ctr., Inc. v. Sebelius, 944 F. Supp. 2d 71, 81 (D.D.C. 2013) (quoting Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002)) (internal quotation marks omitted); see also Steenholdt v. F.A.A., 314 F.3d at 638.

The crux of the parties' dispute is whether judicially manageable standards exist by which to judge the BOP's restrictions of Ms. Bailey's TRULINCS access.  See Mem. at 41-43; Opp. at 41-43; Reply at 20-21.[6]  The government argues that 18 U.S.C. § 4042(a) – which grants the BOP "charge of the management and regulation of all Federal penal and correctional institutions" – gives the BOP discretion to restrict TRULINCS users' access, and that the statute does not provide judicially manageable standards.  See Mem. at 42.  Ms. Bailey concedes that Section 4042(a) does not provide judicially manageable standards suggesting that actions taken pursuant to the statute are "committed to agency discretion" and thus unreviewable.

---

[6]    The government also argues that the BOP's restriction of Ms. Bailey's TRULINCS access is not a "final agency action" that is reviewable under the APA.  See Mem. at 40-41; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990) ("When . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'") (citing 5 U.S.C. § 704).  The Court does not reach this issue in light of its conclusion that the BOP's action in this case "is committed to agency discretion by law."

See Opp. at 41; see also Opp. at 42 (acknowledging that Section 4042 provides "no law for the Court to apply in reviewing [the BOP's] discretionary policy decision"). She contends, however, that the BOP's TRULINCS policy – the TRULINCS "Program Statement" – supplies the judicially manageable standards that the Court can use to assess the propriety of the BOP's TRULINCS restrictions under the APA. Id. at 42.

　　　　　The parties' arguments on this point are meager. More specifically, neither party substantively discusses the language of the TRULINCS Program Statement, and whether the language suggests that the program statement "impose[s] rights or obligations on the respective parties' and whether [the BOP] intended to transform a pronouncement into a binding norm." Seeger v. United States Dep't of Def., 306 F. Supp. 3d at 283 (cleaned up). The language of the particular administrative policies is critical to whether judicially manageable standards exist by which to judge the agency's action. See, e.g., Physicians for Soc. Resp. v. Wheeler, 956 F.3d at 643; Keats v. Becerra, 2021 WL 6102200, at *2 (D.C. Cir. Dec. 3, 2021) (per curium).

　　　　　Despite the parties' cursory arguments, the Court concludes that the TRULINCS Program Statement does not provide judicially manageable standards for at least three reasons. First, the language of the TRULINCS Program Statement in no way suggests that the BOP intended to limit the discretion afforded to it under 18 U.S.C. § 4042(a). In relevant part, the TRULINCS Program Statement states that the BOP may reject "[e]mails that would jeopardize the safety, security, or orderly operation of the correctional facility or the protection of the public and staff may be rejected for reasons that include, but are not limited to . . . ." certain situations. See FED. BUREAU OF PRISONS, PROGRAM STATEMENT – TRUST FUND/DEPOSIT FUND MANUAL (Mar. 14, 2018), www.bop.gov/policy/progstat/4500.12.pdf [hereinafter "TRULINCS Program

Statement"] at 137-38.[7]  The fact that the BOP states that its authority to reject certain messages

is "not limited to" the iterated list of situations indicates that it has maintained broad discretion in

determining the types of messages that "would jeopardize the safety, security, or orderly

operation of the correctional facility."  See id.  As to the BOP's authority to block users, while

the TRULINCS Program Statement lists types of blocks – i.e., "Bureau-wide Block," "Facility-

wide Block," and "Inmate-Specific Block," TRULINCS Program Statement at 135 – it does not

set forth any standard by which the block determination must be made.

   Ms. Bailey does not point to a specific portion of the TRULINCS Program

Statement containing such standards.[8]  Furthermore, the portion of the TRULINCS Program

Statement discussing the "Blocking of Email Address(es)" does not seem to relate to Ms. Bailey

as it is more focused on "blocks [ ] placed on a specific inmate account," not on accounts held by

---

   [7]  While the TRULINCS Program Statement is not attached to the Complaint, Ms. Bailey acknowledges that the TRULINCS Program Statement is incorporated by reference.  See Opp. at 40.  The Court therefore may consider the TRULINCS Program Statement in the context of the government's motion to dismiss.  See Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.").

   [8]  It is worth noting that a separate portion of the TRULINCS Program Statement states that "[i]t is important that staff ensure inmates are only restricted from using TRULINCS, or individual TRULINCS services, when absolutely necessary to protect the safety, security, or orderly operation of the correctional facility, or the protection of the public or staff." TRULINCS Program Statement at 130.  This general statement is not accompanied by further explanation providing judicially manageable standards, such as a "list [of] any standards by which a court could measure" the BOP's action.  Kondapally v. U.S. Citizenship & Immigr. Servs., 557 F. Supp. 3d at 26.  Moreover, the TRULINCS Program Statement itself states that "[p]ublic [m]essaging is the only exception to this approach, as it involves . . . the possibility of continuing criminal or other prohibited activity that may jeopardize the safety and security of the institution."  Program Statement at 130.  Accordingly, even if the Court were to conclude that the BOP's general statement that it will only restrict an inmate's access to TRULINCS if it is "absolutely necessary" provides a sufficient standard under which to review its restriction decisions, any such standard would not apply to the BOP's restriction of "public messaging" at issue in this case.

members of the public. Indeed, much of the TRULINCS Program Statement is concerned with inmates' use of TRULINCS, not the public's use. <u>See</u> TRULINCS Program Statement at 126 ("The Trust Fund Limited Inmate Computer System (TRULINCS) provides inmates with a computer system that does not jeopardize the safety, security, orderly operation of the correctional facility, or the protection of the public or staff."). In sum, the language of the TRULINCS Program Statement and the lack of any standards by which the BOP determines the appropriateness of blocking TRULINCS users' accounts suggests that the TRULINCS Program Statement does not "establish judicially manageable standards." <u>Seeger v. United States Dep't of Def.</u>, 306 F. Supp. 3d at 283.

       Second, the few courts that have considered the issue of whether the TRULINCS Program Statement provides judicially manageable standards for purposes of adjudicating an APA claim have concluded that it does not. <u>See</u> <u>Carter v. Fed. Bureau of Prisons</u>, Civil Action No. 22-2801 (BAH), 2024 WL 983277, at *2 n.3 (D.D.C. Mar. 7, 2024); <u>Lewandowski v. Bureau of Prisons</u>, Civil Action No. 19-15710 (RBK) (AMD), 2021 WL 5937671, at *4-6 (D.N.J. Dec. 16, 2021); <u>see also</u> <u>Sebolt v. LaRiva</u>, Civil Action No. 2:15-0353, 2017 WL 2271441, at *6 (S.D. Ind. May 23, 2017), <u>aff'd</u>, 749 F. App'x 458 (7th Cir. 2018); <u>Solan v. Zickefoose</u>, 530 F. App'x 109, 112 (3d Cir. 2013). In <u>Lewandowski v. Bureau of Prisons</u>, for example, Judge Kugler reasoned that the TRULINCS Program Statement "did 'not create entitlements enforceable under the APA'" because, <u>inter alia</u>, the "Program Statements 'can be altered at will,' and are 'not subject to rule-making proceedings so as to create a right under the [APA].'" <u>Lewandowski v. Bureau of Prisons</u>, 2021 WL 5937671, at *4 (quoting <u>Solan v. Zickefoose</u>, 530 F. App'x at 112 <u>and</u> <u>Robinson v. Sherrod</u>, 631 F.3d 839, 842 (7th Cir. 2011)). In <u>Carter v. Fed. Bureau of Prisons</u>, Judge Howell concluded that an inmate whose TRULINCS

access had been blocked could not state an APA claim because the BOP's decision was "committed to agency discretion." Carter v. Fed. Bureau of Prisons, 2024 WL 983277, at *2 n.3. Judge Howell reached this conclusion based on the BOP's "'wide discretion,' under 18 U.S.C. § 4042, 'to decide on appropriate methods of handling their wards,' as well as BOP's implementing 'regulations designed to achieve' the goal of securing the prison and protecting the public and thereby 'are subject to substantial deference.'" Id. (quoting Sebolt v. Samuels, 749 F. App'x at 460) (internal citations omitted). While the case before Judge Howell arguably can be distinguished by the fact that the plaintiff was an inmate rather than a member of the public like Ms. Bailey, the Court does not believe that this factual difference is material. There is no reason that the BOP's "wide discretion" in deciding on "appropriate methods of handling their wards" extends only to blocks of inmates' TRULINCS access.

Finally, Ms. Bailey "does not cite any case that reviews a correctional official's decision for compliance with BOP policy." Bailey v. Fed. Bureau of Prisons, 2024 WL 3219207, at *12. Each of the cases she cites involved a court assuming that the agency action was reviewable but nonetheless concluding that the plaintiff failed to state a claim. See, e.g., Castelli v. Garrett, Civil Action No. 7:19-1332 (KOB) (HNJ), 2021 WL 9059760, at *4-6 (N.D. Ala. Dec. 30, 2021) (dismissing plaintiffs' APA claim because it lacked merit), report and recommendation adopted, 2022 WL 2132847 (N.D. Ala. June 14, 2022); Solan v. Zickefoose, Civil Action No. 11-1895 (JBS), 2013 WL 1007665, at *8 (D.N.J. Mar. 11, 2013) (granting summary judgment in favor of defendant and dismissing plaintiff's APA claim on the merits); Doe v. Ortiz, Civil Action No. 18-2958 (RMB), 2019 WL 3432228, at *6-7 (D.N.J. July 30, 2019) (dismissing APA claim on the merits); Agofsky v. Bureau of Prisons, Civil Action No. 2:24-0051, 2024 WL 1991448 (BPH) (MKK), at *6 (S.D. Ind. May 6, 2024) (denying

plaintiff's motion for a preliminary injunction as it relates to plaintiff's APA claim since plaintiff had not shown likelihood of success on the merits of the APA claim).[9]  While hardly dispositive, the lack of any authority supporting Ms. Bailey's contention that judicial review of the BOP's decisions pertaining to TRULINCS access is appropriate under the APA further suggests that such decisions are committed to agency discretion and thus unreviewable.

In sum, the Court concludes that the TRULINCS Program Statement does not "suppl[y] the applicable legal standards for reviewing" the BOP's restriction of Ms. Bailey's TRULINCS access.  Sierra Club v. Jackson, 648 F.3d at 855.  The Court reaches this conclusion based on (1) the lack of language in the TRULINCS Program Statement suggesting the BOP intended to limit the broad discretion afforded to it under 18 U.S.C. § 4042; (2) the lack of standards in the TRULINCS Program Statement by which the BOP purports to make decisions blocking TRULINCS users' access; (3) the case law concluding that review of the BOP's actions taken pursuant to the TRULINCS Program Statement are not reviewable under the APA; and (4) the lack of case law to the contrary.  Because neither 18 U.S.C. § 4042 nor the TRULINCS Program Statement supply judicially manageable standards, the Court concludes that the BOP's actions in this case are "committed to agency discretion by law" and thus unreviewable under the APA.  See Kondapally v. U.S. Citizenship & Immigr. Servs., 557 F. Supp. 3d at 25.  Ms. Bailey's APA claim therefore must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Ramirez v. Blinken, 594 F. Supp. 3d 76, 88 (D.D.C. 2022) ("[T]he D.C.

---

[9]    Ms. Bailey also cites to Clark v. True, where the court suggested that the plaintiff could challenge the BOP's TRULINCS restriction by bringing an APA claim.  See Clark v. True, Civil Action No. 20-0049 (JPG), 2021 WL 3860461, at *4 (S.D. Ill. Aug. 30, 2021) ("Plaintiff might have also pursued declaratory or injunctive relief under the [APA]").  The court in Clark did not provide any additional analysis as to whether such a claim could appropriately be brought under the APA, and the Court therefore does not find this persuasive authority.

Circuit has clarified that whether a complaint has sought 'review of agency action committed to agency discretion by law' goes to failure to state a claim 'under Rule 12(b)(6), not . . . the jurisdictional provision of Rule 12(b)(1).'") (quoting <u>Sierra Club v. Jackson</u>, 648 F.3d 848, 854 (D.C. Cir. 2011)).

### *E.  Motion to Transfer*

As a final matter, the government moves to "transfer any surviving first amendment claims to the district where the respective prisons are located."  Mem. at 43 (capitalization omitted).  Importantly, the government makes its request to transfer contingent on the Court dismissing Ms. Bailey's due process and APA claims.  <u>See</u> Mem. at 43 ("If the Court dismisses the due process and APA claims, any remaining First Amendment TRULINCS or retaliation claims should be transferred to the prison districts where the alleged unlawful conduct occurred."); Reply at 22.  Because the Court will not dismiss Ms. Bailey's due process claim, the Court considers the government's request moot.

## IV.  CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss [Dkt. No. 21] is hereby GRANTED IN PART and DENIED IN PART.  Ms. Bailey's APA claims and First Amendment retaliation claim are dismissed in their entirety.  The government's motion to dismiss is denied as to Ms. Bailey's First Amendment and Due Process claims.  Furthermore, the government's request to transfer this case denied.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/11/25